UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TEACHERS INSURANCE AND ANNUITY
ASSOCIATION OF AMERICA,
COLLEGE RETIREMENT EQUITIES FUND,
TIAA-CREF EQUITY INDEX FUND,
TIAA-CREF REAL ESTATE SECURITIES FUND,
TIAA-CREF LARGE CAP VALUE INDEX FUND,
TIAA-CREF SMALL CAP BLEND INDEX FUND,
TIAA-CREF LIFE REAL ESTATE SECURITIES
FUND, TIAA-CREF LIFE EQUITY INDEX FUND,
SHEET METAL WORKERS' NATIONAL
PENSION FUND, UNION ASSET
MANAGEMENT HOLDING AG, KBC ASSET
MANAGEMENT NV, CORSAIR SELECT
100 L.P.,  CORSAIR SELECT MF LTD.,
CORSAIR CAPITAL PARTNERS L.P.,
CORSAIR SELECT L.P., CORSAIR CAPITAL
PARTNERS 100 L.P., CORSAIR CAPITAL
INVESTORS, LTD., THE CITY OF TAMPA
GENERAL EMPLOYEES RETIREMENT FUND,
PAUL MATTEN, SIMON ABADI,
MITCHELL ELLIS, BONNIE ELLIS, AND
BERNEY HARRIS, Individually and on Behalf
of All Others Similarly Situated,

Plaintiffs,

vs.

AMERICAN REALTY CAPITAL
PROPERTIES, INC., ARC PROPERTIES
OPERATING PARTNERSHIP L.P.,
AMERICAN REALTY CAPITAL
TRUST IV, INC., ARC CAPITAL LLC,
RCS CAPITAL CORPORATION,
RCS CAPITAL, LLC,  COLE REAL
ESTATE INVESTMENTS, INC.,

Civil Action No. _____

15 CV 00421



RECEIVED
JAN 20 2015
U.S.D.C. S.D. N.Y.
CASHIERS

CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

*[Caption continued on next page]*

————————————————————  x
:
:
:
NICHOLAS S. SCHORSCH,                          :
DAVID S. KAY, BRIAN S. BLOCK,                  :
EDWARD M. WEIL, PETER M. BUDKO,                :
BRIAN D. JONES, LISA PAVELKA                   :
MCALISTER, LISA BEESON, WILLIAM                :
KAHANE, LESLIE D. MICHELSON,                   :
WILLIAM G. STANLEY, EDWARD G.                  :
RENDELL, SCOTT J. BOWMAN,                      :
THOMAS A. ANDRUSKEVICH,                        :
SCOTT P. SEALY, SR., BRUCE D. FRANK,           :
NICHOLAS RADESCA, ABBY M. WENZEL,              :
ELIZABETH K. TUPPENY,                          :
CHRISTOPHER H. COLE, MARC T. NEMER,            :
JEFFREY C. HOLLAND, STEPHAN KELLER,            :
D. KIRK MCALLASTER, JR., LEONARD W.            :
WOOD, GRANT THORNTON LLP,                      :
J.P. MORGAN SECURITIES LLC,                    :
CITIGROUP GLOBAL MARKETS INC.,                 :
BARCLAYS CAPITAL INC.,                         :
BMO CAPITAL MARKETS CORP.,                     :
KEYBANC CAPITAL MARKETS INC.,                  :
JMP SECURITIES LLC,  LADENBURG                 :
THALMANN & CO. INC., REALTY CAPITAL            :
SECURITIES, LLC, CREDIT SUISSE                 :
SECURITIES (USA) LLC., MORGAN STANLEY          :
& CO. LLC, WELLS FARGO SECURITIES, LLC,        :
CAPITAL ONE SECURITIES, INC.,                  :
MERRILL, LYNCH, PIERCE, FENNER                 :
& SMITH, INC., DEUTSCHE BANK SECURITIES        :
INC., ROBERT W. BAIRD & CO.,                   :
JANNEY MONTGOMERY SCOTT, LLC,                  :
MIZUHO SECURITIES USA INC.,                    :
PNC CAPITAL MARKETS LLC, PIPER                 :
JAFFRAY & CO., and RBS SECURITIES INC.,        :
:
                    Defendants.                :
————————————————————  x

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ............................................................................................1

JURISDICTION AND VENUE ......................................................................................5

PARTIES ........................................................................................................................6

    Plaintiffs ...............................................................................................................6

    Defendants ............................................................................................................8

    Entity Defendants .................................................................................................8

    ARCP Management Defendants .........................................................................11

    ARCP Director Defendants.................................................................................14

    AR Capital Defendants ......................................................................................17

    ARCT IV Defendants ........................................................................................19

    Cole Defendants.................................................................................................20

    Grant Thornton LLP ..........................................................................................21

    Underwriter Defendants.....................................................................................23

CLASS ACTION ALLEGATIONS .............................................................................25

SUBSTANTIVE ALLEGATIONS ..............................................................................27

MATERIALLY FALSE AND MISLEADING STATEMENTS
MADE DURING THE CLASS PERIOD.......................................................................35

ARCP ACKNOWLEDGES THAT ITS  FINANCIAL STATEMENTS CANNOT
BE RELIED UPON AND  THAT IT FALSIFIED ITS REPORTED AFFO ..............................77

MCALISTER FILES HER VERIFIED COMPLAINT................................................85

ARCP'S FINANCIAL REPORTING DURING THE CLASS PERIOD WAS
MATERIALLY FALSE AND MISLEADING................................................................87

ADDITIONAL SCIENTER ALLEGATIONS ..........................................................106

APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET DOCTRINE ................................................................108

**Page**

APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD CREATED THE MARKET FOR  THE FEBRUARY 2014 PLACEMENT ..............110

LOSS CAUSATION/ECONOMIC LOSS ................................................................111

ADDITIONAL ALLEGATIONS RELATING TO ARCP OFFERINGS ..................114

    CLAIMS FOR RELIEF ..............................................................117

    FIRST CLAIM FOR RELIEF
    for Violation of §11 of the 1933 Act ............................................117

    SECOND CLAIM FOR RELIEF
    for Violation of §12(a)(2) of the 1933 Act ....................................120

    THIRD CLAIM FOR RELIEF
    for Violation of §15 of the 1933 Act ............................................123

    FOURTH CLAIM FOR RELIEF
    for Violation of §14(a) of the 1934 Act and
    SEC Rule 14a-9 Promulgated Thereunder ....................................125

    FIFTH CLAIM FOR RELIEF
    for Violation of §10(b) of the 1934 Act and
    SEC Rule 10b-5 Promulgated Thereunder ....................................126

    SIXTH CLAIM FOR RELIEF
    for Violation of §20(a) of the 1934 Act ........................................127

PRAYER FOR RELIEF ........................................................128

JURY TRIAL DEMANDED ..................................................129

Plaintiffs, by their undersigned attorneys, on behalf of themselves and the class they seek to represent, for their Complaint for Violations of the Federal Securities Laws Seeking Damages and Equitable Relief (the "Complaint"), allege the following upon knowledge as to their own acts and upon the investigation conducted by their counsel.  The investigation included examining and analyzing information relating to the relevant time period obtained from public and proprietary sources – including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings, the sworn allegations in *Lisa Pavelka McAlister v. American Realty Capital Properties, Inc., et al.*, Index No. 162499/2014 (Sup. Ct. N.Y. Cnty.), other court filings related to American Realty Capital Properties, Inc. ("ARCP" or the "Company"), public reports, releases, investor presentations, published interviews, news articles and other media reports, interviews with former employees of the Company, and reports of securities analysts and investor advisory services.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of those who purchased or otherwise acquired ARCP securities, including ARCP common stock, preferred stock and debt securities, as well as those who traded in option contracts on ARCP stock between May 6, 2013 and October 29, 2014 (the "Class" and the "Class Period"), seeking to pursue remedies under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("1933 Act" or "Securities Act"), and Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 ("1934 Act" or "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Defendant ARCP is a commercial Real Estate Investment Trust ("REIT"), which owns single-tenant freestanding commercial properties subject to medium-term leases with credit-quality tenants.  ARCP completed its initial public offering ("IPO") on September 7, 2011, raising

$69.75 million.  At year-end 2011, ARCP remained a relatively modest-sized entity, with approximately $132 million in assets.  By the beginning of the Class Period, however, ARCP embarked on an acquisition binge fueled by the sale of billions of dollars of equity and debt securities and the use of ARCP stock as currency.  Within 18 months, the Company expanded exponentially into a $21 billion behemoth via a series of complicated and oftentimes opaque related-party transactions, with ARCP at the center of a complex web of dozens of companies masterminded and controlled by Defendant Nicholas S. Schorsch ("Schorsch").  ARCP's dramatic growth via multi-billion dollar purchases of related-party REITs and thousands of commercial properties was designed to, and did, generate hundreds of millions of dollars in transactional fees and "performance-related" compensation payments for Defendant Schorsch and Schorsch-controlled entities.

3.      Defendants' scheme and wrongful course of business alleged herein – involving the intentional misstatement of, *inter alia*, a financial metric called Adjusted Funds from Operations ("AFFO") – reached its apex in the second quarter of 2014 ("2Q14"), when ARCP reported that it had increased its holdings to 4,429 commercial properties, and generated quarterly revenue of $382 million.  Most importantly to investors, the Company reported AFFO – the key metric analysts and investors rely upon for assessing a REIT's attractiveness and performance – of $205.3 million, up 429% compared to the same period in the prior year.

4.      On October 29, 2014, the week before ARCP was to report its third-quarter 2014 ("3Q14") financial results, the Company stunned the market by announcing that it had overstated its AFFO for the first and second quarters of 2014, and that senior Company executives had been aware of that falsity but intentionally did not correct it.  Moreover, the Company admitted that ARCP's falsification of AFFO for 2Q14 was done to cover up the known misstatement made in the first

quarter, and that, during the second quarter, the Company had also intentionally understated its net loss.  The Company told investors not to rely upon its financial results for the full year ended December 31, 2013, or the first and second quarters of 2014, indicating that the financial fraud that took place at ARCP was perpetrated by former Chief Financial Officer ("CFO") Brian Block ("Block") and former Chief Accounting Officer ("CAO") Lisa Pavelka McAlister ("McAlister"), who had been asked to resign.

5.      The market's reaction was swift and severe.  The price of ARCP securities collapsed in response to the revelations of accounting fraud being perpetrated in ARCP's corporate suite, with the price of ARCP common stock dropping by $4.53 per share, or 36.6%, to $7.85, before recovering to close at $10 per share later that day, on volume of more than 231 million shares, or more than 27 times the average daily trading volume during the Class Period.

6.      The reaction of regulators and the criminal authorities was similarly swift, as *Reuters* and *The Wall Street Journal* almost immediately reported that the FBI and the United States Attorney's Office were conducting criminal investigations of the Company, and that the SEC had issued subpoenas and launched its own investigation.

7.      At or around this same time, ARCP was in the process of completing a $700 million sale of Cole Capital Partners, LLC and Cole Capital Advisors, Inc. (collectively, "Cole Capital") to another Schorsch controlled entity, RCS Capital Corporation ("RCAP").  And although the transaction was scheduled to close the following week, it fell through as a direct result of the announcement, with RCAP citing the "recent disclosures by [ARCP] . . . on October 29, 2014" in terminating the transaction.  Additionally, tens of thousands of independent broker-dealers suspended sales of ARCP and Cole Capital products (among other, related products), as did clearing and custody giants Fidelity, Pershing, and Schwab.

8.      By mid-December 2014, ARCP had also been compelled to announce that:

- Schorsch had stepped down as Executive Chairman of the Company and terminated his roles at many of the other affiliated companies;

- David S. Kay ("Kay"), who had taken over as CEO just over two months earlier, had resigned that position and also stepped down from the Company's Board of Directors; and

- Lisa Beeson ("Beeson") had stepped down as President and Chief Operating Officer ("COO").

The Company represented that these actions were necessary to "stabilize the company and . . . to strengthen future leadership and strategy, improve governance, and complete a separation from Nick Schorsch and his affiliates."

9.      On December 18, 2014, it became apparent why every senior executive employed by the Company during the Class Period – its Chairman, CEO, COO, CFO, and CAO – had been asked to leave the Company or been terminated.  McAlister, who had purportedly resigned from the Company as a result of her role in the misconduct, sued the Company, Schorsch, and Kay in the Supreme Court of the State of New York, alleging, in a Verified Complaint, that she had "repeatedly informed Mr. Schorsch, Mr. Kay, and senior management" of the accounting problems in February 2014 – eight months before they claim to have learned of them – and was instructed by Kay not to change or correct the improper reporting.  She also alleged that Schorsch directed her to take steps to conceal the previous improper reporting, and that when she contacted the Company's outside auditors, Grant Thornton LLP ("Grant Thornton"), to express her concern, she was instructed to sign the Company's 2Q14 financial statements "as is."  McAlister also alleged that she was fired in retribution for bringing the accounting issues in question to light, and to make her a scapegoat for the accounting chicanery committed by Company and its senior leadership.

10.     The overstatement of AFFO in the first quarter of 2014 was neither a simple "error" nor the conduct of a rogue employee.  ARCP Board members and senior executives were intent on

disguising the Company's faltering AFFO to sustain their inexorable expansion campaign, to facilitate related-party transactions that were generating massive fees, and to trigger exorbitant awards under the Company's incentive compensation program.

11. Defendants' misconduct inflated the price of ARCP securities, which in turn allowed Defendant Schorsch and ARCP's senior insiders to consummate billions of dollars of acquisitions using ARCP securities as consideration. And, when the truth about ARCP's operational performance and financial results began to reach the market, ARCP's market capitalization and the value of its securities collapsed by more than $3 billion, inflicting significant harm on Plaintiffs and the other members of the Class.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o], and Sections 10(b), 14(a), and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

13. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v], Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §1331.

14. Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District.

15. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NASDAQ stock market (the "NASDAQ").

- 5 -

## PARTIES

**A.    Plaintiffs**

16.    Proposed Lead Plaintiff Teachers Insurance and Annuity Association of America ("TIAA"), College Retirement Equities Fund, TIAA-CREF Equity Index Fund, TIAA-CREF Real Estate Securities Fund, TIAA-CREF Large Cap Value Index Fund, TIAA-CREF Small Cap Blend Index Fund, TIAA-CREF Life Real Estate Securities Fund, and TIAA-CREF Life Equity Index Fund (collectively, "TIAA-CREF") is a Fortune 100 financial services organization.

17.    TIAA was founded in 1918 and is a joint stock life insurance company incorporated in New York with its principal place of business in New York. TIAA offers traditional annuities, as well as variable annuities that invest, among other things, in real estate and in mutual funds that invest in equities and fixed income investments. College Retirement Equities Fund ("CREF"), a companion organization to TIAA, is a not-for-profit membership corporation incorporated in New York with its principal place of business in New York. Together, TIAA and CREF form the principal retirement system for the nation's education and research communities, which is one of the largest retirement systems in the world based on assets under management.

18.    As of October 31, 2014, TIAA-CREF served over 5 million individuals overall (with more than 3.7 million clients in institutional retirement plans) and manages in excess of $500 billion in assets. As set forth in TIAA-CREF's certification previously filed with the Court and incorporated herein by reference, TIAA-CREF purchased and/or acquired ARCP securities during the Class Period and was damaged thereby.

19.    Proposed Lead Plaintiff Sheet Metal Workers' National Pension Fund ("National Pension Fund"), with assets of nearly $4 billion, is a defined benefit pension fund organized to provide retirement benefits to sheet metal workers and their spouses. As set forth in National Pension Fund's certification attached hereto, National Pension Fund purchased and/or acquired

ARCP securities, including ARCP common stock issued in the Cole Merger (defined below in ¶34) and ARCP common stock in May 21, 2014 offering, as well as ARCP debt securities, during the Class Period and was damaged thereby.

20.     Proposed Lead Plaintiff Union Asset Management Holding AG ("Union") is a large and sophisticated investment company based Germany that manages assets of approximately $279 billion.  As set forth in Union's certification previously filed with the Court and incorporated herein by reference, Union purchased and/or acquired ARCP debt securities during the Class Period and was damaged thereby.

21.     Proposed Lead Plaintiff KBC Asset Management NV ("KBC") is a large and sophisticated investment company based in Belgium that manages assets of approximately $212 billion.  As set forth in KBC's certification previously filed with the Court and incorporated herein by reference, KBC purchased and/or acquired ARCP securities, including ARCP common stock issued in the Cole Merger, during the Class Period and was damaged thereby.

22.     Plaintiffs Corsair Select 100 L.P., Corsair Select MF Ltd., Corsair Capital Partners L.P., Corsair Select L.P., Corsair Capital Partners 100 L.P., and Corsair Capital Investors, Ltd. (collectively "Corsair") are private equity firms focused on investing in the global financial services industry, comprised of a group of private individual funds that operate under the common discretion of Corsair Capital Management, L.P., which makes decisions for the Corsair funds.  As set forth in its certification previously filed with the Court, and incorporated herein, Corsair purchased and/or acquired ARCP securities, including ARCP common stock issued in the Cole Merger and in the May 21, 2014 offering, during the Class Period and was damaged thereby.

23.     Plaintiff the City of Tampa General Employees Retirement Fund ("Tampa") is a defined benefit pension fund organized to provide retirement benefits to City of Tampa employees

and their spouses.  As set forth in its certification previously filed with the Court, and incorporated herein, Tampa purchased and/or acquired ARCP securities, including ARCP common stock issued in the May 21, 2014 offering, during the Class Period and was damaged thereby.

24.     Plaintiff Paul Matten purchased and/or acquired ARCP securities, including ARCP Series F Preferred stock issued in the ARCT IV Merger (defined below in ¶30), and option contracts on ARCP stock, during the Class Period as set forth in his certification previously filed with the Court and incorporated herein, and was damaged thereby.

25.     Plaintiff Simon Abadi ("Abadi") purchased and/or acquired ARCP securities, including ARCP common stock issued in the Cole Merger and ARCP common stock issued in the May 21, 2014 offering, during the Class Period, as set forth in his certification previously filed with the Court and incorporated herein, and was damaged thereby.

26.     Plaintiffs Mitchell Ellis and Bonnie Ellis purchased and/or acquired ARCP securities, including ARCP Series F Preferred stock issued in the ARCT IV Merger, during the Class Period as set forth in their certifications previously filed with the Court and incorporated herein, and were damaged thereby.

27.     Plaintiff Berney Harris purchased and/or acquired ARCP securities and contracts to purchase ARCP stock, during the Class Period as set forth in his certification previously filed with the Court and incorporated herein, and was damaged thereby.

## B.     Defendants

### Entity Defendants

28.     ARCP is a corporation organized and existing under the laws of the state of Maryland, maintains its headquarters at 405 Park Avenue, 15th floor, New York, New York 10022, and qualifies as a REIT for U.S. federal income tax purposes.  ARCP's common stock began trading on The NASDAQ Capital Market under the symbol "ARCP" on September 7, 2011.  On

February 28, 2013, ARCP common stock was transferred to The NASDAQ Global Select Market, or the NASDAQ.  ARCP owns and acquires freestanding commercial real estate leased on a medium term basis pursuant to what are  colloquially referred to as "Triple Net Leases," primarily to investment credit rated and other creditworthy tenants.  ARCP is a subsidiary of AR Capital, which is a subsidiary of RCS Capital, the ultimate parent entity of the Schorsch-related empire. Substantially all of ARCP's business is conducted through its operating partnership, ARC Properties, of which ARCP is the sole general partner.

29.   ARC Properties Operating Partnership L.P. ("ARC Properties") is a subsidiary and the operating partnership of ARCP.  ARCP is ARC Properties' sole general partner.  As of June 30, 2014, ARCP owned 97.3% of the common equity interests in ARC Properties, and certain affiliates of ARCP are limited partners and own an additional 1.7%.  ARC Properties is organized under the laws of the state of Delaware and lists its address as 405 Park Avenue, 15th Floor, New York, New York 10022.

30.   American Realty Capital Trust IV, Inc. ("ARCT IV") was a Maryland corporation incorporated in February 2012 that qualified as a REIT for U.S. federal income tax purposes.  In June 2012, ARCT IV commenced an initial public offering and by September 19, 2013, had more than 71 million shares of common stock outstanding.  ARCT IV's principal executive offices were located at 405 Park Avenue, 15th Floor, New York, New York 10022.  On January 3, 2014, ARCT IV merged into ARCP (the "ARCT IV Merger").  Before the ARCT IV Merger, Schorsch, Weil, Stanley, Budko and Block held executive officer and/or director positions at ARCT IV.

31.   AR Capital LLC ("AR Capital") is a Delaware limited liability company which provided management and advisory services to ARCP and its affiliates.  AR Capital is a subsidiary of RCS Capital and is directly or indirectly owned by Schorsch, Kahane, Budko, Block and Weil and

controlled by Schorsch and Kahane.  AR Capital also owns ARC Properties Advisors, LLC, a Delaware limited liability company, which served as ARCP's external manager prior to January 8, 2014, and for which Schorsch served as chief executive officer ("CEO").  AR Capital is located at 405 Park Avenue, 12th Floor, New York, New York 10022.  During the Class Period, Schorsch, Weil, and Budko held executive officer positions as AR Capital.

32.     RCS Capital Corporation ("RCAP") is a corporation whose stock is traded on the NYSE using the ticker symbol "RCAP."  RCAP is a full-service investment firm with operating subsidiaries including retail advice services, wholesale distribution, investment banking, capital markets, investment research, investment management and crowdfunding.  RCAP is externally managed by RCS Capital Management, LLC, an entity directly or indirectly controlled by Schorsch and Kahane, its co-CEOs.  RCAP served as a "structuring advisor" on the offerings described in ¶352.  RCAP is located at 405 Park Avenue, 14th Floor, New York, New York 10022.  During the Class Period, Schorsch, Weil, Kahane, Budko and Jones held executive officer and/or director positions at RCAP.

33.     RCS Capital, LLC ("RCS Capital") is a multi-platform investment and financial services firm.  Through its subsidiaries, RCS Capital offers real estate investment trust management, securities brokerage, investment banking, transaction management, program management, risk analysis and portfolio management.  RCS Capital has two subsidiaries AR Capital, whose subsidiaries include ARCP and ARCT IV, and RCAP Holdings, LLC., of which RCAP is a subsidiary.  During the Class Period, Schorsch was Chairman of RCS Capital.

34.     Cole Real Estate Investments, Inc. (formerly known as Cole Credit Property Trust III, Inc.) ("Cole Inc.") was a Maryland corporation incorporated in January 2008 that elected to be taxed

as a REIT for U.S. federal income tax purposes.  On February 7, 2014, Cole Inc. merged with ARCP (the "Cole Merger") and became a wholly owned subsidiary of ARCP.

**ARCP Management Defendants**

35.    Schorsch founded ARCP in 2010, and served as its Company's CEO and Chairman of its Board of Directors during the Class Period.  Effective October 1, 2014, Schorsch ceased serving as the Company's CEO.  Schorsch remained Chairman until December 15, 2014, when he "stepped down" from the Company's Board of Directors.  During the Class Period, Schorsch also served and/or continues to serve as an officer and/or director at numerous related entities.[1]  Throughout the Class Period, Schorsch took the actions and/or made the statements detailed herein in his capacity as an officer, member and/or director of ARCP, AR Capital, RCAP, RCS Capital, ARC Properties, ARCT IV as well as the other entities listed above in which he held ownership, executive and/or director positions.

---

[1]    These include RCS Capital Management, LLC (CEO); RCAP Holdings LLC (Chairman and CEO); American Realty Capital Global Trust, Inc. (Chairman and CEO); American Realty Capital Global Trust, Inc. II (Chairman); AR Capital Acquisition Corp. (Chairman); ARC Properties Advisors, LLC (CEO); American Realty Capital Trust V, Inc. (Chairman and CEO); Corporate Income Properties – ARC, Inc. (President and Director); American Realty Capital Daily Net Asset Value Trust, Inc. (Chairman and CEO); American Realty Capital Healthcare Trust, Inc. (Chairman and CEO); American Realty Capital Healthcare Trust II, Inc. (Chairman); American Realty Capital Healthcare Trust III (Chairman); American Realty Capital Hospitality Trust, Inc. (Chairman); American Realty Capital New York City REIT, Inc. (Chairman and CEO); New York REIT (Chairman and CEO); American Realty Capital – Retail Centers of America II, Inc. (Chairman and CEO); ARC Realty Finance Trust ( Chairman and CEO); American Realty Capital – Retail Centers of America, Inc. (Chairman and CEO); American Realty Capital Trust Advisors, Inc. (Chairman and CEO); AR Capital Acquisition Corp. (Chairman); American Realty Capital Trust IV, Inc. (Chairman and CEO); Cole Corporate Income Trust, Inc. (Chairman, President and CEO); Cole Credit Property Trust, Inc. (Chairman and CEO); Cole Credit Property Trust IV, Inc. (Chairman, President and CEO); Cole Credit Property Trust V, Inc. (Chairman);   Cole Office & Industrial REIT, Inc. (Chairman, President and CEO); Cole Real Estate Income Strategy, Inc. (Chairman, President and CEO); Phillips Edison – ARC Grocery Center REIT II (CEO); Business Development Corporation of America (Chairman and CEO).

36.     Kay served as ARCP's President from December 2013 until October 1, 2014, when he replaced Schorsch as the Company's CEO and also joined the Company's Board of Directors.  On December 15, 2014, ARCP announced that Kay "stepped down" as the Company's CEO as well as from its Board of Directors.  During the Class Period, Kay took the actions and/or made the statements detailed herein in his capacity as an officer, member and/or director of ARCP.

37.     Block served as ARCP's CFO and Executive Vice President since its formation in December 2010 and was appointed as its Treasurer and Secretary, effective December 2013.  On October 28, 2014, Block abruptly "resigned" from the Company.  Block currently remains Executive Vice President and CFO of AR Capital, as well as a number of publicly registered, non-traded direct investments sponsored by AR Capital and/or controlled by Schorsch.  Block also served as a director of RCAP from February 2013 until July 2014.  Throughout the Class Period, Block took the actions and/or made the statements detailed herein in his capacity as an officer, member and/or director of ARCP, AR Capital, and RCAP.

38.     Edward M. Weil ("Weil") served as ARCP's President, Treasurer, Secretary and a Director from its formation until January 2014 when he ceased functioning as an executive officer.  Weil remained a member of ARCP's Board of Directors through June 2014, when he "resigned" from the Board in an effort to "enhance corporate governance."  Weil also served as President, Treasurer, Secretary and Director of ARCT IV from its formation in February 2012 until its merger with ARCP.  Weil is currently President and COO at AR Capital under the name "Michael Weil," where Schorsch is Chairman of the Board and CEO.  Additionally, he currently serves as CEO of RCAP.  Prior to being appointed CEO of RCAP, Weil was the President, Treasurer, Secretary and a Director of RCAP.  During the Class Period, Weil served and/or continues to serve as an officer

- 12 -

and/or director at numerous related entities.[2]  Throughout the Class Period, Weil took the actions and/or made the statements detailed herein in his capacity as an officer, member and/or director of ARCP, AR Capital, RCAP, and ARCT IV.

39.    Peter M. Budko ("Budko") was ARCP's Executive Vice President and Chief Investment Officer from December 2010 until January 8, 2014.  During the Class Period, Budko served and/or continues to serve as an officer and/or director at numerous related entities, including: AR Capital (Director); RCAP (Director and Chief investment Officer); American Realty Capital Global Trust, Inc. (Executive Vice President); Business Development Corporation of America (President and CEO); and American Realty Capital – Retail Centers of America II, Inc. (Chief Investment Officer).  Throughout the Class Period, Budko took the actions and/or made the statements detailed herein in his capacity as an officer, member and/or director of ARCP, AR Capital, and RCAP as well as the other entities listed above in which he held ownership, executive and/or director positions.

40.    Brian D. Jones ("Jones") was ARCP's COO from February 2013 until November 2013.  Since December 2013, Jones has been the CFO, Assistant Secretary and Manager of RCAP. Jones also has served as head of the investment banking division of RCAP since February 2013. Jones served as CFO and treasurer of ARCT from its internalization in March 2012 until the close of its merger with Realty Income Corporation in January 2013.  Prior to ARCT's internalization, Jones served as senior vice president, managing director and head of investment banking at RCAP and

---

[2]    These include New York Recovery REIT (Executive Officer); Phillips Edison – ARC Shopping Center REIT (Executive Vice President and Secretary); Phillips Edison – ARC Grocery Center REIT II (President, CEO, Treasurer and Secretary); American Realty Healthcare Trust, Inc. (Executive Officer); American Realty Capital Daily Net Asset Value Trust, Inc. (Director and Executive Officer); American Realty Capital – Retail Centers of America, Inc. (Executive Officer); American Realty Global Trust, Inc. (Director and Executive Officer); American Realty Healthcare Trust II (President, CEO, Treasurer and Secretary); and Business Development Corporation of America (Executive Vice President and Secretary).

ARC Advisory Services, LLC from September 2010 through February 2012.  Throughout the Class Period, Jones took the actions and/or made the statements detailed herein in his capacity as an officer, member and/or director of ARCP, RCAP, as well as the other entities listed above in which he held ownership, executive and/or director positions.

41.     McAlister served as ARCP's Senior Vice President and CAO from November 4, 2013 through October 28, 2014, when she was fired.  During the Class Period, McAlister took the actions and/or made the statements detailed herein in her capacity as an officer ARCP.

42.     Beeson began serving as ARCP's COO beginning on November 7, 2013, and also became President on October 1, 2014.  On December 15, 2014, Beeson "stepped down" as President and COO.  During the Class Period, Beeson took the actions and/or made the statements detailed herein in her capacity as an officer ARCP.

43.     The defendants listed in ¶¶35-42 above are collectively referred to as the "ARCP Management Defendants."

44.     Defendants Schorsch, Weil, Kay, Budko, Block and Beeson are identified in the Proxy Statements related to the ARCT IV Merger and/or Cole Merger as participants in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein in ¶¶114-15, 124-26, 131, 133-37, 145-53, and 159, relating to those mergers.

**ARCP Director Defendants**

45.     William Kahane ("Kahane") was a member of ARCP's Board of Directors from February 2013 until June 24, 2014, when he resigned from the Board. Kahane had previously served as a director and executive officer of the Company from December 2010 until March 2012.  Between November 2010 and March 2012,  Kahane was an executive officer of ARC Property Advisors, ARCP's external manager.  Kahane and Schorsch co-founded AR Capital.  During the Class Period,

Kahane also served and/or continues to serve as an officer and/or director at numerous related entities.[3] Throughout the Class Period, Kahane took the actions and/or made the statements detailed herein in his capacity as an officer, member and/or director of ARCP, RCAP, and AR Capital as well as the other entities listed herein in which he held ownership, executive and/or director positions.

46.     Leslie D. Michelson ("Michelson") served as a member of ARCP's Board of Directors of ARCP during the Class Period.  During the Class Period, Michelson also served as a Director at American Realty Capital Healthcare Trust, Inc. and Business Development Corporation of America.  Throughout the Class Period, Michelson took the actions and/or made the statements detailed herein in his capacity as an officer, member and/or director of ARCP, American Realty Capital Healthcare Trust, Inc. and Business Development Corporation of America.

47.     William G. Stanley ("Stanley") was appointed as an ARCP Director in connection with the Company's acquisition of ARCT IV in January 2014, and remained a Director through the end of the Class Period.  Stanley is the current Chairman and CEO at ARCP, assuming those roles in December 2014 when Schorsch and Kay terminated their employment at ARCP.  Formerly, Stanley served as a Director of two REITs sponsored by AR Capital, as a Director of a non-traded business development company sponsored by AR Capital, and was appointed as a director of ARCT IV in January 2013.  When Stanley became Chairman and CEO in December 2014, the Company announced that Stanley had resigned, or was in the process of resigning, his positions with all

---

[3]     These include RCAP (CEO and Director); American Realty Capital Healthcare Trust, Inc. (Director); American Realty Capital Healthcare Trust II, Inc. (Director); American Realty Capital Healthcare Trust III, Inc. (Director); American Realty Capital New York Recovery REIT, Inc. (Director); American Realty Capital – Retail Centers of America, Inc. (Director); and American Realty Capital – Retail Centers of America II, Inc. (Director, COO, Treasurer and Secretary); Phillips Edison – ARC Shopping Center REIT (Director); Phillips Edison – ARC Shopping Center REIT II (Director); American Realty Capital Hospitality Trust, Inc. (CEO); Business Development Corporation of America (Director); Cole Real Estate Income Strategy (Daily NAV), Inc. (Director); Cole Credit Property Trust (Director).

entities (other than ARCP) related to Schorsch.[4]  Throughout the Class Period, Stanley took the actions and/or made the statements detailed herein in his capacity as an officer, member and/or director of ARCP, ARCT IV as well as the other entities listed herein in which he held ownership, executive and/or director positions.

48.  Edward G. Rendell ("Rendell") served as an ARCP Board member throughout the Class Period.  During the Class Period, Rendell also served and/or continues to serve as an officer and/or director at numerous related entities, including: American Realty Capital Trust (Director) and American Realty Capital – Retail Centers of America, Inc. (Director).  Throughout the Class Period, Rendell took the actions and/or made the statements detailed herein in his capacity as an officer, member and/or director of ARCP as well as the other entities listed above in which he held ownership, executive and/or director positions.

49.  Scott J. Bowman ("Bowman") served as an ARCP Board member during the Class Period until September 9, 2014.  During the Class Period, Bowman served and/or continues to serve as an officer and/or director at numerous related entities, including: American Realty Capital Global Trust, Inc. (Director and CEO); American Realty Capital Daily Net Asset Value Trust, Inc. (Director); and American Realty Capital Trust III (Director).  Throughout the Class Period, Bowman took the actions and/or made the statements detailed herein in his capacity as an officer, member and/or director of ARCP as well as the other entities listed above in which he held ownership, executive and/or director positions.

---

[4]  These include Business Development Corporation of America, Business Development Corporation of America II, American Realty Capital, Retail Centers of America, Inc., and New York REIT Inc.  During the Class Period, Stanley served and/or continues to serve as an officer and/or director of other related entities, including:  New York recovery REIT (Director); American Realty Capital – Retail Centers of America, Inc. (Director); Business Development Corporation of America (Director).

50.     Thomas A. Andruskevich ("Andruskevich") served as an ARCP Board member since the Company's acquisition of Cole Inc. in February 2014.  Andruskevich previously served as a Director of Cole Inc. from October 2008 until Cole Inc.'s merger with ARCP in February 2014. During the Class Period, Andruskevich took the actions and/or made the statements detailed herein in his capacity as an officer, member and/or director of ARCP and Cole Inc.

51.     Scott P. Sealy, Sr. ("Sealy") was appointed as an ARCP Board member as a result of the Company's acquisition of Cole Inc. in February 2014.  Sealy previously served as a director of Cole Inc.  Sealy resigned from ARCP's Board effective June 10, 2014.  During the Class Period, Sealy took the actions and/or made the statements detailed herein in his capacity as an officer, member and/or director of ARCP and Cole Inc.

52.     Bruce D. Frank ("Frank") served as an ARCP Board member from July 8, 2014 through the end of the Class Period.

53.     The defendants listed in ¶¶45-52 above, as well as Schorsch, Kay and Weil, are collectively referred to as the "ARCP Director Defendants."

54.     Defendants Kahane, Michelson, Rendell and Bowman are identified in the Proxy Statements related to the ARCT IV Merger and/or Cole Merger as participants in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein in ¶¶114-15, 124-26, 131, 133-37, 145-53, and 159, relating to those mergers.

**AR Capital Defendants**

55.     Nicholas Radesca ("Radesca") was Executive Vice President and CFO of AR Capital, and served in the same capacity for a number of the publicly registered, non-traded alternative investments AR Capital sponsors, during the Class Period.  During the Class Period, Radesca took the actions and/or made the statements detailed herein in his capacity as an officer AR Capital.

- 17 -

56.     AR Capital, Schorsch, Weil, Kahane, Budko and Radesca are collectively referred to herein as the "AR Capital Defendants."

57.     The AR Capital Defendants are identified in the Proxy Statements related to the ARCT IV Merger and Cole Merger as participants in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged herein related to those mergers.

58.     During the Class Period, the ARCP Management Defendants, ARCP Director Defendants and Redesca as senior executive officers and/or directors of ARCP, AR Capital, RCAP, RCS Capital, and/or ARC Properties were privy to confidential and proprietary, non-public information concerning ARCP, AR Capital, RCAP, RCS Capital, and/or ARC Properties operations, finances, financial condition and present and future business prospects via internal documents, conversations and connections with other officers and employees, and/or attendance at management and/or board of directors meetings and committees thereof. Because of their possession of such information, the ARCP Management Defendants, ARCP Director Defendants and Redesca had the ability and opportunity to prevent the issuance of the Company's reports and releases alleged herein to be false or misleading and/or cause them to be corrected.  The ARCP Management Defendants, ARCP Director Defendants and Redesca's materially false and misleading statements, and omissions during the Class Period violated their duty to promptly disseminate accurate, full and truthful information with respect to ARCP's operations, business, financial statements, and financial metrics such as AFFO, so that the market price of ARCP's securities would be based upon truthful and accurate information.

59.     The ARCP Management Defendants, ARCP Director Defendants and Redesca, by reason of their status as senior executive officers and/or directors ARCP, AR Capital, RCAP, RCS Capital, and/or ARC Properties, were "controlling persons" within the meaning of Section 15 of the

1933 Act and Section 20(a) of the 1934 Act, had the power and influence to cause ARCP, AR Capital, RCAP, RCS Capital, and/or ARC Properties to engage in the unlawful conduct complained of herein, and were able to and did, directly or indirectly, control the conduct of ARCP, AR Capital, RCAP, RCS Capital, and/or ARC Properties.

**ARCT IV Defendants**

60.    Abby M. Wenzel ("Wenzel") was a member of ARCT IV's Board of Directors from May 2012 through the closing of the merger with ARCP.  Wenzel is also a Director at American Realty Capital Global Trust, Inc.  During the Class Period, Wenzel took the actions and/or made the statements detailed herein in her capacity as a director of ARCT IV.

61.    Elizabeth K. Tuppeny ("Tuppeny") was a member of ARCT IV's Board of Directors from May 2014 through the closing of the merger with ARCP.  Tuppeny is also a Director of American Realty Healthcare Trust II, Inc.  During the Class Period, Tuppeny took the actions and/or made the statements detailed herein in her capacity as a director of ARCT IV.

62.    ARCT IV, Schorsch, Weil, Stanley, Wenzel, Tuppeny, Budko and Block are collectively referred to as the "ARCT IV Defendants."

63.    As senior executive officers and/or directors of ARCP and its affiliates, during the Class Period, the ARCT IV Defendants were privy to confidential and proprietary information concerning ARCP's operations, finances, financial condition and present and future business prospects via internal documents, conversations and connections with other officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

64.    The ARCT IV Defendants are identified in the ARCT IV Proxy Statement as participants in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged in ¶¶133-37 related to that merger and were provided with copies of the ARCT

IV Proxy Statement alleged herein to be misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance. Thus, the ARCT IV Defendants had the opportunity to commit the acts alleged herein.

**Cole Defendants**

65.     Christopher H. Cole ("Cole") was Cole Inc.'s Executive Chairman of the Board of Directors from April 5, 2013, until the closing of the merger with ARCP.  During the Class Period, Cole took the actions and/or made the statements detailed herein in his capacity as a director of Cole Inc.

66.     Marc T. Nemer ("Nemer") was Cole Inc.'s CEO from April 5, 2013, until the closing of the merger with ARCP.  During the Class Period, Nemer took the actions and/or made the statements detailed herein in his capacity as an officer of Cole Inc.

67.     Jeffrey C. Holland ("Holland") was Cole Inc.'s President and COO from June 3, 2013, through the closing of the merger with ARCP.  During the Class Period, Holland took the actions and/or made the statements detailed herein in his capacity as an officer of Cole Inc.

68.     Stephan Keller ("Keller") was Cole Inc.'s Executive Vice President, CFO and Treasurer from June 3, 2013, through the closing of the merger with ARCP.  During the Class Period, Keller took the actions and/or made the statements detailed herein in his capacity as an officer of Cole Inc.

69.     D. Kirk McAllaster, Jr. ("McAllaster")was Cole Inc.'s Executive Vice President from April 5, 2013, through the closing of the merger with ARCP.  During the Class Period, McAllaster took the actions and/or made the statements detailed herein in his capacity as an officer of Cole Inc.

70.     Leonard W. Wood ("Wood") was a member of Cole Inc.'s Board of Directors from April 5, 2013, through the closing of the merger with ARCP.  During the Class Period, Wood took

the actions and/or made the statements detailed herein in his capacity as a director of Cole Inc.

71.     Cole Inc., Cole, Nemer, Holland, Keller, McAllaster, Wood, Sealy and Andruskevich are collectively referred to as the "Cole Defendants."

72.     As senior executive officers and/or directors of Cole Inc. and its affiliates, during the Class Period, the Cole Defendants were privy to confidential and proprietary information concerning ARCP's operations, finances, financial condition and present and future business prospects via internal documents, conversations and connections with other officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

73.     The Cole Defendants are identified in the Cole Proxy Statement as participants in the solicitation of proxies and had direct participation in and oversight of the wrongdoing alleged in ¶¶125-26, 131, 145-53 and 159  related to that merger and were provided with copies of the Cole Proxy Statement alleged herein to be misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance. Thus, the Cole Defendants had the opportunity to commit the acts alleged herein.

**Grant Thornton LLP**

74.     Grant Thornton is the U.S. member firm of Grant Thornton International Ltd, an international firm that provides independent audit, tax and advisory services. Grant Thornton has revenue in excess of $1.3 billion and operates 58 offices across the United States with more than 500 partners and 6,000 employees.  Grant Thornton served as ARCP's outside auditor before and during the Class Period.  In connection with its 2013 annual audit, Grant Thornton issued an unqualified audit opinion that certified ARCP's false and misleading financial statements included in its Form 10-K filed with the SEC.  Grant Thornton also consented to including its 2013 unqualified audit opinion in the Registration Statements filed with the SEC in connection with the May 2014 offering

of 138 million shares of ARCP common stock and the September 2014 exchange of $2.55 billion of

Senior Notes.  During the Class Period, Grant Thornton served as ARCP's auditor and received

millions of dollars in payments from Schorsch-related entities,[5] including nearly $1.6 million in fees

for its ARCP audit work in 2013, a 437% increase from the fees it received for such work in 2012.

75.     During the Class Period, Grant Thornton issued an unqualified, or "clean," audit

report that certified ARCP's Class Period financial statements as being free of material

misstatements. Grant Thornton's audit report, included in ARCP's 2013 Form 10-K, stated that

ARCP's statement of financial position for the year under audit and the previous year, and its

statement of the results of operations for the year under audit and the two previous years, presented

"fairly" the financial position of ARCP "in conformity with accounting principles generally accepted

in the United States of America." ARCP's audit report also stated that Grant Thornton "conducted

[its] audits in accordance with the standards of the Public Company Accounting Oversight Board."

Grant Thornton's unqualified audit report for the full year ended December 31, 2013 ("FY13") was

materially false and misleading because, as set forth in ¶¶277-78, ARCP's financial statements for

the FY13 did not present fairly, in all material respects the Company's results of operations or its

financial condition in accordance with Generally Accepted Accounting Principles ("GAAP").

76.     In late July 2014, Grant Thornton was informed about the false and misleading nature

of ARCP's financial statements by McAlister, as described in ¶¶9, 235.  Instead of investigating the

information that was reported, Grant Thornton directed McAlister to sign ARCP's Form 10-Q for

2Q14 and file the false financial statements with the SEC, but did nothing at the time to determine

---

[5]    These include ARCP, American Realty Capital Daily Net Asset Value Trust, Inc., American Realty Global Trust, Inc., American Realty Capital Healthcare Trust II, Inc., American Realty Capital New York City REIT, Inc., American Realty Capital New York Recovery REIT, Inc., American Realty Capital – Retail Centers of America, Inc., and American Realty Capital Trust V, Inc.).

how widespread the reported conduct was, by what amount ARCP's financial statements were potentially misstated, or if other violations of GAAP were occurring.  Grant Thornton remained silent on the reporting of this information, permitting its 2013 unqualified audit opinion, and the Company's false and misleading 1Q14 Form 10-Q and 2Q14 Form 10-Q, to be incorporated by reference into the Registration Statement used in connection with the $2.55 billion offering of ARCP debt securities in September 2014.

### Underwriter Defendants

### July 2013 Offering

77.     J.P. Morgan Securities LLC ("JP Morgan"), Citigroup Global Markets Inc. ("Citigroup"),  Barclays Capital Inc. ("Barclays"),  BMO Capital Markets Corp. ("BMO Capital"), and KeyBanc Capital Markets Inc. ("KeyBanc") acted as Joint Book Running Managers, and JMP Securities LLC ("JMP Securities"), Ladenburg Thalmann & Co. Inc. ("Ladenburg"), and Realty Capital Securities, LLC ("RCS") acted as a Co-Manager of the July 24, 2013 underwriting of $300 million Senior Notes.  Each of the underwriter defendants listed in this paragraph acted as part of the underwriting syndicate and participated in the drafting and/or dissemination of the Registration Statement as well as the sale of those Senior Notes to Plaintiffs and the Class in connection with the July 2013 offering.  The underwriter defendants listed in this paragraph were responsible for ensuring the completeness and accuracy of the statements contained in, or incorporated by reference into, the Registration Statement used in connection with the July 2013 offering. The underwriter defendants listed in this paragraph collectively received more than $8 million in connection therewith.

### December 2013 Offerings

78.     Barclays, Citigroup, Credit Suisse Securities (USA) LLC ("Credit Suisse"),  Morgan Stanley & Co. LLC ("Morgan Stanley"), and Wells Fargo Securities, LLC ("Wells Fargo") acted as

Joint Book Running Managers and Capital One Securities, Inc. ("Capital One") and JMP Securities acted as Co-Managers of the December 2013 offerings of $690 million of Convertible Senior Notes, and participated in the drafting and/or dissemination of the Registration Statements as well as the sale of those Senior Notes to Plaintiffs and the Class.[6] Each of the underwriter defendants listed in this paragraph are likewise liable as they acted as part of the Underwriting Syndicate which drafted and disseminated the offering documents in connection with the December 2013 offerings. The underwriter defendants listed in this paragraph were responsible for ensuring the completeness and accuracy of the various statements contained in, or incorporated by reference into, the Registration Statements used in connection with the December 2013 offerings. The underwriter defendants listed in this paragraph collectively were paid nearly $22 million in connection therewith.

**May 2014 Offering**

79.     Merrill, Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), Citigroup, Barclays, J.P. Morgan, Capital One, Credit Suisse, Deutsche Bank Securities Inc. ("Deutsche Bank"), Wells Fargo, Robert W. Baird & Co. ("Baird"), Ladenburg, BMO Capital, JMP Securities, Janney Montgomery Scott, LLC ("Janney"), Mizuho Securities USA Inc. ("Mizuho"), PNC Capital Markets LLC ("PNC Capital"), Piper Jaffray & Co. ("Piper Jaffray"), and RBS Securities Inc. ("RBS Securities") acted as underwriters of the May 21, 2014 offering of 138 million shares of ARCP common stock, and participated in the drafting and/or dissemination of the Registration Statement as well as the sale of the common stock offered to Plaintiffs and the Class. Each of the underwriter defendants listed in this paragraph are likewise liable as they acted as part of the Underwriting Syndicate which drafted and disseminated the offering documents in connection with the May 2014 offering. The underwriter defendants listed in this paragraph were responsible for ensuring the

---

[6]    The underwriters of this offering exercised the $90 million over-allotment option.

completeness and accuracy of the various statements contained in, or incorporated by reference into, the Registration Statement used in connection with the May 2014 offering. The underwriter defendants listed in this paragraph collectively were paid nearly $57 million in connection therewith.

## CLASS ACTION ALLEGATIONS

80.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the Class. Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

81.     The members of the Class are so numerous that joinder of all members is impracticable. ARCP securities were extensively traded during the Class Period. As of September 2, 2014, ARCP had more than 907 million shares of common stock issued and outstanding that were actively traded on the NASDAQ and other exchanges, over 64 million shares of preferred stock, and more than $4 billion in face value of outstanding debt. The precise number of Class members is unknown to Plaintiffs at this time but is at least in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of ARCP or its transfer agent. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

82.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

83. Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs' and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

84. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

85. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about ARCP and its business;

(c) whether the price of ARCP securities was artificially inflated during the Class Period; and

(d) the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### ARCP Embarks on an Acquisition Spree

86.     ARCP is a Real Estate Investment Trust, or REIT, focused on single-tenant freestanding commercial properties subject to medium-term leases with high-credit quality tenants. By 2014, ARCP had grown into one of the largest REITs in the country, owning more than 4,400 properties spanning almost 100 million square feet.[7]

87.     ARCP went public just over three years ago, on September 7, 2011, raising almost $70 million through the sale of just over 5.5 million shares at $12.50 per share. As of December 31, 2011, the Company had total assets of $132 million. By December 31, 2012, ARCP's assets almost doubled, to $256 million. Since that time, however, ARCP has embarked on one of the most aggressive merger-and-acquisition campaigns ever undertaken in the real estate industry. The table below shows the ARCP Defendants' rapid-fire pattern of acquisition:

### ARCP ACQUISITION SPREE

| Acquisition | Close Date | Deal Value |
|---|---|---|
| Cole Inc. | February 7, 2014 | **$11.2 billion**, including 520.8 million shares of ARCP common stock |
| Red Lobster properties | July 28, 2014 | **$1.5 billion** |
| Fortress Group properties | January 9, 2014 | **$601 million** |
| ARCT IV | January 3, 2014 | **$3 billion**, including 36.9 million shares of ARCP common stock and 42.2 million preferred shares |
| CapLease, Inc. | November 5, 2013 | **$2.2 billion** |
| GE Capital properties | June 28, 2013 | **$774 million** |
| ARCT III | February 28, 2013 | **$2.2 billion** |

---

[7]     REITs own – and typically operate – income-producing real estate or real estate-related assets. REITs provide investors with the ability to receive a share of the income produced through real estate ownership, without owning the underlying real estate. To qualify as a REIT, a company must, *inter alia*, have the bulk of its assets and income connected to real estate investment and must distribute at least 90 percent of its taxable income to shareholders annually in the form of dividends.

88.     By June 2014, ARCP's assets ballooned $21.3 billion.  Describing itself publicly as an "acquisition machine," ARCP became the largest REIT of its kind in the United States.  In fact, in the 2.5 years after December 31, 2011, the Company's total assets increased from $132 million to $21.3 billion, or more than **16,036%**, as the following chart demonstrates:



**American Realty Capital Properties, Inc.**

**The Schorsch Empire Is Rife with
Self-Dealing and Excessive Executive Compensation**

89.     ARCP lies at the center of a complex web of interrelated companies constructed by ARCP's former Chairman and CEO, Schorsch.  In addition to ARCP, Schorsch served as Executive Chairman of the Board of RCAP, a self-described "full-service investment firm expressly focused on the individual retail investor," and as Chairman and CEO of AR Capital, "a full-service investment advisory firm sponsoring a series of investment programs with an emphasis on publicly registered non-traded real estate offerings."

90.    RCAP and AR Capital are but two of the many companies that form the complex array of companies owned and/or controlled by Schorsch, which were used to effectuate the scheme and wrongful course of business alleged herein:



91.     The December 12, 2014 agreement entered into between Schorsch and the Company in connection with his resignation, which does not purport to be complete, identifies **47** entities from which Schorsch agreed to resign his positions.

92.     Schorsch used RCAP, AR Capital, Cole Capital, and others to raise money for his non-traded REITs, and then used equity securities of entities such as ARCP as currency to buy out the non-traded REITs.  Forbes.com has described the Schorsch empire as "[a] fully integrated operation [that] not only manufactured nontraded, high-yielding REITs, it also provided research and advisory services to them, and controlled the second-largest independent financial advisory operation in the nation (and 9,200 brokers) who peddled them."

93.     This complex and opaque web of interrelated companies is permeated with conflicts of interest and was used to transfer hundreds of millions of dollars to Schorsch-controlled entities in connection with the acquisitions detailed herein, as well the purchase, sale and management of assets.  For example, in connection with the ARCT IV Merger, the Company, the ARCT Defendants, and the ARCP Defendants caused ARCP and ARCT IV to pay approximately $25 million dollars to other Schorsch-controlled entities, including:

- $7.66 million to Realty Capital Securities, LLC ("RCS") for "financial advisory and strategic services to **ARCP** prior to the consummation of the ARCT IV Merger,"[8] and **another** $7.66 million for the "[p]rovision of financial advisory and strategic services to **ARCT IV** prior to the consummation of the ARCT IV Merger."  Put another way, one Schorsch- controlled entity (RCS) advised **both** sides of the ARCT IV Merger (the Company and ARCT IV) – both of which were **also** Schorsch-controlled entities – and received $7.66 million from **each** of them.

- Similarly, the Company paid RCS and two other Schorsch-controlled entities, RCS Advisory Services, LLC ("RCSAS") and American National Stock Transfer, LLC, $640,000 to act as "non-exclusive advisor and information agent, respectively, . . . in

_____

[8]    All emphasis in quotations is added unless otherwise noted.

connection with the ARCT IV Merger." Yet ARCT IV paid them $750,000 to do exactly the same thing even though it was the counterparty to the same transaction.

- American Realty Capital Advisors IV, LLC (another Schorsch-controlled entity) received $5.8 million for the "[s]ale of certain furniture, fixtures, equipment and other assets and reimbursement of certain costs."

- ARC Advisory Services, LLC and RCSAS (both Schorsch-controlled entities) received $2 million for unspecified "transition services" in connection with the ARCT IV Merger, and another $500,000 for "legal support services prior to the date of the ARCT IV Merger Agreement."

94.     The purchase of Cole Inc. was likewise used to generate more than $30 million for Schorsch-controlled entities, including:

- $28 million paid to RCS for "financial advisory and strategic services to the Company prior to the consummation of the Cole Merger."

- $2.9 million paid to RCSAS for "certain transaction management services in connection with the Cole Merger."

- $750,000 paid to RCS and RCSAS together for their "[r]etention as non-exclusive advisor and information agent, respectively, to the Company in connection with the Cole Merger."

95.     The acquisition spree was designed to and did have the additional effect of building the asset base in ARCP so that it could then pay incentive compensation payments tied to ARCP's asset base pursuant to the 2014 Multi-Year Outperformance Plan (the "OPP"). The Compensation Committee of ARCP's Board of Directors approved the adoption of the OPP in October 2013, and allocated the bulk of its $222.1 million executive-incentive compensation pool – **42.5%** (or about $94.4 million) – to Schorsch alone (over a five-year period).

96.     The OPP has two components, one "absolute" and one "relative," both measured over a three-year period in terms of total return to stockholders, including both share price appreciation and common stock distributions. First, if ARCP achieved a total return to stockholders of more than 7% a year, the plan paid out 4% of the dollar amount of the total return exceeding that benchmark. Second, if the Company's annual performance exceeded the median total return of a group of peer

companies by six percentage points or more, then the OPP paid out an additional 4% of that excess total return.

97.     With respect to this second component, however, the recipients were to receive 50% of their incentive compensation for a cumulative total return of **zero percent**.  That is, **even with no total return to shareholders whatsoever**, the OPP entitled them to **half** of this component of their incentive compensation.   Schorsch's compensation from the OPP was in addition to: (i) his guaranteed base salary for 2014 of $1.1 million; (ii) an estimated $8.8 million of nonguaranteed cash bonus and equity awards; and (iii) a "retention grant" worth $24.9 million, paid out over nine annual installments of $2.8 million.  Schorsch's total awarded compensation for 2014 alone was estimated at **$28.4 million**, assuming he achieved only the **midrange** of the OPP plan, or almost **26 times** his guaranteed salary of $1.1 million.

98.     The OPP's obvious extravagance resulted in ARCP shareholders rejecting it in a non-binding vote at the Company's annual meeting on May 29, 2014.  Of the 413 million shares represented, only 32.4% voted in favor of the package.  Nonetheless, the Company was not legally bound by the shareholder vote, and all indications are that the plan was later adopted by the ARCP Defendants, notwithstanding its repudiation by ARCP shareholders.  The December 12, 2014 agreement between Schorsch and the Company in connection with his resignation, for example, specifically refers to the "Award Agreement dated January 8, 2014, under the ARCP 2014 Multi-Year Outperformance Plan."

### AFFO Is the Most Critical Metric for ARCP Investors

99.     Arguably the single most critical metric relied upon by analysts and investors in valuing a REIT is a measure of operating performance called AFFO.  AFFO is based on another commonly accepted measure of operating performance for REITs called Funds from Operations, or

FFO.[9]  The Company defines FFO as "net income or loss computed in accordance with GAAP, excluding gains or losses from sales of property but including asset impairment write-downs, plus depreciation and amortization, after adjustments for unconsolidated partnerships and joint ventures." AFFO, in turn, equals FFO adjusted to exclude (in the case of ARCP) acquisition-related fees and expenses, amortization of above-marketplace assets and liabilities, amortization of deferred financing costs, straight-line rent, non-cash mark-to-market adjustments, amortization of restricted stock, non-cash compensation and gains and losses.  AFFO "provides information consistent with management's analysis of the operating performance of the properties.  By providing AFFO, **ARCP believes it is presenting useful information that assists investors and analysts to better assess the sustainability of our operating performance**.  Further, ARCP believes AFFO is **useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies, including exchange-traded and non-traded REITs**."

100.   Indeed, ARCP's financial advisor with respect to its acquisition of Cole Inc., Barclays, likewise relied heavily on AFFO in conducting its analysis of selected comparable companies.  For example, according to the Joint Proxy Statement/Prospectus issued to the stockholders of ARCP and Cole Inc.: "Barclays Capital calculated and compared various financial multiples and ratios of Cole Inc., ARCP and the selected comparable companies.  As part of its selected comparable company analysis, Barclays Capital calculated and analyzed each company's

---

[9]   Although ARCP does not dismiss the utility of GAAP-related metrics for measuring its performance, it does point out certain deficiencies in those metrics with respect to REITs.  As the Company noted repeatedly in 2013 and 2014: "Accounting for real estate assets in accordance with GAAP implicitly assumes that the value of real estate assets diminishes predictably over time.  Since real estate values have historically risen or fallen with market conditions, many industry investors and analysts have considered the presentation of operating results for real estate companies that use historical cost accounting to be insufficient by themselves."

ratio of its current stock price to its calendar year 2014 estimated AFFO based on Wall Street research consensus estimates.  This resulted in a range of 12.2x to 16.8x estimated AFFO with a median of 14.6x."

101.    AFFO is so important in assessing the value and performance of a REIT that analysts, including Ladenburg Thalmann, BMO Capital Markets, and JMP Securities, valued ARCP and its shares throughout the Class Period on a price-to-AFFO basis.  For example, based on the Company's purported "cheap multiple (11x 2014 AFFO compared to the group at roughly 15x)," JMP Securities characterized ARCP stock as a "**must own**" security.

**ARCP Files the Shelf Registration Statement**

102.    On March 14, 2013, prior to the start of the Class Period, ARCP filed a Form S-3ASR (the "Shelf Registration Statement") with the SEC.  As a "well-known seasoned issuer," ARCP was permitted to use the Shelf Registration Statement continuously when making its several offerings of securities to investors during the Class Period.  To that end, the Shelf Registration Statement would automatically update with each subsequent Company filing with the SEC.

103.    According to the Shelf Registration Statement, certain documents filed with the SEC were incorporated by reference:

> [A]ny reports filed by [ARCP] with the SEC after the date of this [statement] and before the date that the offering of securities by means of this prospectus is terminated will automatically update and, where applicable, supersede any information contained in this [statement] or incorporated by reference into this [statement].

*        *        *

> All documents that [ARCP] file[s] (but not those that we furnish) pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, or the Exchange Act, after the date of the initial registration statement of which this prospectus is a part and prior to the effectiveness of the registration statement . . . .

*        *        *

All documents that [ARCP] file[s] (but not those that we furnish) pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act on or after the date of this prospectus and prior to the termination of the offering of any of the securities covered under this prospectus . . . .

104.     The documents filed with the SEC that were incorporated by reference in the Shelf Registration Statement included ARCP's annual and quarterly financial statements on Forms 10-K and 10-Q, as well as the Company's offering materials identified herein.

105.     The Shelf Registration Statement was signed by Defendants Schorsch, Weil, Block, Jones, Kahane, Rendell, Michelson, and Bowman.

**MATERIALLY FALSE AND MISLEADING
STATEMENTS MADE DURING THE CLASS PERIOD**

**First Quarter 2013 Financial Results**

106.     The Class Period begins on May 6, 2013.  On that date, ARCP issued a release announcing its financial results for the first quarter, ended March 31, 2013 ("1Q13").  The Company reported 1Q13 AFFO of $30.8 million, or $0.20 per fully diluted share, compared to AFFO of $3.4 million during the fourth quarter of 2012.  Schorsch commented on the Company's financial results, stating in pertinent part:

> **We are very pleased with our first quarter results which are in line with our earlier 2013 earnings guidance, projecting earnings growth of 16% between 2013 and 2014, and we are particularly well positioned for continued earnings growth**.

*       *       *

> **We intend to continue executing our highly accretive organic acquisition program on which our earnings guidance is constructed** . . . .

107.     Also on May 6, 2013, ARCP filed its Form 10-Q for the period ended March 31, 2013 with the SEC (the "1Q13 Form 10-Q"), which was signed by Schorsch and Block, reiterated ARCP's previously reported financial results, and represented that those financial results were accurate and presented in accordance with U.S. GAAP.  In addition, the 1Q13 Form 10-Q (and each

of ARCP's other quarterly and annual reports filed with the SEC described herein) contained

certifications signed by Schorsch and Block pursuant to §302 of the Sarbanes-Oxley Act of 2002

("SOX"), attesting that the financial information contained in the filing was true, that it did not omit

material facts, and that the Company's internal and disclosure controls were effective.

108.    For example, Schorsch and Block certified in the 1Q13 Form 10-Q (and each of

ARCP's other quarterly and annual reports filed with the SEC described herein) that:

> [T]his report does not contain any untrue statement of a material fact or omit to state
> a material fact necessary to make the statements made, in light of the circumstances
> under which such statements were made, not misleading with respect to the period
> covered by this report.

109.    With respect to ARCP's reported financial information, Schorsh and Block certified

in the 1Q13 Form 10-Q (and each of ARCP's other quarterly and annual reports filed with the SEC

described herein) that:

> Based on my knowledge, the financial statements, and other financial information
> included in this report, fairly present in all material respects the financial condition,
> results of operations and cash flows of the registrant as of, and for, the periods
> presented in this report.

110.    With respect to ARCP's internal controls, Schorsh and Block certified in the 1Q13

Form 10-Q (and each of ARCP's other quarterly and annual reports filed with the SEC described

herein) that they personally: (i) were responsible for establishing and maintaining disclosure controls

and procedures; (ii) designed or caused ARCP's controls or procedures to be designed to ensure that

material information relating to ARCP and its consolidated subsidiaries was made known to them by

others within those entities; (iii) designed or caused ARCP's controls over financial reporting to

provide reasonable assurance regarding the reliability of financial reporting and the preparation of

financial statements for external purposes in accordance with GAAP; (iv) evaluated the effectiveness

of the ARCP's disclosure controls and procedures and presented in ARCP's quarterly and annual

filings their conclusions about the effectiveness of the disclosure controls and procedures.

111.    Later that day, on May 6, 2013, ARCP held a conference call with analysts and investors to discuss the Company's 1Q13 financial results.  During the conference call, Block noted that "**for the balance of 2013, we reaffirm our forecasted AFFO per share of between $0.91 and $0.95 per share** that was provided in our earnings guidance, **as well as the forecast 2014 AFFO per share of $1.06 to $1.10**."

### CapLease Merger Announcement

112.    On May 28, 2013, ARCP issued a release announcing that it had entered into an agreement to acquire all of the outstanding shares of CapLease, Inc. ("CapLease") in a transaction valued at approximately $2.2 billion, which was expected to close during the quarter ended September 30, 2013 ("3Q13").  Block commented on the proposed merger, stating in pertinent part:

"**We have announced revised earnings guidance for 2014 of between $1.17 to $1.21 per share based on AFFO, representing a 28% increase over previously announced 2013 guidance**."

113.    During a May 28, 2013 conference call with analysts and investors to discuss the CapLease acquisition, Schorsch and Block made additional statements about the proposed transaction and its impact on the Company, stating in pertinent part:

Defendant Schorsch:

The transaction rationale is very simple.  This accomplishes exactly what we have been talking about since our IPO in 2011.  This is accretive growth.  **The acquisition is expected to result in approximately 11% accretion to our AFFO in 2014**.

*       *       *

. . . **Pro forma 2014 we expect to add $0.11 per share to our AFFO**. . . .

Defendant Block:

The pro forma financial projections are impressive. . . . Based on our ability to modify the portfolio's capital structure as Nick mentioned earlier, **our 2014 guidance has been revised upward.  The new 2014 earnings guidance range is projected between $1.17 to $1.21 AFFO per share on a fully diluted basis.  Using**

- 37 -

the mid points of the respective ranges, this represents a 28% increase compared to our projected 2013 results.

**ARCT IV Merger Announcement**

114.     On July 2, 2013, ARCP issued a release announcing that it had entered into a definitive merger agreement to acquire the outstanding shares of ARCT IV – a publicly registered, non-traded REIT controlled by Schorsch.  In connection with the proposed merger, ARCP "increased its 2014[] . . . [AFFO] guidance to $1.19-$1.25 per share, equivalent to approximately 31% growth over 2013[] AFFO per share[,]" and emphasized that "**[t]his projected AFFO growth rate leads the net lease industry**."  Schorsch and Block commented on the proposed merger, stating in pertinent part:

Defendant Schorsch:

Today's announced merger solidifies our leadership position in the net lease real estate sector.

\*       \*       \*

**With this acquisition we continue to further diversify our asset and tenant base and increase our projected 2014 AFFO per share**.  This acquisition is yet another example of executing our deliberate and focused strategy to . . . **give us further cost of capital advantages enabling us to deliver AFFO per share earnings accretion.  Our sector-leading 31% 2014 over 2013 projected AFFO growth is further proof of that**. . . .

Defendant Block:

Due to the relative value of our stock offer versus cash consideration, we reasonably expect the acquisition of ARCT IV will be completed primarily through the issuance of ARCP common stock.  **This will result in growth in projected 2014 AFFO per share**, as well as reduced balance sheet leverage. . . .

115.     Later that day, ARCP held a conference call with analysts and investors to discuss the Company's planned acquisition of ARCT IV.  During the conference call, Schorsch and Block spoke about the proposed transaction and its impact on the Company, stating in pertinent part:

Defendant Schorsch:

**We are . . . increasing our AFFO earnings guidance range for 2014 to $1.19 to $1.25 per share**.

\*     \*     \*

I would like to take you through some of the significant benefits we believe this transaction offers our shareholders. The transaction will provide immediate accretion to our earnings once closed. **Accordingly, we have revised our 2014 earnings guidance, increasing the pro forma 2014 AFFO to $1.19 to $1.25**; annualized dividend increase from $0.91 to $0.94 per share, **while the AFFO payout ratio decreases to less than 80%.**

Defendant Block:

. . . **I wanted to focus for a moment on our future earnings outlook for ARCT, which we believe to be very exciting for us as we look at this combined transaction**. . . .

**AFFO per share is expected to grow significantly from 2013 to full year 2014. For 2014, we're projecting fully diluted AFFO per share in the range of between $1.19 per share to $1.25. This represents a growth rate of about 30% over 2013 AFFO per share. This earnings percentage of year-over-year growth is unprecedented in the net lease sector as we continue to aggregate world-class portfolios**.

### July 2013 Investor and Analyst Day

116.     On July 24, 2013, ARCP held an Investor and Analyst Day to discuss the Company's operations and financial results. During a presentation, Block commented on the "conservative" nature of the Company's increased full year 2014 AFFO per share guidance, and responded to an analyst's question on that topic, stating in pertinent part:

What I want to walk you through right now is as it stands today, where our expectation is, what our projections are, as it related to our 2014 guidance.

\*     \*     \*

. . . So again to recap, June 30th, ARC Trust, CapLease, well in your guidance, you said you were going to buy about another $300 million. I wish I can say these are the exact transactions we're going to buy. **We actually have a more robust pipeline today that 300, maybe 400 or 500**, we will see where that works out, **but as a placeholder again to understand how do we get to that $1.19 or $1.25 on your earnings guidance, we're assuming post transactions, the organic transactions**

**we do**.  The one-off two CBS', three Walgreens, four Dollar General's, one Advance Auto, **that composes the $300 million of what we define as organic growth**. . . . We have an abundance of that in our pipeline right now, very attractive credit, extremely attractive pricing with great locations. . . .

\*        \*        \*

I do make one assumption here and it's a very reasonable assumption if you look at our AFFO and a multiple at 13.5 times multiple or 14 times multiple, which hopefully we all agree **is a very conservative number on future earnings growth**.

\*        \*        \*

**We're going to be roughly $450 million of AFFO which equates to about [$]1.19**.

\*        \*        \*

**Now we give a range $1.19 or $1.25.  What could happen there?  Well, our stock could be better**. . . .

\*        \*        \*

So we have a range there, **[what] I wanted to do on a very conservative basis, is roll you forward to the different capital components and acquisition numbers that will arrive at this $1.19 that we put out there**. . . .

**<u>July 2013 Offering</u>**

117.    On July 23, 2013, ARCP announced a $300 million offering of 3.0% Convertible Senior Notes due August 1, 2018 (the "2018 Notes") (the "July 2013 Offering").  The July 2013 Offering was conducted pursuant to the Shelf Registration Statement, a Pricing Term Sheet dated July 23, 2013, Free Writing Prospectuses dated July 23 and filed on July 24, 2013, and Prospectus Supplements dated July 23 and 25, 2013 (collectively, the "July 2013 Offering Materials").

118.    The July 2013 Offering was underwritten by Defendants JP Morgan, Citigroup, Barclays, BMO Capital, KeyBanc, JMP Securities, Ladenburg, and RCS.  These Defendants were "underwriters," as defined in Section 2(11) of the Securities Act, of the 2018 Notes.

119.    The July 2013 Offering Materials specifically incorporated by reference ARCP's 1Q13 Form 10-Q.  These materials, which induced Union and other members of the Class to

- 40 -

purchase ARCP's 2018 Notes, contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, as detailed in ¶¶248-57.

### Second Quarter 2013 Financial Results

120.    On August 6, 2013, ARCP issued a release announcing its financial results for the second quarter, ended June 30, 2013 ("2Q13"), and reported "Record . . . Operating Results."  For the quarter, the Company reported AFFO of $32.8 million, or $0.19 per fully diluted share.  In addition, the Company raised its previously-issued full year 2014 AFFO per share guidance from a range of $1.06 to $1.10 per fully diluted share, to a range of $1.14 to $1.18 per fully diluted share.  Schorsch commented on the announcement, stating in pertinent part:

> **The second quarter of 2013 was about deliberate and predictable execution in all aspects of our business** . . . . We made great strides in capital markets activities by closing a $900 million private placement, upsizing our senior secured credit facility to $1.7 billion of capacity as well as finalizing a $310 million convertible debt offering.  **This execution serves as the framework of building a long-term balance sheet as we continue to enhance ARCP's position as the leader in the net lease sector.**  Our strategic vision is furthered with the completion of the two pending mergers, a substantial and highly accretive acquisition pipeline and a growing team of seasoned real estate professionals as we look towards a future internalization event.

121.    Also on August 6, 2013, ARCP filed its Form 10-Q for the period ended June 30, 2013 with the SEC (the "2Q13 Form 10-Q"), which was signed by Schorsch and Block.  The 2Q13 Form 10-Q reiterated ARCP's previously announced financial results and represented that those financial results were accurate and presented in accordance with GAAP.  The 2Q13 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal control over financial reporting.  The 2Q13 Form 10-Q included Schorsch's and Block's certifications pursuant to SOX, identical in all material aspects to the certification quoted in ¶240.

- 41 -

122.     Later that day, ARCP held a conference call with analysts and investors to discuss the Company's 2Q13 financial results.   During the conference call, Schorsch and Block stated, in pertinent part:

Defendant Schorsch:

**Full quarter AFFO per share was $0.19.   More importantly, the normalized AFFO per share, which also represents the period end run-rate, was $0.23 per share which was above our previously provided 2013 AFFO guidance**.

\*          \*          \*

To sum up, **we are extremely pleased with our accomplishments during this second quarter**. . . .   Our current pipeline of acquisitions and balance sheet strength suggests that **ARCP is well-positioned for continued earnings growth**.

As Brian will discuss in a moment, . . . **we are updating our guidance to $1.14 to $1.18 per share on an AFFO basis**.   This change to our earnings guidance results primarily from two factors – and this is very important.   We will incur approximately $20 million in our guidance of additional debt service cost relating to terming out the fixed debt and increasing our acquisitions to $1.1 billion.

Defendant Block:

As Nick mentioned previously, **we have revised our 2014 AFFO guidance based on increased acquisition activity as well as a more deliberate pursuit of fixed-rate, long-term, match-funded debt**. . . .

**Our revised 2014 AFFO guidance is $1.14 to $1.18 per shar**e, reflecting additional interest costs related to increased duration of fixed rate borrowings to match fund assets and liabilities, . . . **and substantially higher acquisition volumes than previously projected**.   Specifically, we include about $1.4 billion of five, seven and ten year notes with a weighted average interest rate of approximately 4.1%.

123.     The statements referenced above in ¶¶106-17, 120-22 were each materially false and misleading when made.   The true facts, which were then known to or recklessly disregarded by ARCP, Schorsch and Block, were:

(a)     that ARCP, Schorsch and Block's representations in ARCP's 1Q13 and 2Q13 SEC filings with respect to internal controls and financial reporting processes were false and

misleading as they had not conducted a reasonable evaluation of, or ARCP lacked, adequate internal controls;

(b)    that ARCP's financial statements were materially false and misleading as they did not accurately portray the Company's financial performance and were not prepared in accordance with GAAP;

(c)    that ARCP's acquisition program was neither accretive nor organic, but rather: (i) was designed to generate transactional fees and compensation payments for ARCP executives and other parties affiliated with Schorsch-controlled companies, without regard to the underlying fairness of the transactions; and (ii) was predicated on the use of ARCP securities that were overvalued as a result of defendants' misconduct as described herein;

(d)    that ARCP's "sector-leading" 30+ percent AFFO growth estimates were not as represented by ARCP, Schorsch and Block, as ARCP's actual growth rate was at least one third less than represented;

(e)    that as a result of (a) - (d), above ARCP was not well positioned for continued earnings growth, and its actual AFFO and growth did not lead the industry; and

(f)    that as a result of (a) - (e), above, Schorsch and Block had no reasonable basis to believe, and did not in fact believe, their statements detailed herein about the Company's financial performance and its 2014 AFFO estimates of at least $1.19 per share.

### Cole Merger Announcement

124.    On or about October 22, 2013, ARCP and Cole Inc. entered into an Agreement and Plan of Merger (the "Cole Merger Agreement").  Cole Inc. shareholders were to receive, at their election, 1.0929 shares of ARCP common stock or $13.82 in cash per Cole Inc. share, with the cash consideration limited to no more than 20% of Cole Inc.'s shares.

125.    The following day, on October 23, 2013, ARCP and Cole Inc. issued a joint release concerning the merger, which was "valued at $11.2 billion and [would] create the largest net REIT with an enterprise value of $21.5 billion."  ARCP and Cole Inc. also stated that the Cole Merger was "expected to close in the first half of 2014."  In connection with the proposed merger, ARCP issued "updated 2014 AFFO guidance, which is expected to range from $1.13 to $1.19 per share, an increase of approximately 25% over . . . 2013 AFFO per share guidance of $0.91 to $0.95."  The updated guidance "include[d] the projected contribution of the earlier to close of the pending transactions with ARCT IV and CapLease, which together with second half 2013 individual property acquisitions remain[ed] on track."  The release further stated that "[t]he projected AFFO payout ratio falls within the . . . Board target of 85% to 90%."  Schorsch commented on the proposed Cole Merger, in pertinent part:

> . . . ARCP will become the largest net lease REIT and the new industry leader. . . .
>
> *       *       *
>
> Both companies share the same vision, namely to **drive value for stockholders by placing their interests ahead of our own**, aligning pay with performance, **and reporting fully and transparently**. . . . ARCP and Cole both have histories of driving tremendous growth.  By leveraging our successful track records, our complementary businesses and highly skilled professionals, **we are confident that we will be well-positioned to achieve continued growth**. . . . Far more can be accomplished by these two great companies working together than either one could have hoped to achieve independently.
>
> *       *       *
>
> . . . With this acquisition, we continue to further diversify our asset and tenant base **while driving projected 2014 AFFO per share growth**.  This acquisition represents the continuation of our deliberate and focused growth strategy by improving profitability, mitigating risk through increased property type and tenant diversification, constructing a portfolio of properties that produce durable income and potential asset appreciation while preserving principal, providing some inflation and interest rate protection **and enabling us to deliver AFFO per share earnings accretion through further cost of capital advantages.  In addition, the merger with Cole furnishes the size and scale to allow us to continue to reduce our**

**operating costs as a percentage of assets and potentially improve our AFFO multiple**.

126.     Later that day, ARCP held a conference call with analysts and investors.  During the

conference call, Schorsch and  Nemer, the CEO of Cole Inc., extolled the benefits of the proposed

merger with Cole Inc., stating in pertinent part:

Defendant Schorsch:

**This is an epic transaction.  Great companies combining in a win-win to the shareholders**, the employees and the broker-dealer systems that we work with.

The portfolios just fit.  They fit very, very well.  **We're a much stronger company**. We . . . have both proven ourselves.  And if you look back at the last six months, as we've gone through this transaction, **we as a company have improved at ARCP – we've become investment-grade rated; we've managed our balance sheet and a number of other mergers to build a larger company of over $10 billion on a pro forma basis**. . . . **And today, we have created, with this merger, the largest net lease company on the globe**.

                                        *       *       *

**And when you look at the Cole portfolio with the ARCT portfolio, it's just better.  We're more diversified.  We have more scale**.  And this is one of the few industries in real estate where scale actually creates efficiency.

Defendant Nemer:

. . . **This transaction represents a major step in achieving our goal of creating the premier real estate company that delivers best-in-class, long-term results to our shareholders**.  The combination is forward thinking, and our union provides immediate and obvious benefits of size, scale and diversification.

. . . [A]s Nick said, **this combination makes all the sense in the world.  It's truly a one-plus-one-equals-five combination** of a – transactions of this magnitude, this significant, that are this transformational, rarely come together.  And so, I give my hat's off to Nick and his team for the effort that they've made over the last year, to make themselves a more compelling strategic partner, and for putting terms on the table **that produce terrific results for both of our shareholders, both in the immediate term and the long-term**.

127.     During the conference call, Block discussed the Company's full year 2014 AFFO per

share guidance, and responded to an analyst's question on that topic, stating in pertinent part:

Defendant Block:

Just jumping into the numbers here, I want to give an overview of the financial benefits of this transformative transaction. **Specific to adjusted funds from operation, or AFFO for 2014, our guidance remains unchanged with this transaction from a numbers' standpoint. We expanded the range slightly**, due to the fact that we have variability here. In closing this merger within the first half of 2014 **our guidance range on a fully diluted per-share basis is $1.13 to $1.19 per share**.

$$*\qquad*\qquad*$$

**Turning our attention specifically to 2014 guidance, I wanted to point out a range – from an FFO standpoint, fully diluted share count, as we talked about – $1.14 to $1.20; AFFO, $1.13 to $1.19.** The key assumptions . . . include[] $11.2 billion purchase price for Cole. It assumes an election of 80% stock and 20% cash. We're assuming a $70 million expense reduction in aggregate from the combined organization. The distributions go up to $1.00 per share, and again, representing an 86% payout ratio.

$$*\qquad*\qquad*$$

Dan Donlan – Ladenburg Thalmann & Company Inc. – Analyst:

. . . And as far as **when I look at the guidance, the range is wider now. What is – what's the delta between the two?** I mean, is it you don't close on as many acquisitions and timing? Is it that your leverage would be higher at the high-end and lower at the low-end? What are the brackets . . . around the guidance range?

$$*\qquad*\qquad*$$

Defendant Block:

The other thing, Dan, in that number is it also has to do with the cost of debt. **If . . . our debt cost comes down 15 or 20 bps, . . . we're going to push through the high end of the range very quickly**. And if it's where we think it is, which is pretty conservative, we'll be middle, low-end of the range. I think that's probably the single biggest driver when you look at the variability. Because 5 basis points on acquisition cap rate, we can buy a lot more. The question is, do we want to? Because we don't want to lever up.

**And it also assumes our stock price, our combined stock price, being pretty conservative around 7% dividend yield**. And I'm not sure we're going to stay at a 7% dividend yield. So, . . . **that's the other big variable, because if we're buying assets and we're issuing equity, and the equity cost changes to the upside, it's going to increase our earnings dramatically**.

### Third Quarter 2013 Financial Results

128.    On November 7, 2013, ARCP issued a release announcing its financial results for

3Q13.  For the quarter, the Company reported AFFO of $46.7 million, or $0.21 per fully diluted

share, representing a quarter-to-quarter increase of over 42%, and confirmed "[u]pdated AFFO pro

forma 2014 guidance of $1.13 to $1.19 per share."   Schorsch and Block commented on the

Company's financial results, stating in pertinent part:

Defendant Schorsch:

**We have continued to build enterprise value during this third quarter, and for
now are intently focused on execution** . . . . In this regard, we have identified
several near-term key objectives: completing the announced ARCT IV and Cole
transactions; becoming self-managed and significantly broadening our intellectual
capital by continuing to attract the best and brightest managers in the industry;
deleveraging and terming out our balance sheet utilizing long-term, fixed rate debt;
and effectively and seamlessly integrating Cole organization.

\*        \*        \*

We are fully committed to becoming self-managed, as promised . . . . In fact, it is a
closing condition for our merger with Cole.  We will announce the President of
ARCP before year-end.  We have already moved to bolster our team with several key
hires.   Brian Block, our CFO, will now be focused exclusively on ARCP.  Lisa
Beeson joins us as COO after 25 years as an investment banker with tremendous
M&A and capital markets expertise.  Lisa Pavelka McAlister is our new CAO with
25 years' experience in senior financial roles versed in all aspects of financial and
accounting operations.

Defendant Block:

**Our 3rd quarter operating results are in-line with projections** . . . . We are well
positioned to close our pending acquisitions and execute our capital plan.  Our team
is focused on taking advantage of our investment grade rating and securing long-term
financing at attractive rates.  We have commitments in place for $755 million of
long-term, fixed rate debt, and expect to issue senior unsecured in the private and
public markets.  Looking beyond 2013, we will raise equity only in connection with
acquiring accretive real estate investments as we continue to deleverage our balance
sheet.  We do not intend to issue equity simply to pay down debt.

129.    Also on November 7, 2013, ARCP filed with the SEC its Form 10-Q for the period

ended September 30, 2013 (the "3Q13 Form 10-Q").  The 3Q13 Form 10-Q, which was signed by

Schorsch and Block, reiterated ARCP's previously announced financial results and represented that those financial results were accurate and presented in accordance with GAAP.  The 3Q13 Form 10-Q represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal control over financial reporting.  The 3Q13 Form 10-Q also included Schorsch's and Block's certifications pursuant to SOX, identical in all material aspects to the certification quoted in ¶240.

130.    Later that day, ARCP held a conference call with analysts and investors to discuss the Company's 3Q13 financial results.  During the conference call, Schorsch and Block stated:

Defendant Schorsch:

**Our 2014 AFFO earnings guidance**, which reflects the acquisition of Cole, assumes a closing date of April 1 and **is $1.13 to $1.19 per share.  This range includes only $2 billion of acquisitions for 2014, which we think is very manageable**, particularly given the historic acquisition activity of our combined organizations.

*        *        *

Defendant Block:

**In connection with the Cole merger, we widened our 2013 guidance by $0.01 on each side of the range based on the uncertainty with respect to the anticipated closing date**. . . .

**Our 2014 AFFO guidance is $1.13 to $1.19 per share**.  This range, which assumes the Cole merger to close the end of the first quarter of 2014, reflects additional interest costs attributable to increased duration of fixed rate borrowings to match fund, assets and liabilities, as I previously noted, and higher acquisition volumes than previously projected, reflecting increased capacity of the combined teams.

**Cole Merger Presentation**

131.    On November 12, 2013, ARCP caused a shareholder presentation to be disseminated in connection with the Cole Merger, which stated that the Cole Merger would result in ARCP being the world's largest net lease REIT and would generate "significant operating efficiencies" and "AFFO growth" for ARCP.  The shareholder presentation also noted that "guidance for 2014 AFFO

growth estimates" was being "updated to $1.13 to $1.19 per share (fully diluted)" and indicated that ARCP was positioned to post "AFFO of $1.13 per share" even if no further acquisitions were completed during 2014.

132.    The statements referenced above in ¶¶124-31 were each materially false and misleading when made in that they failed to disclose and/or misrepresented the following true facts, which were then known to or recklessly disregarded by ARCP, Schorsch and Block, including:

(a)    that ARCP, Schorsch and Block's representations in ARCP's 1Q13 and 2Q13 SEC filings with respect to internal controls and financial reporting processes were false and misleading as they had not conducted a reasonable evaluation of, or ARCP lacked, adequate internal controls;

(b)    that the Cole Merger would not drive 2014 AFFO per share growth or earnings accretion, but rather ARCP's claimed AFFO growth could be only achieved via the falsification of ARCPs financial statements;

(c)    that the Cole Merger did not place shareholder interests ahead of ARCP, or align pay with performance, nor did it represent a "terrific result[]" for ARCP or Cole Inc. shareholders, but rather was designed to and did reward the ARCP Management Defendants, ARCP Director Defendants and other parties affiliated with Schorsch with tens of millions of dollars of transactional fees and ongoing compensation payments;

(d)    that ARCP's investment grade rating was predicated on financial results that ARCP has since admitted cannot be relied upon;

(e)    that ARCP was not a much stronger company because of the Cole Merger, but rather the Cole Merger aggravated ARCP's already inadequate control issues and undermined ARCP's ability to reasonably estimate 2014 performance;

(f)     that as a result of (a) - (e), above, that ARCP was not well positioned to achieve AFFO growth; and

(g)     that as a result of (a) - (f), above, ARCP, Schorsch and Block had no reasonable basis to believe, and did not in fact believe, the statements detailed herein about the Company's financial performance and its AFFO estimates.

**ARCT IV Merger**

133.     On December 3, 2013, the ARCP Management Defendants, the ARCP Director Defendants, the ARCT IV Defendants, and the AR Capital Defendants caused a Registration Statement to be filed with the SEC on Form S-4, and disseminated a Joint Proxy Statement/Prospectus (collectively, the "ARCT IV Registration Statement/Proxy") to shareholders. A copy of the merger agreement for the transaction was attached as Annex A to the ARCT IV Registration Statement/Proxy and was incorporated by reference in both documents.  The ARCT IV Registration Statement/Proxy and the merger agreement attached thereto were prepared, reviewed and/or signed by ARCP, Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Budko, Block, Beeson, AR Capital, Radesca, ARCT IV, Stanley, Wenzel and Tuppeny.

134.     The ARCT IV Registration Statement/Proxy represented that the ARCT IV Board had unanimously determined that the merger was "advisable, fair to, and in the best interests of ARCT IV and its stockholders."  Likewise, with respect to their own shareholders, the ARCP Directors recommended that the transaction be approved.

135.     The ARCT IV Registration Statement/Proxy represented that the proposed transaction would drive AFFO growth and increase dividend distributions – two important (and related) aspects of the ARCT IV Merger – stating in pertinent part:

> [T]he merger is expected to provide ARCP with significant future acquisitions capacity and higher future AFFO growth rate, and the combined company's

stockholders will benefit from a stable and secure dividend, which is expected to increase to $0.94 per share following the merger.

136.    The ARCT IV Registration Statement/Proxy contained a section titled "Selected Publicly Traded REITs Analysis," which provided multiple ranges of calendar year 2014 estimated FFO per share and calendar year 2014 estimated AFFO per share, derived from the selected publicly traded REITs to corresponding data of ARCP.  The ARCT IV Registration Statement/Proxy also provided "Certain Prospective Financial Information Reviewed by ARCT IV," including projected FFO and AFFO figures through 2018, as follows:

| ($ in millions) | 2011 | 2012 | 2013 (6 months) | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|
| EBITDA as adjusted | ($2) | $ 15 | $ 23 | $ 525 | $ 604 | $ 681 | $ 757 | $ 831 |
| Funds from Operations as adjusted (FFO as adjusted) | ($2) | $ 4 | $ 38 | $ 379 | $ 443 | $ 505 | $ 565 | $ 623 |
| Adjusted Funds from Operations (AFFO) | $ 2 | $ 48 | $ 63 | $ 380 | $ 445 | $ 505 | $ 564 | $ 620 |

137.    The ARCT IV Registration Statement/Proxy was materially false and misleading in that it omitted and/or misrepresented material facts, including:

(a)      that ARCP lacked the acquisition capacity it claimed, as that capacity was predicated upon the use of  securities that were overvalued as a result of financial information that ARCP has since admitted should not be relied upon;

(b)      that the ARCT IV Defendants and the ARCP Director Defendants had no reasonable basis to believe that the combined company's stockholders would benefit from a stable or secure dividend, as ARCP's existing internal controls were not adequate and the Cole Merger would only aggravate that inadequacy;

(c)      that ARCP's projected and reported financial results, including ARCP's AFFO, could not be relied upon because they were the product of improper accounting and

inadequate internal controls, as detailed in ¶¶205, 266-67 and 269-72, *infra*.  Indeed, ARCP has admitted that its 2013 financial statements should not be relied upon; and

        (d)     that as a result of (a) - (c), above, neither the ARCT IV Defendants nor the ARCP Director Defendants had a reasonable basis to believe the AFFO estimates detailed in the ARCT IV Registration Statement/Proxy.

### December 2013 Reopening of the 2018 Notes

138.    On December 4, 2013, ARCP announced a reopening of the 2018 Notes, which were ultimately priced at $287.5 million (the "December 2013 Reopening").  The December 2013 Reopening was conducted pursuant to the Shelf Registration Statement, a Pricing Term Sheet and Free Writing Prospectuses dated December 5, 2013, and Prospectus Supplements dated December 5, 6, and 9, 2013 (collectively, the "December 2013 Reopening Materials").

139.    The December 2013 Reopening was underwritten by Defendants Citigroup, Barclays, Credit Suisse, Morgan Stanley, Wells Fargo, Capital One, and JMP Securities.  These Defendants were "underwriters," as defined in Section 2(11) of the Securities Act, of the 2018 Notes.

140.    The December 2013 Reopening Materials specifically incorporated by reference ARCP's 1Q13 Form 10-Q, 2Q13 Form 10-Q, and 3Q13 Form 10-Q.  These materials, which induced Union and other members of the Class to purchase ARCP's 2018 Notes, contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading.

### December 2013 Offering

141.    Also on December 4, 2013, ARCP announced an offering of 3.75% Convertible Senior Notes due December 15, 2020, which were ultimately priced at $402.5 million (the "2020 Notes") (the "December 2013 Offering").

142.     The December 2013 Offering was conducted pursuant to the Shelf Registration Statement, a Pricing Term Sheet dated December 5, 2013, and Prospectus Supplements dated December 5, 6 and 9, 2013 (collectively, the "December 2013 Offering Materials").

143.     The December 2013 Offering was underwritten by Defendants Citigroup, Barclays, JMP Securities, Credit Suisse, Morgan Stanley, Wells Fargo, and Capital One.  These Defendants were "underwriters," as defined in Section 2(11) of the Securities Act, of the 2020 Notes, as well as of the 2018 Notes as a result of their reopening.

144.     The December 2013 Offering Materials specifically incorporated by reference ARCP's 1Q13 Form 10-Q, 2Q13 Form 10-Q, and 3Q13 Form 10-Q.  These materials, which induced Union and other members of the Class to purchase ARCP's 2020 Notes contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading.

**Cole Merger**

145.     On or about December 23, 2013, ARCP and Cole Inc. filed a Registration Statement on Form S-4 (the "Cole Registration Statement") with the SEC and disseminated a Joint Proxy Statement/Prospectus (the "Cole Proxy") to Cole Inc. shareholders (collectively, the Cole Registration Statement and Cole Proxy, the "Cole Registration Statement/Proxy").  A copy of the Cole Merger Agreement for the transaction was attached to the Cole Proxy/Registration Statement and was incorporated by reference in both documents.

146.     Section 5.7(c) of the Cole Merger Agreement represented that ARCP and its subsidiaries "have devised and maintain a system of internal accounting controls sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP."   It also represented that the members of the audit committee of ARCP's Board of Directors had been informed of "all significant

- 53 -

deficiencies and material weaknesses in the design or operation of internal controls over financial reporting that are reasonably likely to adversely affect [ARCP's] ability to record, process, summarize and report financial data."

147. Section 5.7(c) of the Cole Merger Agreement further represented that:

[ARCP] ha[d] established and maintains disclosure controls and procedures (as such term is defined in Rule 13a-15 promulgated under the Exchange Act designed to ensure that material information relating to [ARCP] required to be included in reports filed under the Exchange Act, including its consolidated subsidiaries, is made known to [ARCP's] principal executive officer and its principal financial officer by others within those entities, particularly during the periods in which the periodic reports required under the Exchange Act are being prepared, and, to the knowledge of [ARCP], such disclosure controls and procedures are effective in timely alerting [ARCP's] principal executive officer and its principal financial officer to material information required to be included in [ARCP's] periodic reports required under the Exchange Act.

148. ARCP's 1Q13 Form 10-Q, 2Q13 Form 10-Q and 3Q13 Form 10-Q, which were each signed by Schorsch and Block and incorporated by reference in the Cole Registration Statement/Proxy, each assured investors that:

[W]e, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

149. Section 5.7(a) of the Cole Merger Agreement also contained a representation by [ARCP] that its filings with the SEC "complied in all material respects with the requirements of the Securities Act or the Exchange Act, as the case may be, and the applicable rules and regulations of the SEC thereunder," and did not contain "any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading."

150.    Section 5.8(a) of the Cole Merger Agreement also represented that:

None of the information supplied or to be supplied in writing on behalf of [ARCP] for inclusion or incorporation by reference in (i) the Form S-4 [Registration Statement] will, at the time such document is filed with the SEC, at any time such document is amended or supplemented or at the time such document is declared effective by the SEC, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, or (ii) the Joint Proxy Statement will, at the date it is first mailed to the stockholders of [Cole Inc. and of ARCP], at the time of the [Cole Inc.] Stockholder Meeting and the ARCP[] Stockholder Meeting, at the time the Form S-4 is declared effective by the SEC or at the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading.

151.    Section 6.2(c)(v) of the Cole Merger Agreement also contained a representation by ARCP that it would "maintain all financial books and records in all material respects in accordance with GAAP."

152.    On December 23, 2013, the Cole Registration Statement/Proxy was disseminated to Cole Inc. and ARCP shareholders and, among other things, presented financial data for ARCP for the first nine months of 2013, ended September 30, 2013, and represented that "[i]n [ARCP's] opinion, such unaudited financial statements include all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of the interim September 30, 2013 financial information."

153.    The Cole Registration Statement/Proxy was materially false and misleading.  The true facts were:

(a)    that ARCP was in the midst of an acquisition spree designed to generate transactional fees and compensation payments for Schorsch, ARCP executives, and other parties affiliated with Schorsch-controlled companies, without regard to the fairness or merits of the underlying transaction;

- 55 -

(b)      that ARCP did not maintain a system of internal controls sufficient to provide reasonable assurances regarding the reliability of it financial reporting or financial status;

(c)      that Defendants failed to carry out a reasonable evaluation of the effectiveness of ARCP's disclosure controls and procedures;

(d)      that ARCP's filings with the SEC did not comply in all material respects with the requirements of the 1933 Act or the 1934 Act and its financial statements did not include all adjustments necessary for a fair presentation of the Company's financial information;

(e)      that ARCP's projected and reported financial results, including ARCP's AFFO, could not be relied upon because they were the product of improper accounting and inadequate internal controls.  Indeed, as detailed in ¶¶205, 266-67 and 269-72, *infra*, ARCP has admitted that its 2013 financial statements should not be relied upon; and

(f)      that as a result of (a) - (e), above, Defendants had no reasonable basis to believe their statements detailed herein about the Company, its financial performance, and its AFFO estimates.

### ARCT IV Merger Release

154.    On January 3, 2014, ARCP issued a release in connection with the Company's acquisition of ARCT IV, wherein Block noted:

> This transaction is instrumental to achieving 2014 AFFO growth per share, and will reduce our balance sheet leverage with ARCT IV's highly unencumbered portfolio of real estate assets.  As we previously announced, our 2014 AFFO guidance ranges from $1.13 per share to $1.19, in conjunction with this transaction along with other previously announced transactions.

### February 2014 Private Placement

155.    On February 6, 2014, ARCP completed a $2.55 billion private placement of 2.0% Senior Notes due February 6, 2017, 3.0% Senior Notes due February 6, 2019, and 4.6% Senior Notes due February 6, 2024 (the "Senior Notes") (the "Private Placement").  The Private Placement

was conducted by way of an Offering Memorandum pursuant to Securities Act Rule 144A, by which the initial purchasers purchase the securities from the issuers and resell them pursuant to an SEC regulation providing a safe harbor for resales of unregistered securities to "Qualified Institutional Buyers."

156.    The Private Placement was the first step in a two-step process known as an "Exxon Capital Exchange."  The second step, the "Exxon Capital Exchange Offer," is the means by which the 144A notes are converted into registered, freely tradable securities.  In practice, the Rule 144A/Exxon Capital framework does not differ from registration.  High yield issuers and their underwriters prepare the offering memoranda for Rule 144A offerings in contemplation of the Exxon Capital Exchange Offer and, accordingly, prepare such documents to conform in all material respects to a registered offering.

157.    Underwriters purchased the Senior Notes from the issuers and resold them to investors, including National Pension Fund and other members of the Class, with the understanding and expectation that the Senior Notes would later be exchanged for freely tradeable registered bonds in the second step Exxon Capital Exchange Offer.  National Pension Fund and other members of the Class purchased the unregistered Senior Notes based upon the statements contained in the Offering Memorandum.

158.    In accordance with a registration rights agreement, ARCP subsequently filed a prospectus for the Exxon Capital Exchange Offer on September 12, 2014, as discussed below at ¶¶192-202.

**Closing of the Cole Merger**

159.    The Cole Merger closed on February 7, 2014, following approval by the shareholders of Cole Inc. and ARCP at respective Special Meetings of Stockholders.  The $11.2 billion Merger allowed for shares of Cole Inc. common stock to be exchanged for shares of ARCP common stock

and/or cash pursuant to the terms of the Cole Merger Agreement, as set forth in the Cole Registration Statement/Proxy.  The small faction of Cole Inc. shareholders who made a cash election received approximately $181 million.  However, based on the representations in the Cole Registration Statement/Proxy, 98% of Cole Inc. shareholders chose instead to receive 1.0929 shares of ARCP common stock for every Cole Inc. share exchanged.  Additionally, in connection with the consummation of the Cole Merger, ARCP issued shares of Company common stock to Cole Inc., Nemer, Keller, Holland and McAllaster.

160.    On February 7, 2014, ARCP issued a release commenting on the closing of the Cole Merger, wherein Block stated: "**With this success, we reaffirm our 2014 AFFO guidance range of $1.13 to $1.19 per share**."  The release further highlighted that – in addition to Moody's – ARCP had now received an "investment grade credit rating from Standard & Poor's Rating Services."

### Fourth Quarter 2013 Financial Results

161.    On February 27, 2014, ARCP issued a release announcing its financial results for the fourth quarter ("4Q13") and FY13.  The release emphasized ARCP's "Record Earnings of $163.9 Million and AFFO Per Share of $0.86 for 2013" and its "record operating results for the full year ended December 31, 2013[.]"  For 4Q13, the Company reported AFFO of $55.8 million, a year-over-year increase of 153%, and AFFO per fully diluted share of $0.25, a year-over-year increase of 108%.  For FY13, the Company reported AFFO of $163.9 million, an increase of 240% from 2012, and AFFO per fully diluted share of $0.86, an increase of over 80% from 2012 and "Exceeding Consensus AFFO Estimates."   The Company also reiterated its full year 2014 AFFO per share guidance of $1.13 to $1.19 per fully diluted share.

162.    Commenting on the Company's financial results, Block emphasized that while 2013 "proved to be a **record-setting year** for ARCP both in terms of earnings and growth . . . **we firmly**

believe that 2014 will be an even more impressive year.  These factors should fortify our 2014

AFFO guidance of $1.13 to $1.19 per share.”  Schorsch further noted:

> **As these results unequivocally demonstrate, we have accomplished an extraordinary amount in a very short time, underscoring our ability to execute key initiatives on every level across the organization**.  We will complete over $1.0 billion of acquisitions during the first quarter, at a pace ahead of projections and accretive to our earnings.  Our robust pipeline of property acquisitions, as well as other corporate opportunities we are privy to, is consistent with our ability to grow impressively, while staying true to our strategy.
>
> *       *       *
>
> In addition to the strong growth we have seen with our earnings, ARCP’s improved leverage posture and identified G&A synergies from the Cole acquisition are also generating a positive impact to the bottom line.  **Not only did we beat consensus estimates for the fourth quarter, our first quarter is off to a tremendous start**.  When you compare these financial results to our peer group valuation metrics, particularly dividend yield and earnings multiple, **we believe our Company is undervalued and poised for a share price increase.**

163.    Also on February 27, 2014, ARCP filed its annual report for the year ended

December 31, 2013 with the SEC on Form 10-K (the “2013 Form 10-K”).  The 2013 Form 10-K,

which was signed by Schorsch, Beeson, Block, Kay and McAlister, among others (Michelson,

Stanley, Bowman, Rendell, Andruskevich and Sealy), reiterated ARCP’s previously announced

financial results and represented that those financial results were accurate and presented in

accordance with GAAP.  The 2013 Form 10-K represented that the Company’s internal controls

were effective and disclosed any material changes to the Company’s internal control over financial

reporting.  The 2013 Form 10-K also included Schorsch’s and Block’s certifications pursuant to

SOX, identical in all material aspects to the certification quoted in ¶240.

164.    Later that day, ARCP  held a conference call with analysts and investors to discuss

the Company’s 4Q13 and FY13 financial results.  During the conference call, Schorsch confirmed

that “**[o]ur earnings guidance is solid, with room for upside**[.]”  Block likewise stated in pertinent

part:

Based on the strength of our acquisitions, success in our private capital management business, strategic execution of our balance sheet initiatives, and the continued savings in G&A costs, **we comfortably affirm our 2014 AFFO guidance of $1.13 to $1.19 per share**.

*        *        *

We currently have today 812.5 million shares and share equivalents outstanding on a fully diluted basis.  **The end result of all these numbers I just mentioned is a run rate of around $1.11 to $1.13 per share AFFO**.  Again, this number is a run rate through what we know today.

**If we didn't do anything else as of April 1, we would achieve this roughly $1.12 per share for the prospective 12 months.  We of course will continue to acquire more than the $1 billion we've discussed over the next nine months, and therefore achieve higher results**.

These results demonstrate tremendous success and are a result of the equally tremendous hard work.

165.    During the conference call, Block responded to an analyst's question about the

Company's full year 2014 AFFO per share guidance, stating in pertinent part:

<u>Chris Lucas – Capital One Securities – Analyst</u>:

Okay.  And then, again related to guidance, Brian, just in terms of getting to the low end of the numbers **we should just assume that $1.13 at the low end is reflective of** just essentially what you talked about before, which is **what's done and nothing more?  Is that effectively how we should be thinking about the low end?**

<u>Defendant Block</u>:

**That's correct**.  To repeat Chris, **if we didn't do anything past March 31, we would be at the low end of the range, notwithstanding the fact that we have a lot more acquisition potential for the duration of the year**.

166.    Also during the call, Beeson highlighted ARCP's "acquisition machine" as the

mechanism driving ARCP's strong performance.  Beeson stated in pertinent part:

<u>Josh Patinkin – BMO Capital Markets – Analyst</u>:

Okay.  And is that, you think, what enabled you such an attractive initial yield, going into smaller deal size?

- 60 -

<u>Defendant Beeson</u>:

Absolutely.  That is how we distinguish ourselves.  **No other company has the acquisition machine that we have built here**, that enables us to cost effectively do smaller one-off transactions, **and that's how we're able to get the pricing differential**.

We can buy three assets at a 7.75% or an 8% cap that another competitor buys in a portfolio at a 6, 7% cap.  That's a significant spread differential, and we do that because we're able to, and we'll do granular level acquisitions.

167.     The statements referenced above in ¶¶154-66 were each materially false and misleading when made.  The true facts, which were then known to, or recklessly disregarded by, ARCP, Schorsch, Block, Beeson, Kay and McAlister were:

(a)     that ARCP, Schorsch and Block's representations in ARCP's interim and FY13 SEC filings with respect to internal controls and financial reporting processes were false and misleading as these defendants had not conducted a reasonable evaluation of, or ARCP lacked, adequate internal controls;

(b)     that ARCP's investment grade credit rating was obtained through and based upon false financial statements that the Company has since admitted cannot be relied upon;

(c)     that ARCP's earnings guidance was not "solid," nor was there room for upside, as ARCP, Schorsch, Block, Beeson, Kay and McAlister were aware that the only way ARCP could meet guidance was through the artificial manipulation of the ARCP's financial results;

(d)     that 2013 was not a "record-setting year" for ARCP, but rather was made to appear that way through the use of falsified financial results, which ARCP has since admitted cannot be relied upon;

(e)     that Defendants based their statement that the Company was undervalued on manipulated AFFO numbers for 2014 that were based on the falsification of ARCP's actual performance;

(f)     that ARCP's earnings guidance was not "solid," nor was there room for upside, as these Defendants were aware that the only way ARCP could meet guidance was through the manipulation of ARCP's reported financial results; and

(g)     that as a result of (a) - (f), above, ARCP, Schorsch, Block, Beeson, Kay and McAlister had no reasonable basis to believe, and did not in fact believe, the Company's estimated 2014 performance and AFFO estimates.  Indeed, ARCP has now admitted that the Company's earnings releases and other financial communications should no longer be relied upon.

### First Quarter 2014 Financial Results

168.    On May 8, 2014, ARCP issued a release announcing its financial results for the first quarter, ended March 31, 2014 ("1Q14").  The release emphasized that ARCP had achieved "**Record First Quarter 2014 Operating Results**" and that "AFFO [was] in Line With Company Expectations at $0.26 per share[.]"  The Company reported AFFO available to common stockholders of $147.4 million, or $0.26 per fully diluted share, representing a year-over-year increase of 334.6%.  ARCP reaffirmed its full year 2014 AFFO guidance of $1.13 to $1.19 per fully diluted share.  Schorsch and Kay commented on the Company's financial results, stating in pertinent part:

Defendant Schorsch:

**I am very pleased with our results for the first quarter of the year** . . . . **We had a record quarter with earnings coming exactly in line with our expectations of $0.26 AFFO per share, consistent with our previously stated guidance for the year**. **Additionally, our year-to-date acquisitions**, combined with properties currently under contract **puts us well-ahead of schedule to achieve our total 2014 annual acquisition targets by midyear**.  With our strengthened balance sheet, and the Company ready to capitalize on a number of large-scale sale- leaseback transactions, **we are in position to deliver strong shareholder return this year**. . . .

Defendant Kay:

With our acquisitions team firing on all cylinders, **every aspect of our business is exceeding our expectations** . . . . **With strong earnings, our acquisition volume is outpacing our guidance**, our cap rates surpass all industry peers, Cole Capital launched two new products, and we successfully integrated our management and

systems, all of which is allowing us to execute with a disciplined intensity. The $1.7 billion of acquisitions we have closed or placed under contract were at a 7.92% cash cap rate or 8.26% GAAP cap rate. These 150 self-originated transactions are indicative of **the scale and expertise of our platform, providing a significant competitive advantage**. Finally, we are ramping up our capital raising initiatives in May and **remain confident that we will achieve our target of raising $3.1 billion of capital during 2014**.

169.    Beeson further noted that the Company's "**improved operational and financial efficiencies**" had positioned ARCP "**well to drive meaningful growth**."

170.    Also on May 8, 2014, ARCP filed with the SEC its Form 10-Q for the period ended March 31, 2014 (the "1Q14 Form 10-Q"), which was signed by Schorsch and Block, reiterated ARCP's previously announced financial results, and represented that those financial results were accurate and presented in accordance with GAAP. The 1Q14 Form 10-Q represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal control over financial reporting. The 1Q14 Form 10-Q also included Schorsch's and Block's certifications pursuant to SOX, identical in all material aspects to the certification quoted in ¶240.

171.    The 1Q14 Form 10-Q also contained a table, at page 66, which purportedly reflected the items deducted or added to net loss in the calculation of AFFO and represented 1Q14 AFFO of $147 million, compared to 1Q13 AFFO of $34 million.

172.    Later that day, ARCP held a conference call with analysts and investors to discuss the Company's 1Q14 financial results. During the conference call, Schorsch stated: "Our first quarter earnings came in exactly where we expected, at $0.26 per share of AFFO," while reiterating that "[w]e are confident with our guidance for the full year of 2014 of $1.13 to $1.19 per share, and a forward quarterly run rate of $0.29 to $0.30 per share. . . ." Block noted that the 1Q14 AFFO was $0.26 per share, fully diluted, and that the Company's "current run rate based on AFFO per share fully diluted is between $0.29 and $0.30."

173.   Beeson discussed various aspects of the Company's operations and net lease portfolio, noting how ARCP had "successfully integrated over 300 individuals from the multiple entities into one cohesive enterprise" and confirmed that the respective accounting systems had likewise been "fully integrated as well."

174.   Upon completion of the prepared remarks by Schorsch, Kay, Block and Beeson, the call was opened up for questions.  In response to questions from one analyst, Schorsch stated that investors should be buyers of ARCP stock as **"we're way undervalued."**  Schorsch further emphasized that **"our stock is cheap**.**"**

175.   The statements referenced above in ¶¶168-74 were each materially false and misleading when made, the true facts which were then known to or recklessly disregarded by ARCP, Schorsch, Block, Kay and Beeson were:

(a)   that the FY13 and 1Q14 financial results reported by ARCP were false and misleading as detailed in ¶¶204-08, 229-34, 248-53, 258-61 and 263-72;

(b)   that ARCP's 1Q14 AFFO was not in in line with Company guidance at $0.26 per share, but rather 1Q14 AFFO was overstated by an estimated $17,638,000 on a net basis (or $11,974,000 on a gross basis);

(c)   that ARCP's projected and reported financial results for interim periods and full year fiscal 2014 could not be relied upon because they were the product of improper accounting and inadequate internal controls;

(d)   that ARCP did not maintain a system of internal controls sufficient to provide reasonable assurances regarding the reliability of its financial reporting or financial status;

(e)   that Schorsch and Block failed to carry out a reasonable evaluation of the effectiveness of ARCP's disclosure controls and procedures;

(f)     that the Company's year-to-date acquisitions and those underlying ARCP's AFFO estimates were predicated upon the use of artificially inflated ARCP shares as currency to complete acquisitions and/or the sale of ARCP securities at artificially inflated prices;

(g)     that absent the fraudulent manipulation described herein, the Company's true earnings were not outpacing the Company's guidance;

(h)     that the Company's reported financial performance and rate of acquisitions were not indicative of the scale and expertise of its platform, but rather reflected ARCP, Schorsch, Block, Kay and Beeson's propensity to falsify financial information;

(i)     that the Company could only achieve its target of raising $3.1 billion of capital during 2014 if Defendants continued to falsify ARCP's reported financial performance;

(j)     that based on its true financial condition, the Company was not "way undervalued" and its stock was not "cheap"; and

(k)     that as a result of (a) - (j), above, ARCP, Schorsch, Block, Kay and Beeson had no reasonable basis to believe, and did not believe, their statements detailed herein about the Company, its financial performance, and its AFFO estimates.  Indeed, ARCP has now admitted that the Company's earnings releases and other financial communications should no longer be relied upon.

**May 21, 2014 Secondary Offering**

176.    On May 21, 2014, ARCP entered into an agreement related to the offering of 138 million newly issued shares of ARCP common stock at $12.00 per share (the "May 21 Equity Offering"),[10] raising $1.65 billion from investors pursuant to a false and misleading registration

---

[10]   In connection with the May 21 Equity Offering, the underwriters exercised an option to purchase an additional 18 million newly issued shares of ARCP common stock beyond the 120 million shares sold in the May 21 Equity Offering.  In total, ARCP sold 138 million shares in the May 21 Equity Offering.

statement filed March 13, 2013, along with a preliminary prospectus supplement filed May 21, 2014 and a prospectus supplement filed May 23, 2014, both of which were incorporated therein (collectively, the "May 21 Equity Offering Documents"). The May 21 Equity Offering closed on May 28, 2014.

177. The May 21 Equity Offering Documents incorporated by reference ARCP's 2013 Form 10-K and its 1Q14 Form 10-Q, each of which included the Company's false financial results and represented that: (i) the financial results contained therein were accurate and presented in accordance with GAAP; and (ii) the Company's internal controls were effective and any material changes to the Company's internal controls over financial reporting had been disclosed.

178. Each of the 2013 Form 10-K and 1Q14 10-Q also included false and misleading certifications executed by Schorsch and Block and filed pursuant to SOX.

179. The statements referenced above in ¶¶176-77 were each materially false and misleading when made in that they failed to disclose and/or misrepresented the following adverse facts:

(a) that ARCP's financial statements were inaccurate as they did not accurately portray the Company's financial performance and were not prepared in accordance with GAAP;

(b) that ARCP was unable to prepare sufficiently reliable financial statements as it lacked the necessary and appropriate internal controls with regard to its accounting systems; and

(c) the Company's reported AFFO was overstated by more than $17 million on a net basis.

**Multi-Tenant Shopping Center Portfolio Sale Announcement**

180. On May 21, 2014, ARCP also announced that it would be selling substantially all of its multi-tenant shopping center portfolio to an affiliate of the Blackstone Group for approximately $2 billion, and that ARCP would use the proceeds from the sale to fund its recently-announced

purchase of 500 Red Lobster locations.  In an effort to boost sagging interest in the Company shares, ARCP also announced that it was increasing its self-originated acquisitions guidance for the full-year 2014 to $4.5 billion.

### Annual Shareholder Meeting

181.     On May 29, 2014, ARCP held its annual shareholder meeting.  Shareholders focused intently on ARCP's management's compensation scale and ARCP's OPP Plan.  The OPP Plan is a compensation scheme that entitled ARCP senior management to payments of as much as $221.1 million over a five-year period, 42.5% of which (nearly $100 million) was allocated to be paid to Schorsch assuming ARCP met certain performance goals measured over the ensuing three years. Notably, Schorsch and ARCP's senior management were entitled to at least 50% of those payments **even if the total return to stockholders over the measuring period, including both share price appreciation and common stock distributions, as measured against a hurdle rate and a peer group of companies was – *zero*.**

182.     Shareholder reaction to the ARCP compensation scheme was overwhelmingly negative, as only 32% of the shares represented at the annual meeting voted in favor of the OPP Plan.

### REITWeek Investor Forum

183.     On June 3, 2014, Schorsch, speaking at the National Association of Real Estate Investment Trusts REITWeek Investor forum, highlighted the Company's increased acquisition guidance for 2014, stating in pertinent part:

> **We've also raised our acquisition guidance – our core acquisition guidance. This is critically important for people to understand about what we do.**  This is a very, very large enterprise.  It's about $30 billion between our non-traded REITs that are the Cole brand and our traded ARCP balance sheet.

*     *     *

- 67 -

. . . But the reason we've raised our acquisition target is because we net the entire years' core acquisition target by June. It makes no sense to not have acquisitions in the last half of the year. Now granted, we do not expect anywhere near the acquisition speed in the last half of the year . . . but **we did raise our target from $3 billion to $4.5 billion and we're currently already locked and loaded on $3.3 billion to close this year through the end of June**.

### June 20 Stockholder Memorandum

184. On June 20, 2014, ARCP announced via a stockholder memorandum Schorsch's planned transition to Executive Chairman and that Kay would replace Schorsch as CEO in October 2014. The memorandum also confirmed that Kahane and Weil would be resigning from their board seats. The announcement followed on the heels of the May 29, 2014 vote at the annual shareholder meeting repudiating ARCP's management compensation practices via an adverse advisory "say on pay" vote. The stockholder memorandum also included a chart emphasizing that ARCP was "a compelling value proposition" due in part to the fact that it traded at the "lowest 2014 AFFO multiple" relative to its peers.

### Second Quarter 2014 Financial Results

185. On July 29, 2014, ARCP issued a release announcing its financial results for 2Q14. For the quarter, the Company reported **AFFO of $205.3 million, representing a year-over-year increase of 429.0%, and AFFO per fully diluted share of $0.24, representing a year-over-year increase of 26%**. The Company also reported a **net loss of $63.4 million, or $0.08 per share**, compared to a net loss of $72.2 million, or $0.36 per share during 2Q13.

186. Noting that ARCP's use of AFFO was designed to "provide a more complete understanding of our performance relative to our peers and a more informed and appropriate basis on which to make decisions involving operating, financing and investing activities," the Company reported a "[p]ro forma normalized estimated AFFO run rate as of year-end 2014 of $1.18-$1.20 per

share including 2014 completed and announced transactions."  Kay and Schorsch commented on the

Company's financial results, stating in pertinent part:

> Defendant Kay:
>
> **Our second quarter results and accomplishments are indicative of our focus on driving long-term value by delivering on our commitments** . . . . In six months, we have fully integrated the organization, achieved $38.0 million of the $77.0 million of cost synergies to come in the first year, reduced leverage, de-risked the balance sheet, lengthened debt maturities, created $11.8 billion of unencumbered assets and significantly extended and upsized our credit facility. With these actions undertaken and the formative stage of the company behind us, we are focused on the day-to-day operations of the company. **Through all of these undertakings, we are positioned for long-term success**.
>
> **Our balance sheet acquisitions in the quarter**, owned and under contract, of 1,217 properties in over 210 separate transactions **demonstrates the continuing systematic execution of our core acquisition strategy and testifies to the repeatability of our investment process**.  As always, we see a tremendous volume of deals, but **with only approximately $250 million of acquisitions remaining to transact in calendar year 2014 on the balance sheet to meet our previously announced $4.5 billion target**, we intend to maintain a highly disciplined and selective approach to purchase the best assets for the portfolio.
>
> \*      \*      \*
>
> **The daily execution of these collective actions allows us to maintain our 2014 AFFO per share guidance of $1.13-$1.19**, while significantly de-levering the balance sheet and maximizing value for our stockholders."
>
> Defendant Schorsch:
>
> . . . I have continued to focus my attention on improving corporate governance . . . . With the support of our Board of Directors, we are improving our practices by eliminating related party transactions, enhancing disclosures, evaluating executive compensation, opting out of the MUTA to assure our stockholders' right to elect the entire Board at each annual meeting, and implementing other policies designed to improve our reporting and transparency, further align interest with our stockholders, and eliminate potential conflicts of interest. Our goal is to constantly improve our corporate governance, which we expect will ultimately be reflected in our corporate governance scores.  All of these efforts are taken with a view toward creating long-term value for stockholders.

187.    Also on July 29, 2014, ARCP filed its Form 10-Q for the period ended June 30, 2014

with the SEC (the "2Q14 Form 10-Q"), which was signed by Schorsch, Block and McAlister,

reiterated ARCP's previously announced financial results, and represented that those financial results were accurate and presented in accordance with GAAP. The 2Q14 Form 10-Q represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal control over financial reporting. The 2Q14 Form 10-Q also included Schorsch's and Block's certifications pursuant to SOX, identical in all material aspects to the certification quoted in ¶240.

188.    The 2Q14 Form 10-Q contained a table, at page 74, which purportedly reflected the items deducted or added to net loss in the calculation of AFFO and represented that AFFO was $205,278,000 and $353,058,000 for the three and six month periods ended June 30, 2014, respectively, compared to $38,802,000 and $72,279,000 for the three and six month periods ended June 30, 2013, respectively.

189.    Later that day, ARCP held a conference call with analysts and investors to discuss the Company's 2Q14 financial results. During the conference call, Kay and Block stated in pertinent part:

Defendant Kay:

. . . From afar, **it may appear at times our rapid growth is hard to understand. I can assure you, however, that everything we do is directed towards a singular objective: to create value for our shareholders**.

*        *        *

**We have built this Company with the future in mind and we are well positioned to take advantage of market opportunities as they arise**.

*        *        *

For example, I am often asked how can a company of our size consistently invest in properties at cap rates meaningfully better than our competitors. There is no alchemy here, I assure you. In part, our ability to invest at prices better than our peer groups result from our origination team being the largest in the industry.

*        *        *

**ARCP is positioned for success**. It is now not about creating this foundation, but building upon it. **I could not be more excited about the prospects for this Company** and I look forward to our future together.

Defendant Block:

Our second-quarter results are in line with our expectations. . . . AFFO was $198.6 million, or $0.24 per fully diluted share, which represents a 26% increase from this period last year. **We are confident with our [AFFO] guidance range for the full year of 2014 of $1.13 to $1.19 per share**. . . .

*      *      *

Additionally, **our internal operations continue[s] to strengthen. The synergy created by the integration of the Cole team and the adoption of new technology has allowed us to be more timely and efficient in our financial reporting**. In fact, this enhanced scale allowed us to move up the timing of our 10-Q filing and earnings call as a result of these improvements by roughly a week.

Let me turn to our earnings guidance numbers. . . .

**The second-half estimated AFFO projected run rate of $533 million** . . . includes second quarter as well as G&A for the second half of the year of approximately $80 million, which is inclusive of commissions and cost synergies. This is consistent with our full-year estimate of total G&A, including noncash compensation of approximately $176 million. **The run rate AFFO also includes an estimate for Cole Capital based on our projected $3.1 billion of capital raise and $4.9 billion of acquisitions into the managed funds**. The projection results in AFFO for Cole Capital for the full year of approximately $120 million.

190.   During the conference call, an analyst questioned ARCP's guidance, and Kay responded in pertinent part:

Dan Donlan – Ladenburg Thalmann & Company Inc. – Analyst:

David, just wanted to go to the guidance of a quick just so I understand it. **The pro forma AFFO run rate at year-end 2014, you have $1.18 to $1.20, that implies a quarterly run rate of $0.295 to $0.30**.

That's not a run rate for the fourth quarter, is it? **Is that what it would be** . . . at the very end of the quarter . . . **for the first quarter of 2015 assuming nothing new to 2015**. Is that right?

Defendant Kay:

**That is correct. Other than for Cole Capital that would assume the same estimates for 2015 as we have estimated for 2014**. So yes, that would be a year-

- 71 -

end run rate but would assume the same $4.9 billion of assets acquired during 2015 as well as the same $3.1 billion of equity raised in the Cole Capital managed funds.

*    *    *

<u>Dan Donlan – Ladenburg Thalmann & Company Inc. – Analyst:</u>

. . . If I am looking at the other guidance range that you reiterated, the one **for the full-year 2014 of $1.13 to $1.19** I think, **the midpoint of that is $1.16**. So you have done $0.49 year to date. That **would imply about $0.335 in the third quarter and fourth quarter to get to that midpoint – is that right as well?**

<u>Defendant Kay:</u>

That is roughly, yes, the math. And the reason there being is again, most of the Cole Capital EBITDA will occur with the acquisitions in the capital (inaudible) in Cole Capital versus where we were the first two quarters of the year. It is a very steep ramp up, as you know.

<u>Dan Donlan – Ladenburg Thalmann & Company Inc. – Analyst:</u>

Yes, yes. And so you probably have some benefit from ARCM not getting full potentially until the first part of the fourth quarter as well.

<u>Defendant Kay:</u>

That is exactly right. Because as articulated in that and part of the reason why we really wanted to lay that out is because you will have Red Lobster and ARCenters being owned for the three-month period, roughly, both at the same time. And that is why **we tried to be transparent and give both numbers – give the AFFO run rate** so that you will see the difference of actually Centers coming out as well as the year with both Centers and Lobster in at the same period of time.

*    *    *

Just to note, one other thing also in the estimates there is no promote or one-time disposition fees in any of the Cole numbers either in the AFFO run rate that we gave of $1.18 to $1.20 or in the $1.13 to $1.19 range where we reconciled to $1.14.

191.     The statements referenced above in ¶¶176-77 and 180-83 were each materially false and misleading when made. The true facts which were then known to, or recklessly disregarded by, ARCP, Schorsch, Block, Kay and McAlister were:

        (a)        that ARCP's reported FY13, 1Q14 and 2Q14 financial results were materially false and misleading as detailed in ¶¶204-72;

- 72 -

(b)      that the representations in ARCP's FY13, 1Q14 and 2Q14 SEC filings with respect to its internal controls and financial reporting processes were false and misleading as detailed in ¶¶204-72;

(c)      that ARCP's second quarter results had not positioned the Company for "long term success," nor were they the product of a focus on driving long term value for ARCP shareholders, but rather were the product of the intentional manipulation of ARCP's financial reports as detailed in ¶¶204-72;

(d)      that ARCP was not "positioned for success" nor was it "well positioned to take advantage of market opportunities," as its reported financial performance had been manipulated to portray artificially inflated AFFO growth rates;

(e)      that ARCP's internal controls and processes were not adequate and its operations did not "continue[] to strengthen" during the Class Period, but rather the inadequacy of ARCP's internal controls and financial reporting processes had been further aggravated by the tens of billions of dollars of acquisitions made by ARCP during the Class Period including the Cole Merger and the ARCT IV Merger.

(f)      that ARCP Management Defendants' efforts were not directed toward creating shareholder value, but rather were designed to facilitate rapid growth in ARCP's asset base in order to generate tens of millions of dollars in transactional fees, ongoing management fees and performance related compensation payments for the ARCP Management Defendants and Schorsch controlled entities;

(g)      that ARCP's reported results did not demonstrate the Company's continuing systematic execution of its acquisition strategy, but rather was accomplished via false financial

reporting and  the use of artificially inflated ARCP stock which could not be continued once Defendants' malfeasance was discovered;

(h)     that ARCP was not "a compelling value proposition" due in part to the fact that it traded at the "lowest 2014 AFFO multiple" relative to its peers, as ARCP's purported AFFO multiple was artificially inflated as a result of Block and Schorsch's wrongful acts as detailed herein;

(i)     that Schorsch and Block had no reasonable basis to believe, and did not in fact believe, that ARCP would generate FY14 AFFO of $1.18-$1.20 per share, absent the manipulation of ARCP's financial performance as detailed herein;

(j)     that Schorsch and Block had no reasonable basis to believe, and did not in fact believe, that ARCP could post an AFFO run rate in 4Q14 of $0.295-$0.30 per share, absent the manipulation of ARCP's financial performance as detailed in herein; and

(k)     that as a result of (a)-(h), above, Schorsch, Block, Kay and McAlister had no reasonable basis to believe, and did not believe, their statements about the Company's 2014 financial performance and AFFO estimates.  Indeed, ARCP has now admitted that the Company's earnings releases and other financial communications should no longer be relied upon.

**Exxon Capital Exchange Pursuant to
September 12, 2014 Senior Notes Offering**

192.    On September 12, 2014, ARCP and ARC Properties registered the $2.55 billion worth of Senior Notes previously issued in the February 2014 Placement (discussed above in the section entitled "February 2014 Private Placement") through the Exxon Capital Exchange Offer.

193.    The Exxon Capital Exchange Offer was conducted pursuant to the Shelf Registration Statement[11] and a Prospectus dated September 12, 2014 (the "Senior Notes Registration Statement").

---

[11]    The Shelf Registration Statement was signed by Schorsch, Weil, Block, Jones, Kahane, Rendell, Michelson, and Bowman.

The Senior Notes Registration Statement contained untrue statements of material fact and failed to disclose material information required to be disclosed therein pursuant to the regulations governing its preparation.

194.    Specifically, the Senior Notes Registration Statement contained financial statements that ARCP now admits "should no longer be relied upon" and that violated GAAP.  In addition, the Senior Notes Registration Statement was materially inaccurate because it contained materially misstated: (i) pro-forma financial information; (ii) AFFO financial measures; (iii) risk disclosures; and (iv) representations about the Company's internal controls.

195.    The Senior Notes Registration Statement incorporated by reference ARCP's: (i) 2013 Form 10-K; (ii) 1Q14 Form 10-Q; and (iii) 2Q14 Form 10-Q, which (as detailed herein) contained ARCP's financial statements for those periods, which the Company now admits were materially inaccurate and "should no longer be relied upon."  The Senior Notes Registration Statement also incorporated by reference the inaccurate internal control disclosures and SOX certifications contained in ARCP's: (i) 2013 Form 10-K; (ii) 1Q14 Form 10-Q; and (iii) 2Q14 Form 10-Q.

196.    ARCP now admits that the 2Q14 financial statements violated GAAP and failed to report approximately $10.5 million in "certain expenses," causing the reported net loss attributable to the Company for the quarter ended June 30, 2014 to be understated by 18.6%.[12]

197.    The Senior Notes Registration Statement also contained pro-forma financial statements based upon ARCP's materially misstated 2Q14 financial statements.  Accordingly, the pro-forma financial statements included in the Senior Notes Registration Statement, including the

---

[12]   Regulation S-X provides that financial statements filed with the SEC are presumed to be misleading and inaccurate if they have not been prepared in conformity with GAAP.  *See* 17 C.F.R. §210.4-01.(a)(1).

unaudited selected pro-forma consolidated operating data for the six months ended June 30, 2014 and the disclosures related thereto, were materially false.

198.     The Senior Notes Registration Statement was also materially inaccurate because it contained ARCP's materially misstated AFFO for 1Q14 (overstating AFFO by 13.6%), as well as for the three and six months ended June 30, 2014 incorporated by reference from the 1Q14 Form 10-Q (overstating AFFO by 5.6%) and the 2Q14 Form 10-Q (overstating AFFO by 6.9%).

199.     Additionally, the 1Q14 Form 10-Q and the 2Q14 Form 10-Q incorporated by reference in the Senior Notes Registration Statement contained materially inaccurate disclosures in the MD&A (*Management's Discussion and Analysis of Financial Condition and Results of Operations* under Regulation S-K [17 C.F.R. §229.303]).  The disclosures in the MD&A (which require that ARCP provide investors with information sufficient to understand the Company's results of operations, liquidity and capital resources) were materially false and misleading because they were based, in part, upon ARCP's admittedly misstated AFFO for 1Q14 and the three and six months ended June 30, 2014.

200.     Additionally, Item 3 of Form S-4 required that the Senior Notes Registration Statement furnish the information required by Item 503 of Regulation S-K [17 C.F.R. §229.503], including, among other things, a "discussion of the most significant factors that make the offering risky or speculative."  The risk disclosures in the Senior Notes Registration Statement were materially inaccurate because they negligently failed to advise investors about significant, then-existing factors that made the offering speculative or risky, including ARCP's managements' continual efforts to intentionally inflate the Company's reported operating performance and intentionally file unreliable and material misstated financial statements with the SEC.

201.    Finally, the Senior Notes Registration Statement represented that the Company was implementing "additional enhancements to its corporate governance practices as it remains focused on 'best practices[.]'"

202.    The statements referenced above in ¶¶192-201 were materially false and misleading in that they failed to disclose and/or misrepresented that ARCP lacked the necessary and appropriate internal controls over its accounting systems to prepare sufficiently reliable financial statements, and accordingly, was not enhancing its corporate governance practices or focusing on best practices. And just seven weeks after the September 2014 offering, ARCP admitted that the 1Q14 financial statements incorporated into the Senior Note Registration Statement contained errors that were "identified but intentionally not corrected," and that the 2Q14 financial statements incorporated into the Senior Note Registration Statement contained errors that were "intentionally made[.]"

**Announced Sale of Cole Capital**

203.    On October 1, 2014, ARCP issued a release announcing the planned sale of its private capital management business, consisting of Cole Capital to RCAP – another Schorsch-controlled entity – "for at least $700 million."

**ARCP ACKNOWLEDGES THAT ITS
FINANCIAL STATEMENTS CANNOT BE RELIED UPON AND
THAT IT FALSIFIED ITS REPORTED AFFO**

204.    Before the market opened on October 29, 2014, ARCP issued a release and filed a Form 8-K with the SEC revealing that the Company's previously reported FY2013 financial results, as well as its financial results for 1Q14 and 2Q14, "**should no longer be relied upon**," and that the Company intended to restate its financial results for those periods. ARCP further admitted that:

(1) the Company's AFFO was overstated during the first quarter of 2014 by an estimated **$17,638,000** on a net basis (or $11,974,000 on a gross basis), and was overstated during the second quarter of 2014 by an estimated **$10,869,000** on a gross basis; and

(2) the Company's net loss attributable to common stockholders was understated during the second quarter of 2014 by an estimated **$9,242,000**.

In addition, the Company's Audit Committee had concluded that the first quarter error "was **identified but intentionally not corrected**," and the second quarter errors were "**intentionally made**[.]" As a result, the Company was "reevaluating its internal control over financial reporting and its disclosure controls and procedures."

205.    The Form 8-K stated, in pertinent part:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**.
>
> . . . **On October 24, 2014, the Audit Committee** of the Board of Directors (the "Audit Committee") **of [ARCP]** . . . **concluded that the previously issued audited consolidated financial statements and other financial information contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013, the previously issued unaudited financial statements and other financial information contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2014 and June 30, 2014, and the Company's earnings releases and other financial communications for these periods (collectively, the "Prior Financial Information") should no longer be relied upon**.
>
> The Audit Committee based its conclusion on the preliminary findings of its investigation into **concerns regarding accounting practices and other matters** that first were reported to the Audit Committee on September 7, 2014. The Audit Committee promptly initiated an investigation, which is being conducted with the assistance of independent counsel and forensic experts.
>
> The investigation conducted to date has not uncovered any errors in the consolidated financial statements (prepared in accordance with U.S. GAAP) for the three months ended March 31, 2014. However, **based on the preliminary findings of the investigation, the Audit Committee believes that the Company incorrectly included certain amounts related to its non-controlling interests in the calculation of adjusted funds from operations ("AFFO"),** a non-U.S. GAAP financial measure, **for the three months ended March 31, 2014 and, as a result, overstated AFFO for this period. The Audit Committee believes that [1] this error was identified but intentionally not corrected, and [2] other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014**.

*        *        *

**Based on the preliminary findings of the investigation, the Company has identified** the **potential adjustments** set forth in Exhibit 99.1 to this Report **[1] to the Company's reported net loss in accordance with U.S. GAAP for the three and six months ended June 30, 2014 and [2] to reported AFFO . . . for the three months ended March 31, 2014 and the three and six months ended June 30, 2014**. Note that, in calculating AFFO for the first quarter of 2014, the Company presented activity from non-controlling interests on a net basis, while in the second quarter of 2014, as permitted, the Company presented its activity from non-controlling interests on a gross basis (which it will continue to do in calculating AFFO in future periods). The weighted average number of shares used in calculating AFFO differs depending on whether the net or gross method is used (but does not change for purposes of calculating net loss per share in accordance with U.S. GAAP. **The investigation is ongoing and there can be no assurance that the potential adjustments** set forth in the table below **will not change based upon the final results of the investigation, and any such change could be material**.

The Company will work with the Audit Committee and the Audit Committee's independent advisors to determine the adjustments required to be made to the Prior Financial Information as expeditiously as possible. **Upon the completion of this process, which could identify further adjustments in addition to those discussed above, the Company will restate the Prior Financial Information and amend its prior periodic filings to the extent required [and update its earnings guidance at that time]**.[13] The Company will file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2014 after the amended filings have been made.

In light of the preliminary findings of the Audit Committee's investigation, **the Company is reevaluating its internal control over financial reporting and its disclosure controls and procedures. The Company intends to make the necessary changes to its control environment to remediate all control deficiencies that are identified as a result of the ongoing investigation and the restatement process**.

206.    The Form 8-K announced the abrupt resignations of the Company's CFO, Defendant Block, as well as McAlister, the Company's CAO.

207.    The release and Form 8-K contained identical tables setting forth "Potential Adjustments" to the Company's: (1) previously-reported AFFO for the first and second quarters of 2014; and (2) previously-reported net loss attributable to common stockholders (a GAAP measure) for the second quarter of 2014. According to those tables, the Company's AFFO was overstated

---

[13]    Bracketed language is contained in the Company's October 29, 2013 press release.

during the first quarter of 2014 by an estimated **$11,974,000** on a gross basis, and during the second quarter of 2014 by an estimated **$10,869,000** on a gross basis. In addition, the Company's second quarter 2014 overstatement of AFFO included an understatement of the Company's net loss attributable to common stockholders of an estimated **$9,242,000**.

208.    Later that day, Defendants held a conference call with analysts and investors, during which Kay admitted that the Company had inappropriately accounted for various accruals and expenses, which affected, among other things, the Company's reported GAAP earnings per share ("EPS"). Kay explained that "various accruals and expenses . . . should[] [have] been accrued in the second quarter that ended up resulting in an accrual in the third quarter instead. . . .  That does impact our GAAP statements. Accruals are an expense item. They affect both AFFO as well as EPS."

209.    In response to these announcements, ARCP common stock traded as low as $7.85 per share on October 29, 2014, a decline of more than 36% from the prior day's closing price of $12.38 per share, before closing at $10.00 per share, a decline of more than 19%, on more than 231 million shares traded, or more than 27 times the average daily trading volume during the Class Period.

210.    The price of the Company's common stock continued to decline as the market absorbed the import of ARCP's October 29, 2014 announcements and analysts issued reports downgrading and lowering their estimates for the Company, closing at $9.42 per share on October 30, 2014, and ultimately tumbling to a closing price of $7.85 per share on November 3, 2014.

211.    ARCP debt securities likewise experienced a substantial decline in price as a result of the corrective disclosures announced on October 29, 2014. As reflected in the following table, debt prices experienced a one-day decline of between 1.8% and 7.1%:

|  | 2.0% Sr. 2/6/2017 | 3.0% Sr. 2/6/2019 | 4.6% Sr. 2/6/2024 | 3.0% Cvrt. 8/1/2018 | 3.75% Cvrt. 12/15/2020 |
|---|---|---|---|---|---|
| **10/28/2014** | $100.47 | $100.72 | $103.87 | $99.50 | $100.06 |
| **10/29/2014** | $98.69 | $97.70 | $96.52 | $94.25 | $95.75 |
| **$ Chg.** | ($1.78) | ($3.02) | ($7.35) | ($5.25) | ($4.31) |
| **% Chg.** | -1.8% | -3.0% | -7.1% | -5.3% | -4.3% |

212.    ARCP Series F Preferred stock also experienced a substantial decline in price as a result of the corrective disclosures announced on October 29, 2014.  On October 28, 2014 the adjusted closing price of ARCP Series F Preferred stock was $23.09; on October 29, 2014 the price of ARCP Series F Preferred stock declined to $21.84 on usually heavy trading volume.  As the news of ARCP's corrective disclosure penetrated the market the price of ARCP Series F Preferred stock continued to decline.  On November 3, 2014 the adjusted closing price of ARCP Series F Preferred stock was $20.64 per share.

213.    Analysts reacted negatively to the Company's October 29, 2014 disclosures.  For example, Wells Fargo Securities noted, "we believe this morning's announcement will be a significant setback for the company in terms of earning or maintaining investor trust, credibility, and allaying investor skepticism."

214.    Credit rating agencies likewise reacted negatively.  On October 29 and October 30, 2014, S&P and Moody's, respectively, placed the corporate debt ratings of ARCP under review for possible downgrade.

215.    On October 29, 2014, *The Wall Street Journal* reported that the SEC "intends to launch an inquiry into the accounting irregularities" at ARCP.  According to the October 29, 2014 *Wall Street Journal* article:

> The incident might make it harder for [ARCP], which manages nearly $30 billion in real estate, . . . to raise capital for purchasing properties, analysts said.

- 81 -

*      *      *

Others said the errors could directly undermine [ARCP's] growth strategy, which has relied on tapping the debt and equity markets for capital to pay for acquisitions.

The company's "credibility is likely impugned for some period of time," wrote J.P. Morgan analyst Anthony Paolone, adding that "capital costs will be higher in the near term . . . thus making growth more difficult."

Investors also are worried the timing of the accounting revelations could imperil a deal that [ARCP] announced earlier this month, according to a person familiar with the matter.

On Oct. 1, the company said that it would sell its private capital-management business, Cole Capital, which raises money for nontraded REITs, for $700 million to RCS Capital Corp., another company chaired by Mr. Schorsch.

216.    On October 31, 2014, *Reuters* reported that the Federal Bureau of Investigation and the United States Attorney's Office for the Southern District of New York had "opened a criminal probe of [ARCP] . . . in the wake of the . . . accounting errors[.]"

217.    On November 3, 2014, Wells Fargo Securities suspended equity research coverage on ARCP, citing news reports "that the FBI and the U.S. attorneys' office have both opened a criminal probe into ARCP."  Ladenburg Thalmann also suspended coverage.

218.    Although the Company had represented that it did not expect its revelations of accounting improprieties "to impact any previously announced transactions, including the sale of Cole Capital," on November 3, 2014, ARCP announced that RCAP had notified the Company "[i]n the middle of the night" that it was terminating its $700 million agreement to purchase Cole Capital from ARCP.  RCAP cited the "recent disclosures by [ARCP] . . . on October 29, 2014, and the matters arising with respect to such disclosures" – notwithstanding the fact that Schorsch held executive-level positions at both RCAP and ARCP.

219.    On November 6, 2014, Oppenheimer released a research report summarizing a conversation with Kay and Michael Sodo in which they indicated that they "expect[ed] to release revised result for all three quarters in 2014 and full year 2013 together."

220.    Kay similarly confirmed the impending restatement of the 2013 and first three quarters of 2014 financial results to J.P. Morgan.  On November 11, 2014, J.P. Morgan analysts issued an analyst report summarizing their conversation with Kay, in which he disclosed that "Restated financials for 1Q'14, 2Q'14, 3Q'14 and FY 2013 will all be issued at the same time." J.P. Morgan analysts noted that Kay gave them the impression that the restated financials would be filed "reasonably soon, not months from now."

221.    The Company's ability to finance the acquisitions so critical to its business strategy was hindered by its fraudulent financial reporting and its inability to file accurate financial statements.  Thus, on November 14, 2014, ARCP announced that it "had received . . . consent . . . from its lenders on its unsecured credit facility for an extension" of time to file "its third quarter 2014 financial statements . . .  by January 5, 2015."  As a condition of the extension, however, the Company's lenders required it "to permanently reduce the maximum amount of indebtedness" under the unsecured credit facility "from $4.65 billion to $4.0 billion[,]" and to "temporarily" reduce that amount to $3.6 billion until the Company filed its amended financial statements with the SEC – which left ARCP with only $400 million of remaining borrowing capacity.  Subsequently, on December 23, 2014, ARCP was forced to further "permanently reduce the maximum amount of indebtedness under its credit facility to $3.6 billion," in exchange for an additional extension of time from its unsecured credit facility lenders to file its third quarter 2014 and amended financial statements.

222.    On November 18, 2014, ARCP announced that, as a result of its failure to timely file its third quarter 2014 Form 10-Q, the Company had received a notice from the NASDAQ stating that it was "not in compliance with NASDAQ Listing Rule 5250(c)(1) that requires timely filing of reports with the [SEC,]" and had until January 11, 2015 to submit a plan to regain compliance.

223.    Then, on December 15, 2014, ARCP filed a Form 8-K with the SEC announcing that Schorsch had "resigned as Executive Chairman and a director of [ARCP]" and had "also resigned from all other employment and board positions that he held at the Company and its subsidiaries and certain Company-related entities . . . ."   According to a release issued that day, ARCP was "unwinding all of its relationships with entities in which Mr. Schorsch maintains an executive or director-level role or is a significant stockholder."   The December 15, 2015 Form 8-K also announced the sudden resignations of Kay, the Company's CEO and a member of the Board of Directors, and Defendant Beeson, the Company's President and COO.

224.    The following day, S&P downgraded ARCP's credit rating to junk status and cautioned that further downgrades were possible in the near-term.  Moody's likewise downgraded the Company's credit rating below investment grade, with a "negative outlook."

225.    The market was surprised by Kay and Beeson's sudden resignations.  According to a J.P. Morgan research report dated December 18, 2014, "[w]e were surprised (and so was the market) by the resignation of David Kay (former CEO) this week since, up until recently Mr. Kay stated that he was there for the long haul."

226.    As a result of Defendants' fraud, ARCP's reputation and credibility among investors and business associates have been devastated.  ARCP purchases real estate with money raised by selling non-traded, illiquid REITS, primarily to small investors through a network of independent broker-dealers and financial advisors.   Indeed, nearly 40,000 independent broker-dealers

immediately suspended sales of ARCP, Cole Inc., and RCAP-sponsored products, and three giants

of the clearing and custody industry – Fidelity, Pershing, and Schwab –followed suit.  As Paul

Adornato, a REIT analyst with BMO Capital markets stated: "It would be difficult if not impossible

for any broker to sell shares . . . until the investigation into ARCP['s] . . . financial control is

satisfactorily completed."

227.    The Company's credibility has been so severely harmed that it was compelled to

conduct "a review of its portfolio" and assure the market in a December 24, 2014 release that it had

re-confirmed ownership status of its own portfolio and the status of property leases.  In the same

release, ARCP delivered yet another blow to investors: it would "not pay a dividend on its common

stock until its financial statements have been delivered," and "intend[ed] to review its dividend

policy" thereafter.

## MCALISTER FILES HER VERIFIED COMPLAINT

228.    On December 18, 2014, the reason for the dramatic departures announced three days

before became clear.  Former ARCP CAO McAlister filed a Verified Complaint in the Supreme

Court of the State of New York, County of New York, asserting claims of defamation *per se* against

ARCP, Schorsch, and Kay.  In an action captioned *Lisa Pavelka McAlister v. American Realty

Capital Properties, Inc., et al.*, Index No. 162499/2014 (Sup. Ct. N.Y. Cnty.), McAlister disputed the

account of events given by the Company and Kay on October 29, 2014, including their

representation that she had "resigned."

229.    Specifically, McAlister alleged that, beginning in or about **February 2014**, she

"**repeatedly informed Mr. Schorsch, Mr. Kay and senior management** [that] she had discovered

that the Company had, in the fourth quarter of 2013 ('2013 Q4'), and possibly in earlier quarters,

suddenly and without any apparent justification or basis, changed the method by which it had

historically reported its adjusted funds from operations ('AFFO') relative to previous financial quarters."  Verified Complaint ¶1.

230.    In an explanation facially similar to the one given by Kay during the October 29, 2014 investor and analyst call, McAlister – who described AFFO as "arguably the single most critical metric" for publicly traded REITs (*id.* ¶33) – alleged:

> Specifically, the Company ceased pro-rating the added-back-to-AFFO non-recurring transaction and deferred financing costs on its 10K and 10Q reports, opting instead to add to and increase the Company's AFFO by the entirety of the edit-back costs, including the portion thereof that should have been attributed to non-controlling interests in the operating partnership, ARC Properties Operating Partnership LP, instead of adding to AFFO only the Company's *pro rata* share of the added-back costs.

*Id.* ¶31.

231.    According to McAlister's sworn statement, she made senior management, **including Schorsch and Kay**, aware of the problem in or about the previous **February**.

232.    Moreover, McAlister alleged that, upon apprising Kay of the problem she had identified, he directed her and CFO Block "not to change or correct the fraudulent reports, **in an apparent effort to avoid public disclosure of the Company's faltering financial performance**." *Id.* ¶37.

233.    She also alleged that, during a conference call with her and Block on or around July 28, 2014:

> **Mr. Schorsch directed Mr. Block** to reallocate the funds used to calculate the AFFO and shift the numbers in the 2014 Q2 report **in an effort to conceal the previous improper reporting**, by having Mr. Block prepare a schedule changing the add-back amortization and write off of deferred financing costs.

*Id.* ¶39.

234.    In addition, she alleged that Schorsch and Kay directed the Company to "change[] the beginning point for its AFFO calculation from 'net loss attributable to stockholders (in accordance

with U.S. GAAP)' to 'net loss (in accordance with U.S. GAAP).'" *Id.* ¶40. While this change was not improper in and of itself, she alleged, "it made it more difficult for stockholders to see the fraudulent change in the add-backs of non-recurring transaction and deferred financing costs." *Id.*

235.    Although McAlister "repeatedly expressed her concerns regarding Mr. Schorsch's instruction to shift and reallocate the funds in the 2014 Q2 report, . . . her objections went ignored." *Id.* ¶42. Therefore, after she was appointed to be the "'principal accountant' on the 2014 Q2 report," *id.* ¶43, she "emailed Jessica Estrada, a Manager at Grant Thornton, the Company's auditors, and called attention to the manipulative accounting practice reflected in the Q2 report." *Id.* ¶44. In response to her email, according to McAlister: "Ms. Estrada and Richard LeFleur, a Partner at grant Thornton, told Ms. McAlister that she could sign and file the 2004 Q2 report 'as is.'" *Id.* ¶45. On Grant Thornton's instruction, McAlister filed the 2014 Q2 report. *Id.* ¶46.

236.    Finally, McAlister alleged that the issues she had raised concerning the Company's accounting resulted in the Audit Committee's internal investigation, *id.* ¶48, that she was later "terminated" on or about October 28, 2014, *id.* ¶51, and that her termination was "a clear act of retaliation for her blowing the whistle on ARCP's unlawful accounting and financial reporting practices, and an attempt to use her as a scapegoat for Defendants' fraudulent conduct." *Id.* ¶52. After learning about McAlister's complaint, which "suggest[ed] a more broad knowledge of the intentional misstatement," J.P. Morgan surmised that the resignations could be because the lawsuit could "impugn Mr. Kay's credibility," and signify that the Audit Committee's "investigation . . . [had] uncovered evidence that Mr. Kay knew more than previously thought."

## ARCP'S FINANCIAL REPORTING DURING
## THE CLASS PERIOD WAS MATERIALLY FALSE AND MISLEADING

237.    Pursuant to Regulation S-X [17 C.F.R. §210.4-01.(a)(1)], financial statements filed with the SEC are presumed to be misleading and inaccurate if they have not been prepared in

conformity with GAAP.  This presumption also exists for interim financial statements filed with the SEC.  *See* 17 C.F.R. §210.10-01.

238.    ARCP, ARC Properties, the Management Defendants, and the ARCP Director Defendants were responsible for conducting ARCP's business activities in accordance with Section 13 of the 1934 Act (the "Exchange Act"), which provides:

> Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall –
>
> A.      make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> B.      devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> i.       transactions are executed in accordance with management's general or specific authorization;
>
> ii.      transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;
>
> iii.     access to assets is permitted only in accordance with management's general or specific authorization; and
>
> iv.      the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

**ARCP's Financial Disclosures During the Class Period**

239.    As an SEC registrant, ARCP filed with the SEC its historical financial statements during the Class Period, which the Company, the Management Defendants, and the ARCP Director Defendants represented were prepared in conformity with GAAP (the "GAAP Financial Statements").

240.    For example, the 1Q13 Form 10-Q contained certifications signed by Defendants Schorsch and Block pursuant to §302 of SOX, attesting that the financial information contained in

the filing was true, that it did not omit material facts, and that the Company's internal and disclosure controls were effective.  The certification stated:

I, [Schorsch and Block], certify that:

1. I have reviewed this . . . Report . . . of [ARCP];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably

likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

241.    Likewise, the 1Q13 Form 10-Q represented that:

In accordance with Rules 13a-15(b) and 15d-15(b) of the Securities Exchange Act, as amended (the "Exchange Act"), we, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this . . . [report] and determined that the disclosure controls and procedures are effective.

242.    These representations concerning the Company's internal and disclosure controls, and Schorsch and Block's certifications pursuant to SOX, were repeated, in all material respects, in the Forms 10-K and 10-Q that ARCP filed with the SEC, as detailed in ¶¶121, 129, 163, 170 and 187, *supra*.

243.    Further, and pursuant to Regulation S-X, ARCP filed with the SEC certain "pro-forma" financial statements.  As provided by Regulation S-X, the objective of pro-forma financial information is to provide investors with information about the continuing impact of a particular transaction by illustrating how it may have affected an entity's historical financial statements had the transaction been consummated earlier.  Accordingly, during the Class Period ARCP filed various pro-forma financial statements combining the Company's historical GAAP financial statements with

the historical financial statements of certain of the entities it acquired during the Class Period (the "pro-forma financial statements").

244.    In addition to the foregoing, during the Class Period ARCP provided investors with certain "non-GAAP" financial measures.  The objective of non-GAAP measures, which are governed by Regulation G [17 C.F.R. §244.100], is to facilitate the understanding of a company's underlying operational performance, liquidity or financial position.

245.    Due to certain unique operating characteristics of real estate companies, industry trade group National Association of Real Estate Investment Trusts, Inc. ("NAREIT") adopted a financial measure known as funds from operations ("FFO"), which is designed to provide investors with a supplemental, industry-wide standard measurement of a REIT's operating performance that would exclude certain perceived drawbacks associated with the presentation of a REIT's net income as calculated under GAAP.

246.    Accordingly, during the Class Period, ARCP supplemented its GAAP financial statements with non-GAAP measures FFO and AFFO.  ARCP represented that its calculation of FFO was consistent with the standards established by the White Paper on FFO approved by the Board of Governors of NAREIT, which generally defines FFO as net income (computed in accordance with GAAP) less: (i) gains (or losses) from sales of most property; and (ii) depreciation expense on real estate related assets.

247.    ARCP also provided investors with its AFFO as a supplemental measure of its operating performance.  For example, ARCP Form 10-K for the year ended 2013 notes that its AFFO provides information that assists investors and analysts to better assess the sustainability of the Company's ongoing operating performance by excluding transactions that are not related to the ongoing profitability of its portfolio of properties, stating in pertinent part, as follows:

- **By providing AFFO**, we believe we are presenting useful information that **assists investors and analysts to better assess the sustainability of our ongoing operating performance without the impacts of transactions that are not related to the ongoing profitability of our portfolio of properties**.

- We believe **AFFO is useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies that are not as involved in activities which are excluded from our calculation**.

- We believe that the use of FFO and AFFO, together with the required U.S. GAAP presentations, provide a more complete understanding of our performance relative to our peers and a more informed and appropriate basis on which to make decisions involving operating, financing, and investing activities.

**ARCP's Admissions that Its Financial Reporting
During the Class Period Was Materially False and Misleading**

248.    On October 29, 2014, ARCP issued a release announcing that the Audit Committee had concluded that the financial statements for the year ended December 31, 2013 and the quarters ended March 31, 2014 and June 30, 2014 (collectively, the "Class Period financial statements") "**should no longer be relied upon**." The press release also announced:  (i) "**intentional**" financial statement errors caused the Company's previously disclosed net loss (pursuant to GAAP) for the three and six months ended June 30, 2014 to be understated (the "intentional 2Q14 GAAP errors"); (ii) an error in the calculus of the Company's AFFO for the three months ended March 31, 2014 caused the AFFO it previously reported to investors to be overstated during that period (the "1Q14 AFFO error"); and (iii) "**intentional**" AFFO errors during the quarter ended June 30, 2014 coupled with the intentional 2Q14 GAAP errors and the 1Q14 AFFO error, which although identified, was "**intentionally**" left uncorrected, caused the Company's previously disclosed AFFO for the three and six months ended June 30, 2014 to be overstated (the "2Q14 AFFO error").

249.    During an October 29, 2014 conference call, Kay provided additional explanation about the 1Q14 AFFO error, stating in pertinent part, as follows:

There are two methods which are acceptable – both are acceptable in disclosing and presenting non-controlling interest in the AFFO calculation. In the first quarter, our Company was using the net method. Under the net method, you present net income on a net basis, meaning that any income related or allocated to the noncontrolling shareholders, which are those of shareholders in our operating partnership – we have a traditional OP structure, UPREIT structure. And so those OP or noncontrolling interest shareholders represent roughly 3.5% of the total shares outstanding.

Under the net method, we would present the top net income at 96.5%, and add back roughly 96.5% of each of the add-backs to come to AFFO. You would then divide AFFO by just the common shareholder numbers, the weighted average common shares, to get to an AFFO per share number. You can see that depicted in the table that is in both the 8-K as well as at the back of the press release.

The impact of that for the first quarter of the adjustment – what happened was when the add-backs were done, they were done at 100% instead of 96 – roughly 96.5%. That created too much add-back, or presentation for AFFO would be too high by roughly $17.6 million. That was a roughly $0.03 overstatement of AFFO per share for the quarter in that presentation.

250.    With respect to the 2Q14 AFFO error, the October 29, 2014 release also stated, in

pertinent part:

. . . [B]ased on the preliminary findings of the investigation, the Audit Committee believes that the Company incorrectly included certain amounts related to its non-controlling interests in the calculation of adjusted funds from operations ("AFFO"), a non-U.S. GAAP financial measure, for the three months ended March 31, 2014 and, as a result, overstated AFFO for this period. **The Audit Committee believes that this error was identified but intentionally not corrected, and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO** and an understatement of the Company's net loss for the three and six months ended June 30, 2014.

**ARCP's Admission that Its Financial
Misstatements Were Material**

251.    While, as of the date of the filing of this Complaint, ARCP has not filed with the SEC

amended financial statements for FY13, 1Q14 or 2Q14, it has "adjusted" certain previously reported

GAAP and Non-GAAP financial measures for 1Q14 and the three and six months ended June 30,

2014. This adjustment means that ARCP has already determined that such financial measures were

- 93 -

materially misstated as GAAP requires only materially misstated financial measures to be corrected and re-reported on a retroactive basis.[14]

252.    Defendants have now acknowledged that ARCP's financial misstatements, including those resulting from the "intentional" acts, caused:

- ARCP's AFFO for 1Q14 to be overstated by **13.6%**;

- ARCP's AFFO per-share for 1Q14 to be overstated by **13.0%**;

- ARCP's net loss attributable to the Company (on a U.S. GAAP basis) for 2Q14 to be understated by **18.6%**;

- ARCP's loss-per-share (on a U.S. GAAP basis) for 2Q14 to be understated by **11.1%**;

- ARCP's AFFO for 2Q14 to be overstated by **5.6%**; and

- ARCP's AFFO for the six months ended June 30, 2014 to be overstated by **6.9%**.

253.    These overstatements of the Company's income-related financial measures disseminated by Defendants are both quantitatively and qualitatively material, causing the Company's reported operating performance during the Class Period to be artificially inflated.

254.    Moreover, GAAP, as articulated in the SEC's Codification of Staff Accounting Bulletins Topic 1M ("CSAB Topic 1M"), provides that materiality in the context of a financial misstatement not only includes an assessment of the magnitude of the misstatement in percentage terms, but also requires an assessment of the factual context in which the user of financial statements would view the financial misstatement (referred to in accounting and auditing literature as "quantitative" and "qualitative" factors).

---

[14]   *See, e.g.*, Accounting Standards Codification ("ASC") Topic 250, *Accounting Changes and Error Corrections*, SEC Staff Accounting Bulletin Topic 1-M, *Materiality*, and SEC Staff Accounting Bulletin Topic 1-N, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*.

255.    Thus, CSAB Topic 1M provides: "the staff believes that there are numerous circumstances in which misstatements below 5% could well be material.  Qualitative factors may cause misstatements of quantitatively small amounts to be material."

256.    For example, CSAB Topic 1M notes that even quantitatively small financial misstatements may be material if management has intentionally made adjustments to various financial statement items in a manner inconsistent with GAAP.  Accordingly, CSAB Topic 1M cautions that SEC registrants "**should not assume that even small intentional misstatements in financial statements**" are immaterial.  Here, ARCP has admitted that its financial misstatements during the Class Period were caused by "intentional" acts of the Company's senior management, and are thus material.

257.    In addition, CSAB Topic 1M provides that the "volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."  When ARCP publicly admitted to the Class financial misstatements, the price of its common stock declined more than **19%**, and its market capitalization and the value of its securities collapsed by more than **$3 billion**, evidencing the qualitative materiality of the misstatements.

**ARCP's Financial Misstatements
Were the Result of Intentional Conduct**

258.    The intentionality of the Class Period misstatements is not in doubt, as the Company has admitted:

- The Company's senior-most management participated in the intentional, material misstatement of ARCP's operating performance measures, including the understatement of GAAP net loss attributable to the Company and loss-per-share;

- The Company's most senior executives, including those directly responsible for its accounting – were all fired or "stepped down" within a two month period.  On October 29, 2014, ARCP announced it had "replaced" Defendant Block (Executive Vice President, CFO, Treasurer and Secretary) and McAlister (Senior Vice President

and Chief Accounting Officer).  On December 12, 2014, Defendant Schorsch "resigned" as Executive Chairman and a director of ARCP and on December 15, 2014, Kay "resigned" as CEO and a director of the Company and Defendant Beeson "resigned" as President and Chief Operating Officer of the Company;

- The Company's Audit Committee hired independent legal and accounting advisors to assist it with an "investigation" into the concerns about the Company's financial reporting and internal controls;

- The Company's previously issued financial measures were materially misstated due to a myriad of accounting improprieties; and

259.    The magnitude of ARCP's financial misstatements, the Audit Committee's retention of legal and accounting advisors to assist it with its ongoing investigation, the nearly immediate and ongoing investigations launched by the SEC and FBI, the Company's wholesale management "replacements" and "resignations," and the numerous, intentional accounting manipulations disclosed to date are not indicative of innocent record keeping "errors."

260.    Moreover, as detailed herein, in her defamation lawsuit, McAlister alleges that in February of 2014, she informed ARCP's executive management about the financial improprieties now admitted to by Defendants.  Nonetheless, according to McAlister, at the "specific direction of Defendants Schorsch and Kay," ARCP continued to engage in the fraudulent financial reporting alleged herein.

### The Audit Committee's Investigation into ARCP's
### False Financial Statements Is Ongoing

261.    The October 29, 2014 release announced the Audit Committee's conclusions based upon the **preliminary** findings of its investigation, emphasizing that the investigation was "ongoing."  It also announced that the "Company will work with the Audit Committee and the Audit Committee's independent advisors **to determine the adjustments required to be made to the Company's previously issued financial statements**," and that "[u]pon completion of this process, which could identify further required adjustments in addition to those discussed above, the

**Company will restate prior financial statements and amend its prior periodic filings** to the extent required and update its earnings guidance at that time."

262. On the October 29, 2014 conference call, Kay acknowledged that the intentional 2Q14 GAAP errors were associated with "certain expenses" that went unrecorded.

263. In addition, on November 6, 2014, Oppenheimer & Co. Inc. issued an equity research update on the Company stating in pertinent part:

> We met with David Kay (CEO) and Michael Sodo (CFO) at NAREIT on Wednesday. **Management expects to release revised results for all three quarters of 2014 and 2013 together; the hope is by mid-November** but there is no way of knowing when the forensic accountants will be finished.

264. These representations make clear that the FY13 financial statements and the 1Q14 financial statements, which Defendants claimed were free of errors, were presented in violation of GAAP and are materially false and misleading.

265. On November 7, 2014, *The Wall Street Journal* reported that Rendell, an Independent Director of ARCP, stated that the Company's accounting irregularities were associated with "employee bonuses." *The Wall Street Journal* article quoted Rendell as stating the Company's financial statements were "incorrect because [executives] fudged something about bonuses to cover up a prior mistake."

## ARCP's GAAP Violations

266. As detailed herein, Defendants have admitted that ARCP's financial reporting during the Class Period violated GAAP.

267. GAAP, in ASC Topic 450, requires that financial statements recognize and report a charge to income when information existing at the date of the financial statements indicates that it is probable (*i.e.*, likely) that an asset has been impaired or a liability has been incurred and the amount of which can be reasonably estimated.

268.    ARCP has now admitted that, in violation of GAAP, it failed to record approximately $10.5 million in "certain expenses" causing the reported net loss attributable to the Company for the quarter ended June 30, 2014 to be understated by 18.6%.

269.    The 2013 Form 10-K describes ARCP's accounting for its acquisition of affiliated entities as a "critical" accounting policy, stating in pertinent part, as follows:

**Allocation of Purchase Price of Business Combinations and Acquired Assets**

In accordance with the guidance for business combinations, we determine whether a transaction or other event is a business combination. If the transaction is determined to be a business combination, we determine if the transaction is considered to be between entities under common control. The acquisition of an entity under common control is accounted for on the carryover basis of accounting whereby the assets and liabilities of the companies are recorded upon the merger on the same basis as they were carried by the companies on the merger date.

270.    Upon information and belief, ARCP's Class Period financial statements violated GAAP, and certain of its critical accounting policies, by failing to:

- record expenses in conformity with ASC Topic 450;

- disclose related party transactions in conformity with ASC Topic 850; and

- timely recording asset impairments in conformity with ASC Topic 360.

271.    By failing to file financial statements with the SEC that complied with GAAP, ARCP disseminated financial statements that were presumptively misleading and inaccurate.

272.    The Company's Forms 10-K and 10-Q filed with the SEC during the Class Period were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

**Grant Thornton's Inaccurate Audit Opinion**

273.     ARCP has engaged Grant Thornton, a firm of certified public accountants, to provide the Company with independent auditing and various accounting-related services since March 21, 2011.

274.     As a result of Grant Thornton's history with Schorsch-controlled entities, including ARCP and those detailed in ¶74, above, and the scope of services it provided to the Company, Grant Thornton personnel were intimately familiar with ARCP's business, including its related-party transactions.  The extensive services rendered by Grant Thornton to ARCP are demonstrated by the fees that the Company paid Grant Thornton.

275.     The aggregate fees received by Grant Thornton for the year ended December 31, 2013 totaled $1.593 million, a 437% increase from the $297,000 in fees Grant Thornton received from ARCP in 2012, the vast majority of which were financial statement audit and review related.

276.     With respect to audit related services, Grant Thornton's website claims that its "professionals recognize that **to deliver a quality financial statement audit, it's important to look beyond the accounting entries to the underlying activities and operations**."

277.     Grant Thornton's February 27, 2014 inaccurate, unqualified audit opinion, on ARCP's 2013 financial statements and ARCP's system of internal controls over financial reporting was included in the May 21 Equity Offering Documents and the Senior Notes Registration Statement stated, in pertinent part:

> **REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
>
> Board of Directors and Stockholders
> American Realty Capital Properties, Inc.
>
> We have audited the accompanying consolidated balance sheets of American Realty Capital Properties, Inc. (a Maryland corporation) and subsidiaries (the "Company") as of December 31, 2013 and 2012, and the related consolidated statements of operations and comprehensive loss, changes in equity, and cash flows for each of the

three years in the period ended December 31, 2013. Our audits of the basic consolidated financial statements included the financial statement schedules listed in the index. These financial statements and financial statement schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of American Realty Capital Properties, Inc. and subsidiaries as of December 31, 2013 and 2012, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2013 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the related financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2013, based on criteria established in the 1992 *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 27, 2014 expressed an unqualified opinion. [Emphasis in the original.]

278. These statements were both objectively false, and Grant Thornton could not have believed them at the time they were made because:

(a)    as detailed above, ARCP's 2013 financial statements violated GAAP;

(b)    material deficiencies existed in ARCP's internal control over financial reporting; and

(c)    Grant Thornton's audit of the FY13 financial statements was not conducted in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").

279.    Auditing standards have been established to ensure that external auditors fulfill their obligations when auditing and reviewing financial statements and other information contained in SEC filings.  These standards include those originally established by the American Institute of Certified Public Accountants ("AICPA"), which include, *inter alia*, ten basic standards that establish the objectives of a financial statement audit and provide guidance for the quality of audit procedures to be performed, as well as interpretations of these standards.

280.    As a result of SOX, the PCAOB, was created to oversee the audits of public companies, and has now adopted, amended and expanded upon the auditing standards and interpretations previously issued by the AICPA (referred to by the PCAOB as "interim standards) and has also promulgated additional auditing standards (referred to herein as "AS___").

281.    The PCAOB's AS No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, identifies the following as indicators of material weakness(es) in a company's system of internal control:

- the identification of fraud, whether or not material, on the part of senior management; and

- a restatement of previously issued financial statements to reflect the correction of a material misstatement.

282.    These indicators, which were admittedly present during the Class Period, demonstrate that material weaknesses existed in ARCP's system of internal control as of December 31, 2013.

283.    In addition, Grant Thornton's knowledge of ARCP's transactions with its affiliates and related parties created various obligations under the auditing standards that it failed to meet. This is particularly true since Grant Thornton, as a large and prominent certified public accounting firm, fully understood the requirements associated with the audit of related-party transactions and long-lived asset impairments.

284.    For example, AS No. 15, *Audit Evidence*, provides that an auditor has a reasonable basis for issuing an audit opinion when the auditor has planned and performed audit procedures in a manner that enables the auditor to obtain "sufficient appropriate audit evidence."  AS No. 5 defines sufficiency as "the measure of the quantity of audit evidence" and appropriateness as "the measure of the quality of audit evidence."

285.    In addition, AS No. 14, *Evaluating Audit Results*, provides that when evaluating whether the financial statements as a whole are free of material misstatement, the auditor should evaluate the qualitative aspects of the company's accounting practices, including potential bias in management's judgments about the amounts and disclosures in the financial statements.

286.    Further, AU §334, *Related Parties*, notes that the auditor "should place emphasis on testing material transactions with parties he knows are related to the reporting entity" and "apply the procedures [the auditor] considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements."

287.    Had Grant Thornton performed its audit in accordance with the standards of the PCAOB, it would have learned, if it did not already know, that the 2013 financial statements were not presented in conformity with GAAP and could not be relied upon.  Accordingly, Grant Thornton failed to obtain sufficient appropriate audit evidence as required by applicable auditing standards, including those associated with related parties and asset impairments.

288.    Indeed, the importance of the foregoing auditing standards is demonstrated by the mandate of Section 10A of the Exchange Act, which, apart from auditing standards, provides that each audit shall incorporate:

(a)    procedures designed to provide reasonable assurance of detecting illegal acts that would have a direct and material effect on the determination of financial statement amounts; and

(b)      procedures designed to identify related party transactions that are material to the financial statements or otherwise require disclosure therein.

289.      In addition, AS No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, provides that a direct relationship exists between the degree of risk that a material weakness could exist in a particular area of the company's internal control over financial reporting and the amount of audit attention that should be devoted to that area. In addition, AS No. 5 provides that the auditor should focus more of his or her attention on the areas of highest risk.

290.      Grant Thornton violated the standards of the PCAOB by failing to focus its attention on the areas of highest risk, particularly those associated with the related-party transactions, which were the accounting policies that ARCP deemed to be "critical" in nature.

291.      Moreover, AU §230, *Due Professional Care in the Performance of Work*, required Grant Thornton to exercise "due professional care" and "professional skepticism" in the performance of its audit of the 2013 financial statements.  Grant Thornton violated this auditing standard because it failed to determine that the 2013 financial statements were unreliable and presented in violation of GAAP.

292.      In addition to the foregoing, Grant Thornton violated, at least, the following auditing standards when examining the FY13 Financial Statements:

(a)      GAAS Standard of Reporting No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP.  Grant Thornton's opinion inaccurately represented that FY13 Financial Statements were presented in conformity with GAAP when, as alleged herein, they were not;

(b)     AS No. 8, *Audit Risk*, which provides that to form an appropriate basis for expressing an opinion on the financial statements, the auditor must plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement due to error or fraud.  Reasonable assurance is obtained by reducing audit risk to an appropriately low level through applying due professional care, including obtaining sufficient appropriate audit evidence; and

(c)     AU §220, *Independence*, which requires that independence in mental attitude is to be maintained by the auditor in all matters related to the audit.

293.     In certifying the FY13 Financial Statements, Grant Thornton represented that its audit of such financial statements was performed in accordance with each of the above-noted auditing standards, when it was not.  Accordingly, the representations in Grant Thornton's audit opinion were both objectively false and could not have been believed at the time they were rendered.

294.     Moreover, ARCP has now admitted that the FY13 Financial Statements should not be relied upon.  In addition, former ARCP CAO McAlister has sworn that she informed the Grant Thornton audit manager assigned to FY13 Financial Statements that ARCP had been engaging in deceptive accounting practices *prior to* the Company's filing of the 2Q14 Form 10-Q.

295.     PCAOB standards, including AU §561, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report*, provide that when the auditor becomes aware of information that would have been investigated had it been known prior to issuing the audit report, the auditor is obligated to investigate its reliability and whether it existed at the date of its report.  If the financial statements or the auditor's report would have been affected, and it is believed there are persons currently relying or likely to rely on the financial statements who would attach importance to the information, the auditor should advise the client to make appropriate disclosure of the newly

discovered facts.  If the client refuses to cooperate, the auditor should, among other things, notify appropriate regulatory agencies (here, the SEC) that the auditor's report should no longer be relied upon.

296.    Indeed, apart from these PCAOB standards, Section 10A of the 1934 Act, requires, in pertinent part:

(2) Response to failure to take remedial action

If, after determining that the audit committee of the board of directors of the issuer, or the board of directors of the issuer in the absence of an audit committee, is adequately informed with respect to illegal acts that have been detected or have otherwise come to the attention of the firm in the course of the audit of such firm, the registered public accounting firm concludes that–

(A) the illegal act has a material effect on the financial statements of the issuer;

(B) the senior management has not taken, and the board of directors has not caused senior management to take, timely and appropriate remedial actions with respect to the illegal act; and

(C) the failure to take remedial action is reasonably expected to warrant departure from a standard report of the auditor, when made, or warrant resignation from the audit engagement;

the registered public accounting firm shall, as soon as practicable, directly report its conclusions to the board of directors.

(3) Notice to Commission; response to failure to notify

An issuer whose board of directors receives a report under paragraph (2) shall inform the Commission by notice not later than 1 business day after the receipt of such report and shall furnish the registered public accounting firm making such report with a copy of the notice furnished to the Commission.  If the registered public accounting firm fails to receive a copy of the notice before the expiration of the required 1-business-day period, the registered public accounting firm shall–

(A) resign from the engagement; or

(B) furnish to the Commission a copy of its report (or the documentation of any oral report given) not later than 1 business day following such failure to receive notice.

297.    Although Grant Thornton was told about ARCP's deceptive accounting practices prior to July 29, 2014, when the Company filed its Form 10-Q for the quarter ended June 30, 2014,

there is no indication that Grant Thornton notified ARCP's Board of Directors about such improprieties, as required by PCAOB standards and Section 10A of the Exchange Act. To the contrary, it appears that ARCP's Board of Directors was not notified of the Company's deceptive accounting practices until September 7, 2014.

298.    Additionally, notwithstanding ARCP's admission that the FY13 Financial Statements should not be relied upon and Grant Thornton being informed that ARCP engaged in deceptive accounting practices during the Class Period, Grant Thornton has not withdrawn its audit opinion on the FY13 Financial Statements.

## ADDITIONAL SCIENTER ALLEGATIONS

299.    On October 29, 2014, at the end of the Class Period, the Company admitted that the AFFO it reported for 1Q14 was false, and that the falsity of that AFFO was "**identified but intentionally not corrected**" before it was publicly reported. The Company also admitted that the AFFO and net loss metrics it reported for 2Q14, were overstated and understated, respectively, that those misstatements were "**intentionally made**," and that the calculation of AFFO "included a number that went into there in order **to conceal the error from the first quarter**."

300.    That same day, the Company admitted that two senior officers of the Company – then CFO Block and then CAO McAlister, both of whom are Defendants – had been implicated during the Audit Committee's investigation related to the concealment of the accounting misstatements. The Company also announced the purported "resignation" of those two individuals, who – the Company admitted – had "key roles in the preparation" of its financial statements, including those reported for fiscal 2013.

301.    In her Verified Complaint, McAlister **admits** her pre-filing awareness of the "improper accounting" the Company used to report its AFFO for the first quarter of 2014, and alleges that she specifically apprised Block and Kay of that impropriety. She also alleges that, in

response to her efforts, "Mr. Kay told Ms. McAlister and Mr. Block not to change or correct the fraudulent reports, in an apparent effort to avoid public disclosure of the Company's faltering financial performance." Verified Complaint ¶37.

302.    In addition, McAlister alleges that, on or about July 28, 2014, she witnessed Schorsch direct Block "to reallocate the funds used to calculate the AFFO and shift the numbers in the 2014 Q2 report **in an effort to conceal the previous improper reporting**, by having Mr. Block prepare a schedule changing the add-back amortization and write off of deferred financing costs." *Id.* ¶39.

303.    McAlister also alleges that both Schorsch and Kay "directed" Block to take steps to make it "more difficult for stockholders to see the fraudulent change in the add-backs of non-recurring transaction and deferred financing costs." *Id.* ¶¶39, 40.  "In other words, Mr. Schorsch **instructed** Mr. Block to take steps to cover up the improper change in accounting and unlawfully misleading financial reports with both further fraudulent accounting reflected in the 2014 Q2 report and a proper change that made it more difficult for stockholders to see the fraudulent failure to prorate the added-back non-recurring transaction and deferred financing costs." *Id.* ¶41.

304.    Finally, McAlister alleges that she informed the Company's auditor, Grant Thornton, about the "manipulative accounting practice reflected in the Q2 report," but was instructed that she could "sign and file the 2014 Q2 report 'as is,'" which she did. *Id.* ¶¶44, 45.

305.    On October 29, 2014, ARCP announced it had "replaced" Block, the Company's Executive Vice President, CFO, Treasurer and Secretary, and McAlister, its Senior Vice President and CAO.  On December 12, 2014, Schorsch "resigned" as Executive Chairman and a director of ARCP, and on December 15, 2014, Kay resigned as CEO and a director of the Company, and Beeson resigned as President and COO of the Company.

306.    Moreover, Defendants had substantial motivations for engaging in the improper conduct alleged herein.  Their misrepresentation of AFFO permitted Defendants to disguise, in the words of McAlister, the Company's "faltering financial performance" (McAlister Verified Complaint ¶37), thereby allowing the Company to continue on its aggressive binge of mergers and acquisitions.  As alleged above, these transactions facilitated massive self-dealing among the web of companies founded by Schorsch, resulting in the generation of tens, if not hundreds, of millions of dollars through related-party transactions rife with conflicts of interest.

307.    And, by inflating the Company's share price, the fraud permitted the Management Defendants to reap extraordinary awards – dwarfing their salaries – through the Company's 2014 Multi-Year Outperformance Plan, or OPP.

308.    Thus, Defendants engaged in this misconduct to perpetuate ARCP's campaign of growth and expansion, to consummate the related-party transactions attendant thereto, and to trigger grossly disproportionate incentive compensation payments that were premised on the Company meeting certain targets for total return to shareholders, a metric that includes share price appreciation.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

309.    At all relevant times, the markets for ARCP securities were efficient for the following reasons, among others:

(a)    ARCP stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, ARCP filed periodic public reports with the SEC and the NASDAQ;

(c)     ARCP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     ARCP was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

310.    As a result of the foregoing, the markets for ARCP securities promptly digested current information regarding ARCP from all publicly available sources and reflected such information in the prices of ARCP's securities.  Under these circumstances, all purchasers of ARCP securities during the Class Period suffered similar injury through their purchase of ARCP securities at artificially inflated prices and a presumption of reliance applies.

311.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding ARCP's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD CREATED THE MARKET FOR**
**THE FEBRUARY 2014 PLACEMENT**

312.    As alleged herein, in connection with the offering and sale of the Senior Notes pursuant to the February 2014 Private Placement (the "Private Placement"), defendants employed devices, schemes, and artifices to defraud, and engaged in acts, practices and courses of business which would and did operate as a fraud and deceit upon certain Lead Plaintiff movants and other members of the Class.  This scheme included the offering and sale of the Senior Notes based on materially false and misleading information, and without disclosing material facts.

313.    The information contained in the Offering Memorandum was materially false and misleading, as alleged herein.  Had truthful and complete information been provided to potential investors at the time of the Private Placement, investors would have known that the credit risk associated with the Senior Notes was substantially greater than the credit risk reflected by the rates of return on the Senior Notes.  Accordingly, had the true facts about ARCP been disclosed to investors at the time of the Private Placement, and had investors known of ARCP's true financial and operational condition, there would have been no market for the Senior Notes.

314.    The scheme described herein was intended to, and did, bring the Senior Notes into the market fraudulently.  Thus, the fraud alleged herein created a market for the Senior Notes which would not otherwise have existed.  Absent the fraud, there would have been no Private Placement and, ultimately, no Exxon Capital Exchange.

315.    When purchasing the Senior Notes in the Private Placement, Plaintiffs and the Class members reasonably relied on the availability of those securities in the market as an indication of their genuineness.  Plaintiffs and the Class members relied on the integrity of the market to furnish securities that were not the product of a fraudulent scheme.  Thus, the reliance of Lead Plaintiff

movants and the Class members on Defendants' fraudulent scheme, including their misstatements and omissions, should be presumed.

## LOSS CAUSATION/ECONOMIC LOSS

316.   During the Class Period, as detailed herein, Defendants engaged in a scheme and wrongful course of business that artificially inflated the price of ARCP securities by making false and misleading statements, and omitting material information, about ARCP's operations and financial results.  As Defendants' false and misleading statements and omissions became apparent to the market, beginning on October 29, 2014, the price of ARCP securities fell, as the prior artificial inflation came out.  As a result of their acquisitions of ARCP securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss.

317.   In direct response to the October 29, 2014 disclosure, ARCP common stock plummeted, trading as low as $7.85 per share on October 29, 2014, on an extremely heavy trading volume.  Before the market closed on October 29, 2014, ARCP held a conference call, which over 1,000 analysts and investors listened to telephonically.  During the call, Kay attempted to minimize the fraud, characterizing it as "a one-quarter adjustment," implying that culpability was limited to two Company executives, and emphasizing that the Company's "controls and processes [had] continued to improve" over the last 10 months.  Following Kay's reassurances, the price of ARCP common stock rebounded slightly, closing at $10.00 per share on October 29, 2014, a decline of more than 19% from the prior day's closing price, with over 231 million shares traded, 27 times the average daily trading volume during the Class Period.

318.   The price of the Company's common stock continued to decline on October 30, 2014, closing at $9.42 per share as the market absorbed the import of the October 29, 2014 announcements and analysts issued reports downgrading and lowering their estimates for the Company.  ARCP's common stock price ultimately tumbled to a closing price of $7.85 per share on November 3, 2014,

after investors learned that RCAP had terminated its $700 million agreement to purchase Cole Capital from ARCP, citing the October 29, 2014 disclosures as the reason for the termination of the agreement.

319.   The price of ARCP's debt securities also fell as a direct result of the October 29, 2014 revelations:

| | 2.0% Sr. 2/6/2017 | 3.0% Sr. 2/6/2019 | 4.6% Sr. 2/6/2024 | 3.0% Cvrt. 8/1/2018 | 3.75% Cvrt. 12/15/2020 |
|---|---|---|---|---|---|
| 10/28/2014 | $100.47 | $100.72 | $103.87 | $99.50 | $100.06 |
| 10/29/2014 | $98.69 | $97.70 | $96.52 | $94.25 | $95.75 |
| $ Chg. | ($1.78) | ($3.02) | ($7.35) | ($5.25) | ($4.31) |
| % Chg. | -1.8% | -3.0% | -7.1% | -5.3% | -4.3% |

320.   ARCP Series F Preferred stock also experienced a substantial decline in price as a result of the corrective disclosures announced on October 29, 2014.   On October 28, 2014 the adjusted closing price of ARCP Series F Preferred stock was $23.09; on October 29, 2014 the price of ARCP Series F Preferred stock declined to $21.84 on usually heavy trading volume.   As the news of ARCP's corrective disclosure penetrated the market the price of ARCP Series F Preferred stock continued to decline.   On November 3, 2014 the adjusted closing price of ARCP Series F Preferred stock was $20.64 per share.

321.   The declines in the price of ARCP securities between October 29, 2014 and November 3, 2014 were a direct result of the nature and extent of Defendants' prior false and misleading statements and omissions being revealed to investors and the market.   The timing and magnitude of the price declines of ARCP securities negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' wrongful conduct.

322.    The following charts demonstrate the clear divergence of ARCP's common stock prices from its peer index, and the divergence of the prices of ARCP debt securities from the FINRA-BLP Active Investment Grade U. S. Corporate Bond Index ("NBBIPR"), as the truth became known to the market:





323.    The economic loss suffered by Plaintiffs and other members of the Class was a direct result of Defendants' wrongful conduct that inflated the prices of ARCP securities and the subsequent decline in the value of those securities when Defendants' prior false and misleading statements and omissions were revealed

**ADDITIONAL ALLEGATIONS RELATING TO ARCP OFFERINGS**

**Defendants Failed to Exercise Reasonable Care or to
Conduct a Reasonable Investigation in Connection with the Offerings**

324.    No Defendant made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in ARCP's offering materials issued during the Class Period were accurate and complete and not misstated in any material respects.

325.    Due diligence is a critical component of the issuing and underwriting process. Directors, officers, and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information.  Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a verification process.  At a minimum, due diligence for every public offering should involve interviews of upper and mid-level management, as well as a review of: (1) the auditor's management letters and items identified therein; (2) the company's SEC filings (particularly those incorporated by reference); (3) the company's financial statements, including gaining an understanding of the company's accounting and conducting conversations with the company's auditors without management present; (4) the company's internal controls; (5) adverse facts and concerns within each underwriter's organization and within the underwriter syndicate; and (6) critical non-public documents forming the basis for the company's assets, liabilities and earnings.  Red flags uncovered through this process must be investigated.  Officers and auditors must participate in the underwriters' due diligence, and directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.

326.    Had Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

327.    The defendants identified in ¶¶77-79 (the "Underwriter Defendants"), under the heading The Underwriter Defendants, did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the offering materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.  In particular, the Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding the Company's financial statements, AFFO and internal controls

specified herein.  The Underwriter Defendants could not simply rely on the work of ARCP's outside auditors because the investing public relies on underwriters to obtain and verify relevant information and make sure that essential facts are disclosed.  Thus, the Underwriter Defendants were obligated to conduct their own independent and reasonable investigation into the accuracy of the Company's financial statements and assessments of internal controls.  Had the Underwriter Defendants conducted a reasonable investigation, they would have learned that ARCP's financial statements and reported AFFO were inaccurate and that the Company's internal controls were ineffective.

328.    Similarly, the Defendants who signed the offering materials failed to conduct a reasonable investigation of the statements contained in the offering materials and documents incorporated therein by reference and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.  Had these Defendants conducted a reasonable investigation, they would have learned that the offering materials contained material misstatements and omissions about ARCP's financial statements, reported AFFO and the effectiveness of the Company's internal controls.

329.    The Defendants who signed the offering materials were knowledgeable about accounting and internal control issues given their collective industry experience, yet failed to reasonably investigate the accuracy of ARCP's financial statements and reported AFFO and the effectiveness of the Company's internal controls, notwithstanding the presence of red flags.

330.    Moreover, any challenged statements of opinion or belief made by any of the Officer Defendants in connection with the offerings detailed herein were materially inaccurate statements of opinion or belief when made and at the time of those offerings.

## FIRST CLAIM FOR RELIEF
### for Violation of §11 of the 1933 Act

331.    Plaintiffs incorporate ¶¶1-5, 12-75, 77-85, 99-105,117-119, 133-153, 176-179, 192-202, 204-212, 237-251, 253-258, 261, 263-264, 266-273, 277-280, 288, 292-293, 324-330 as though fully set forth herein.  For purposes of this Claim, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Claim is based solely on claims of strict liability and/or negligence.

332.    This Claim is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, against defendants as detailed below:

| Registration Statement For | Date | Individual Defendants/ Registration Statement Signatories | Defendant Underwriters | Defendant Auditor | Named Plaintiff |
|---|---|---|---|---|---|
| $300 million 3% Convertible Senior Notes due 2018 | 7/2013 | Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman | J.P. Morgan, Citigroup, Barclays, BMO Capital, KeyBanc, JMP Securities, Ladenburg, RCS | | Union |
| $287.5 million 3% Convertible Senior Notes due 2018 | 12/2013 | Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman | Citigroup, Barclays, Credit Suisse, Morgan Stanley, Wells Fargo, Capital One, JMP Securities | | Union |
| $402.5 million 3.75% Convertible Senior Notes due 2020 | 12/2013 | Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman | Citigroup, Barclays, Credit Suisse, Morgan Stanley, Wells Fargo, Capital One, JMP Securities | | Union |
| 79.1 million shares of stock issued in ARCT IV Merger | 1/3/2014 | Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Budko, Block, Beeson, Jones | | | Paul Matten<br><br>Mitchell Ellis<br>Bonnie Ellis |
| 520.8 million shares of ARCP common stock issued in Cole Merger | 2/2014 | Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Kay, Budko, Block, Beeson | | | TIAA-CREF<br><br>National Pension Fund<br><br>Corsair<br><br>KBC<br><br>Simon Abadi |

| Registration Statement For | Date | Individual Defendants/ Registration Statement Signatories | Defendant Underwriters | Defendant Auditor | Named Plaintiff |
|---|---|---|---|---|---|
| 138 million shares of ARCP common stock issued in May 2014 Offering | 5/2014 | Schorsch, Weil, Stanley, Kahane, Andruskevich, Michelson, Rendell, Bowman, Sealy, Block, Jones | Merrill Lynch, Citigroup, Barclays, JP Morgan, Capital One, Credit Suisse, Deutsche Bank, Wells Fargo, Baird, Ladenburg, BMO Capital, JMP Securities, Janney, Mizuho, PNC Capital, Piper Jaffray, RBS | Grant Thornton | National Pension Fund<br><br>Tampa<br><br>Corsair<br><br>Simon Abadi |
| $2.55 billion of Senior Notes | 9/2014 | Schorsch, Stanley, Frank, Andruskevich, Michelson, Rendell, Bowman, Block, McAlister | | Grant Thornton | National Pension Fund |

333.    The Registration Statements and Prospectuses issued in connection with the offerings detailed above were false and misleading in that they and/or omitted to state material facts required to be stated therein, contained untrue statements of material facts, and/or omitted to state facts necessary to make the statements made therein not misleading.

**Registrants**

334.    ARCP is the registrant for the each of the offerings listed in ¶332 above.  As the issuer of the all the securities except for the securities issued in the September 12, 2014 offering listed in ¶332  above, ARCP is strictly liable to plaintiffs and the Class for the misstatements and omissions in the applicable Registration Statements and Prospectuses.

335.    ARC Properties is an additional registrant of the securities registered in the September 12, 2014 Registration Statement listed above.  As the issuer of the securities issued in the September 12, 2014 Registration Statement listed above, ARC Properties is strictly liable to plaintiffs and the Class for the misstatements and omissions in the Registration Statement and Prospectus related to that offering.

**Individual Defendants**

336.    The Individual Defendants named in ¶332  above were responsible for the contents and dissemination of the Registration Statements and Prospectuses.  Each of the Individual Defendants signed or authorized the signing of the Registration Statements and Prospectuses, as described in ¶332  above, participated in the preparation and dissemination of the Registration Statements and Prospectuses.  As a signatory to one or more of the Registration Statements and Prospectuses as described in ¶332, each is liable to the plaintiffs and members of the Class for the misstatements and omissions contained within those Registration Statements and Prospectuses pursuant to §11 of the 1933 Act.

**Grant Thornton**

337.    Grant Thornton consented to the inclusion of its report on ARCP's false financial statements in the Registration Statements and Prospectuses in connection with the May 21, 2014 offering and September 12, 2014 exchange described in ¶332  above.

**Underwriters**

338.    The underwriter defendants named in this claim, underwrote the ARCP securities sold in certain of the offerings as described in ¶332  above and owed to the class members who acquired ARCP securities pursuant and/or traceable to those Registration Statements and Prospectuses, the duty to make a reasonable and diligent investigation of the statements contained in those Registration Statements and Prospectuses.

339.    The defendants named herein did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Registration Statements and Prospectuses used in the offerings described in ¶332 above and did not possess reasonable grounds for believing that the statements made therein were not false and/or misleading.

340.    Plaintiffs and members of the Class acquired the securities described in ¶332 above pursuant and/or traceable to the Registration Statements as described in ¶332.  As a direct and proximate result of the misrepresentations and/or omissions described in ¶332 above, plaintiffs and members of the Class suffered substantial damage in connection with their acquisition of the securities described in the ¶331 above.  As a result of the conduct herein alleged, each defendant named in ¶332 above violated §11 of the 1933 Act.

341.    At the time of their acquisition of the securities described in ¶332 above, plaintiffs and other members of the Class were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions prior to October 29, 2014.  Less than one year elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiffs filed the complaint. Less than three years elapsed between the time that the securities upon which this Claim is brought were offered to the public and the date the action was commenced.

## SECOND CLAIM FOR RELIEF
### for Violation of §12(a)(2) of the 1933 Act

342.    Plaintiffs incorporate ¶¶1-5, 12-75, 77-85, 99-105,117-119, 133-153, 176-179, 192-202, 204-212, 237-251, 253-258, 261, 263-264, 266-273, 277-280, 288, 292-293, 324-341 as though fully set forth herein.  For purposes of this Claim, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Claim is based solely on claims of strict liability and/or negligence.

343.    This Claim is asserted by plaintiffs pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C. §77l, on behalf of members of the Class.

344.    Plaintiffs and members of the Class purchased certain securities from the defendants as described below:

| Registration Statement For | Date | Individual Defendants/ Registration Statement Signatories | Defendant Underwriters | Named Plaintiff |
|---|---|---|---|---|
| $300 million 3% Convertible Senior Notes due 2018 | 7/2013 | Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman | J.P. Morgan, Citigroup, Barclays, BMO Capital, KeyBanc, JMP Securities, Ladenburg, RCS | Union |
| $287.5 million 3% Convertible Senior Notes due 2018 | 12/2013 | Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman | Citigroup, Barclays, Credit Suisse, Morgan Stanley, Wells Fargo, Capital One, JMP Securities | Union |
| $402.5 million 3.75% Convertible Senior Notes due 2020 | 12/2013 | Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman | Citigroup, Barclays, Credit Suisse, Morgan Stanley, Wells Fargo, Capital One, JMP Securities | Union |
| 79.1 million shares of stock issued in ARCT IV Merger | 1/2014 | Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Budko, Block, Beeson, Jones | | Paul Matten<br><br>Mitchell Ellis<br>Bonnie Ellis |
| 520.8 million shares of ARCP common stock issued in Cole Merger | 2/2014 | Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Kay, Budko, Block, Beeson | | TIAA-CREF<br><br>National Pension Fund<br><br>Corsair<br><br>KBC<br><br>Simon Abadi |
| 138 million shares of ARCP common stock issued in May 2014 Offering | 5/2014 | Schorsch, Weil, Stanley, Kahane, Andruskevich, Michelson, Rendell, Bowman, Sealy, Block, Jones | Merrill Lynch, Citigroup, Barclays, JP Morgan, Capital One, Credit Suisse, Deutsche Bank, Wells Fargo, Baird, Ladenburg, BMO Capital, JMP Securities, Janney, Mizuho, PNC Capital, Piper Jaffray, RBS, Baird | National Pension Fund<br><br>Tampa<br><br>Corsair<br><br>Simon Abadi |
| $2.55 billion of Senior Notes | 9/2014 | Schorsch, Stanley, Frank, Andruskevich, Michelson, Rendell, Bowman, Block, McAlister | | National Pension Fund |

345.    The Prospectuses and the Prospectus Supplements for the offerings described in ¶344 above contained untrue statements of material fact and/or omitted material facts.  Defendants named in the paragraph above did not conduct a reasonable investigation of the statements contained in and incorporated by reference in Prospectuses and Prospectus Supplements issued for each offering described in ¶344 above and did not possess reasonable grounds for believing that the statements

therein were true not false or misleading.  In particular, defendants named in ¶344 did not conduct a reasonable investigation into the accuracy of the statements regarding the Company's financial statements, AFFO and internal controls specified herein.

346.    Defendants described in ¶344 above were statutory sellers who sold and assisted in the sale of securities to plaintiffs and other members of the Class by means of the defective Prospectuses and Prospectus Supplements and did so for personal gain.

347.    Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths contained and/or omissions from the Prospectuses and Prospectus Supplements at the time plaintiffs acquired the ARCP securities.

348.    By reason of the conduct alleged herein, defendants described in ¶344 above violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiffs and the other members of the Class who purchased the securities described in ¶344 above pursuant to the Prospectuses and Prospectus Supplements sustained substantial damages in connection with their purchases of the securities.

349.    Plaintiffs and the other members of the Class who hold such securities have the right to rescind and recover the consideration paid for their securities, upon tender of their securities to defendants sued herein.  Class members who have sold their securities seek damages to the extent permitted by law.

350.    At the time of their acquisition of the securities described in ¶344 above, plaintiffs and other members of the Class were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions prior to October 29, 2014.  Less than one year elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiffs filed the complaint.

Less than three years elapsed between the time that the securities upon which this Claim is brought were offered to the public and the time the action was commenced.

### THIRD CLAIM FOR RELIEF
### for Violation of §15 of the 1933 Act

351.    Plaintiffs incorporate ¶¶1-5, 12-75, 77-85, 99-105,117-119, 133-153, 176-179, 192-202, 204-212, 237-251, 253-258, 261, 263-264, 266-273, 277-280, 288, 292-293, 324-350 as though fully set forth herein.

352.    This Claim is brought pursuant to §15 of the 1933 Act, 15 U.S.C. §77o, against ARCP, ARC Properties, AR Capital, RCS Capital, RCAP and the individuals described below:

| Registration Statement For | Date | Individual Defendants | Named Plaintiff |
| --- | --- | --- | --- |
| $300 million  3% Convertible Senior Notes due 2018 | 7/2013 | Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman | Union |
| $287.5 million  3% Convertible Senior Notes due 2018 | 12/2013 | Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman | Union |
| $402.5 million 3.75% Convertible Senior Notes due 2020 | 12/2013 | Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman | Union |
| 79.1 million shares of stock issued in ARCT IV Merger | 1/2014 | Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Budko, Block, Beeson, Jones | Paul Matten<br><br>Mitchell Ellis<br>Bonnie Ellis |
| 520.8 million shares of ARCP common stock issued in Cole Merger | 2/2014 | Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Kay, Budko, Block, Beeson | TIAA-CREF<br><br>National Pension Fund<br><br>Corsair<br><br>KBC<br><br>Simon Abadi |
| 138 million shares of ARCP common stock issued in May 2014 Offering | 5/2014 | Schorsch, Weil, Stanley, Kahane, Andruskevich, Michelson, Rendell, Bowman, Sealy, Block, Jones | National Pension Fund<br><br>Tampa<br><br>Corsair<br><br>Simon Abadi |
| $2.55 billion of Senior Notes | 9/2014 | Schorsch, Stanley, Frank, Andruskevich, Michelson, Rendell, Bowman, Block, McAlister | National Pension Fund |

353.    ARCP, ARC Properties and the individuals described in ¶352 above each violated §11 of the 1933 Act as alleged in the First Claim for Relief above.

354.    ARC Properties controlled ARCP, and served as the vehicle through which ARCP conducted its business, including raising capital.

355.    ARCP controlled ARC Properties, through its role as General Partner of ARC Properties.  ARCP and ARC Properties were, in turn, both controlled by AR Capital.  AR Capital and ARCP also shared executive officers and board members during the Class Period, including Schorsch, Weil, Kahane and Budko.

356.    ARCP, ARC Properties and AR Capital were each controlled by RCS Capital, the parent company entity which Schorsch and Kahane co-founded, and which Schorsch served as Chairman during the Class Period.

357.    At various times during the Class Period, Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Budko, Block, Beeson, Andruskevich, Kay, McAlister, Stanley, Frank and Sealy were executive officers and/or directors, and exercised control over, ARCP.

358.    Likewise during the Class Period, Schorsch, Weil, Kahane, Budko and Block were also executive officers and/or directors, and exercised control over, RCAP, AR Capital and/or RCS Capital.

359.    By virtue of the foregoing, the individuals described in ¶352 above each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of ARCP, ARC Properties, AR Capital, RCAP and/or RCS Capital including the content of the Registration Statements and Prospectuses for the offerings described in ¶352 above.

360. By reason of their control person status, as alleged above, ARCP, ARC Properties, AR Capital, RCAP, RCS Capital and the individuals named in this claim are jointly and severally liable for the underlying violations of the 1933 Act pursuant to §11 detailed in ¶¶331-40.

**FOURTH CLAIM FOR RELIEF**
**for Violation of §14(a) of the 1934 Act**
**and SEC Rule 14a-9 Promulgated Thereunder**

361. Plaintiffs incorporate ¶¶1-73, 80-85, 133-137, 145-153, 204-212, 237-257, 261-264, 266-272, 316, 318-323 as though fully set forth herein.

362. SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the 1934 Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

363. Plaintiffs allege that the defendants named below prepared, reviewed and/or disseminated false and misleading Proxy Statements, which Proxy Statements misrepresented and/or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading as detailed below:

| Proxy Statement | Defendants |
|---|---|
| Proxy Statement Related to the ARCT IV Merger dated 12/4/2013 | ARCP, Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Budko, Block, Beeson, AR Capital, Radesca, ARCT IV, Stanley, Wenzel, Tuppeny |
| Proxy Statement Related to the Cole Merger dated 12/23/2013 | ARCP, Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Kay, Budko, Block, Beeson, AR Capital, Radesca, Cole Inc., Cole, Nemer, Audruskevich, Sealy, Wood, Holland, Keller, McAllaster |

364. Each of the 12/14/13 and 12/23/13 Proxy Statements contained untrue statements of material fact and/or omitted to state facts necessary to make the statements made therein not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. The

Proxy Statements used to consummate the ARCT IV and the Cole Mergers were an essential link in the consummation of the Merger.

365.    The Proxy Statements described in ¶363 above violate §14(a) and Rule 14a-9 because they were materially false and/or misleading and were provided in at least a negligent manner.

366.    As a direct result of the defendants' preparation, review and dissemination of the false and/or misleading Proxy Statements as described in 363 above, the false and/or misleading Proxy Statement used to obtain shareholder approval of the ARCT IV Merger and Cole Merger deprived members of the class of their right to a fully informed shareholder vote in connection therewith.

367.    At all times relevant to the dissemination of the materially false and/or misleading Proxy Statements, defendants described in 363 above were aware of and/or had access to the true facts.  Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy Statements defendants described in 363 above used to obtain shareholder approval of the ARCT IV Merger and Cole Merger, plaintiffs and the class suffered damage and actual economic losses in an amount to be determined at trial.

368.    By reason of the misconduct detailed herein, the defendants described in ¶363 above are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

**FIFTH CLAIM FOR RELIEF**
**for Violation of §10(b) of the 1934 Act**
**and SEC Rule 10b-5 Promulgated Thereunder**

369.    Plaintiffs incorporate ¶¶1-64, 74-76, 80-138, 141-142, 145-152, 154-158, 160-178, 180, 183-199, 203-323 as though fully set forth herein.

370.    This Claim is brought by persons who purchased and/or acquired ARCP common stock, preferred shares and debt as well as transacted in options contracts during the Class Period against defendants ARCP, ARC Properties, Schorsch, Block, Beeson, Kay, McAlister, and Grant Thornton.

371.    During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they misrepresented and/or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

372.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers and/or acquirers of ARCP common stock, preferred stock and/or debt securities as well as those who transacted in options contracts during the Class Period.

373.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ARCP securities.  Plaintiffs and the Class would not have purchased and/or acquired ARCP securities at the prices they paid, or at all, if they had been aware that the prices those ARCP securities were trading at or were offered at had been inflated by defendants' misleading statements and/or omissions.

374.    As a direct and proximate cause of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases and/or acquisition of ARCP securities during the Class Period.

## SIXTH CLAIM FOR RELIEF
### for Violation of §20(a) of the 1934 Act

375.    Plaintiffs incorporate ¶¶1-64, 74-76, 80-138, 141-142, 145-152, 154-158, 160-178, 180, 183-199, 203-323, 369-374 as though fully set forth herein.

376. This Claim is brought against defendants ARCP, ARC Properties, AR Capital, RCS Capital and RCAP.

377. This claim is also brought against individual defendants Schorsch, Block, Weil, Kahane, Beeson, Kay, Michelson, Stanley, Rendell, Bowman, Andurskevich, Sealy and Frank.

378. The individuals named herein acted as controlling persons of ARCP, ARC Properties, AR Capital, RCAP and/or RCS Capital within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors, and/or their ownership interest in, ARCP, ARC Properties, AR Capital, RCAP or RCS Capital, the individuals named herein had the power and authority to cause these entities to engage in the wrongful conduct complained of herein.

379. ARC Properties controlled ARCP, and served as the vehicle through which ARCP conducted its business, including raising capital.

380. ARCP, in turn, controlled ARC Properties, the General Partner of ARC Properties. ARCP and ARC Properties were, in turn, both controlled by AR Capital. AR Capital and ARCP also shared executive officers and board members during the Class Period, including Schorsch, Weil, Kahane and Budko.

381. ARCP, ARC Properties and AR Capital were each controlled by RCS Capital, the parent company entity which Schorsch and Kahane co-founded, and for which Schorsch was Chairman during the Class Period.

382. By reason of such conduct, defendants described in ¶¶369-381 above are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives and Robbins Geller Rudman & Dowd LLP and Motley Rice LLC as Class Counsel;

B.      Awarding Plaintiffs and other members of the Class damages together with interest thereon;

C.      With respect to Claims for Relief I, II and III, an order that the Offerings be rescinded;

D.      Awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.      Awarding Plaintiffs and other members of the Class injunctive and other equitable relief, including rescission, as appropriate, in addition to any other relief that is just and proper under the circumstances.

## JURY TRIAL DEMANDED

383.    Plaintiffs hereby demand a trial by jury.

DATED: January 20, 2015                ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                        SAMUEL H. RUDMAN


                                        _____
                                        SAMUEL H. RUDMAN

                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone: 631/367-7100
                                        631/367-1173 (fax)
                                        srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
MICHAEL J. DOWD
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
miked@rgrdlaw.com

*Attorneys for TIAA-CREF and*
*[Proposed] Lead Counsel for the Class*


MOTLEY RICE LLC
WILLIAM H. NARWOLD (WN-1713)
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT  06103
Telephone:  860/822-1681
860/882-1682 (fax)
bnarwold@motleyrice.com

MOTLEY RICE LLC
DONALD A. MIGLIORI (DM-1098)
600 Third Avenue, Suite 2101
New York, NY  10016
Telephone:  401/457-7709
401/457-7708 (fax)
dmigliori@motleyrice.com

*Attorneys for Sheet Metal Workers' National*
*Pension Fund, Union Asset Management Holding*
*AG, and KBC Asset Management NV and*
*[Proposed] Lead Counsel for the Class*

LOWEY DANNENBERG COHEN
  & HART, P.C.
BARBARA J. HART
One North Broadway, Suite 509
White Plains, NY  10601
Telephone: 914/997-0500
914/997-0035 (fax)
bhart@lowey.com

*Attorneys for Corsair Select 100 L.P., Corsair*
*Select MF Ltd., Corsair Capital Partners L.P.,*
*Corsair Select L.P., Corsair Capital Partners 100*
*L.P., and Corsair Capital Investors, Ltd.*

- 130 -

STULL, STULL & BRODY
HOWARD T. LONGMAN
6 East 45th Street
New York, NY  10017
Telephone: 212/687-7230
212/490-2022 (fax)
hlongman@ssbny.com

*Attorneys for Berney Harris*


LEVI & KORSINSKY LLP
NICHOLAS I. PORRITT
30 Broad Street
24th Floor
New York, NY  10004
Telephone: 212/363-7500
866/367-6510 (fax)
nporritt@zlk.com

*Attorneys for Mitchell and Bonnie Ellis*

WEISSLAW LLP
JOSEPH H. WEISS
1500 Broadway, 16th Floor
New York, NY  10036
Telephone: 212/682-3025
212/682-3010 (fax)
jweiss@weisslawllp.com

*Attorneys for Simon Abadi*
MORGAN & MORGAN, P.C.
PETER SAFIRSTEIN
28 W. 44th St., Suite 2001
New York, NY  10036
Telephone:  212/564-1637
212/564-1807 (fax)
psafirstein@MorganSecuritiesLaw.com
*Attorneys for The City of Tampa General
Employees Retirement Fund*

JOHNSON & WEAVER, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY  10016
Telephone:  212/802-1486
212/602-1592 (fax)
scotth@johnsonandweaver.com

*Attorneys for Paul Matten*

- 131 -

## PLAINTIFF'S CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned, Marc Le Blanc, on behalf of Sheet Metal Workers' National Pension Fund ("SMWNPF"), declares the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed an amended complaint against American Realty Capital Properties, Inc. ("American Realty") and designate Motley Rice LLC as proposed lead counsel for SMWNPF in this action for all purposes.

2.      I am duly authorized to institute legal action on SMWNPF's behalf, including litigation against American Realty and the other defendants.

3.      SMWNPF did not acquire American Realty securities at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

4.      SMWNPF is willing to serve as a lead plaintiff and understands that a lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.   SMWNPF also understands that, if appointed lead Plaintiff in this action, it will be subject to the jurisdiction of the Court and will be bound by all rulings by the Court, including rulings regarding any judgments.

5.      SMWNPF will not accept any payment for serving as a representative party beyond its pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

6.      SMWNPF has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification, except as detailed below:

*City of Sterling Heights General Employees' Retirement System v. Hospira, Inc. et al.*, 11-cv-08332 (N.D. Ill. 2011);

*City of Westland Police and Fire Retirement System v. SAIC, Inc. et al.*, 12-cv-01353-DAB (S.D.N.Y. 2012);

*Construction Workers Pension Trust Fund – Lake County and Vicinity v. Navistar International Corp., et al.*, 13-cv-02111 (N.D. Ill. 2013);

*Bodner v. Aegerion Pharmaceuticals, Inc., et al.*, 14-cv-10105 (D. Mass. 2014);

*In re NII Holdings, Inc. Securities Litigation*, 14-cv-00227 (E.D. Va. 2014); and

*Irving Firemen's Relief and Retirement Fund v. Tesco PLC, et al.*, 14-cv-08495 (S.D.N.Y. 2014).

7.      SMWNPF understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by its decision to serve as a representative party.

8.      Attached hereto as Schedule A is a complete listing of all transactions SMWNPF made during the time period in the securities that are the subject of the amended complaint.  SMWNPF will provide records of those transactions upon request.

**I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.**

Executed this _19th_ day of _January_____, 2015.

_____

Marc Le Blanc
Fund Administrator
Sheet Metal Workers' National Pension Fund

**Schedule A**

**American Realty Capital Properties, Inc.**
**Time Period: 05/06/13 - 10/29/14**

| **Sheet Metal Workers' National Pension Fund** | | **Date** | **Shares** | **Price** |
|---|---|---|---|---|
| **(ISIN: US02917T1043)** | | | | |
| | Purchases: | 05/20/13 | 7,100 | $17.7700 |
| | | 05/21/13 | 1,700 | $17.7130 |
| | | 05/22/13 | 1,900 | $17.7857 |
| | | 05/28/13 | 4,000 | $16.8532 |
| | | 08/02/13 | 5,600 | $14.1033 |
| | | 01/23/14 | | |
| | | (1) | 65,028 | $14.5900 |
| | | 04/11/14 | 8,000 | $13.3586 |
| | | 05/21/14 | 30,100 | $12.0000 |
| | | 05/22/14 | 1,900 | $12.3643 |
| | | 05/23/14 | 1,900 | $12.3937 |
| | | 07/11/14 | 13,800 | $12.5684 |
| | | 10/15/14 | 9,900 | $11.6536 |
| | Sales: | 10/30/13 | 3,200 | $13.3984 |
| | | 11/26/13 | 500 | $13.2400 |
| | | 11/26/13 | 3,400 | $13.2762 |
| | | 11/27/13 | 3,100 | $13.2923 |
| | | 11/29/13 | 200 | $13.2062 |
| | | 12/02/13 | 5,700 | $13.3633 |
| | | 12/03/13 | 400 | $13.2735 |
| | | 12/03/13 | 3,400 | $13.3156 |
| | | 12/04/13 | 1,200 | $13.2487 |
| | | 12/05/13 | 1,000 | $12.9581 |
| | | 12/06/13 | 4,500 | $12.8199 |
| | | 12/09/13 | 2,900 | $12.8711 |
| | | 12/10/13 | 3,500 | $12.8376 |
| | | 12/11/13 | 2,300 | $12.6005 |
| | | 12/12/13 | 1,400 | $12.3818 |
| | | 12/13/13 | 2,500 | $12.5532 |
| | | 12/13/13 | 3,600 | $12.6279 |
| | | 12/16/13 | 800 | $12.7451 |
| | | 12/17/13 | 300 | $12.7817 |
| | | 12/18/13 | 800 | $12.8197 |
| | | 12/23/13 | 200 | $12.6524 |
| | | 12/24/13 | 500 | $12.7037 |
| | | 01/27/14 | 1,100 | $13.9405 |
| | | 02/11/14 | 1 | $13.7636 |

|  | 03/11/14 | 3,300 | $14.4515 |
|---|---|---|---|

**(ISIN: US03879QAA22 / US03879QAB05)**

| Purchases (US03879QAA22): | 09/16/14 | 4,000 | $100.1000 |
|---|---|---|---|
| Exchange US03879QAA22 Notes for US03879QAB05 Notes: | 10/15/14 | 4,000 | $100.0000 |

**(ISIN: US03879QAE44 / US03879QAF19)**

| Purchases (US03879QAE44): | 05/15/14 | 300 | $102.1500 |
|---|---|---|---|
|  | 05/15/14 | 200 | $102.1500 |
|  | 05/15/14 | 400 | $102.1800 |
|  | 05/15/14 | 300 | $102.1500 |
|  | 05/21/14 | 300 | $102.5000 |
|  | 05/28/14 | 300 | $103.2100 |
| Exchange US03879QAE44 Notes for US03879QAF19 Notes: | 10/15/14 | 1,800 | $100.0000 |

(1) Shares acquired from the CREI merger with an implied value of $14.59 per share.